IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | February 14, 2024 |
|  | ) | 9:30 a.m. Docket |
| Reorganized Debtor. | ) |  |
|  | ) |  |
|  | ) |  |
| DUGABOY INVESTMENT TRUST, | ) | **Adversary Proc. 23-3038-sgj** |
| et al., | ) |  |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) | THE HIGHLAND PARTIES' MOTION |
| v. | ) | TO DISMISS COMPLAINT [13] |
|  | ) |  |
| HIGHLAND CAPITAL | ) |  |
| MANAGEMENT, L.P., et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Defendants/<br>Movants: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY  10017-2024<br>(212) 561-7760 |
| For the Plaintiffs/<br>Respondents: | Deborah Rose Deitsch-Perez<br>Michael P. Aigen<br>STINSON, LLP<br>2200 Ross Avenue, Suite 2900<br>Dallas, TX  75201<br>(214) 560-2201 |
| Recorded by: | Michael F. Edmond, Sr.<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street, 12th Floor<br>Dallas, TX  75242<br>(214) 753-2062 |

2

Transcribed by:              Kathy Rehling
                             311 Paradise Cove
                             Shady Shores, TX   76208
                             (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

DALLAS, TEXAS - FEBRUARY 14, 2024 - 9:33 A.M.

THE CLERK:  All rise.  The United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session, The Honorable Stacey Jernigan presiding.

THE COURT:  Good morning.  Please be seated.  All right.  We have a setting this morning in the adversary styled Dugaboy Investment Trust and Hunter Mountain Investment Trust versus Highland, Adversary 23-3038.

We have the Highland Parties' motion to dismiss the adversary.

Who is appearing for the Movant, Highland?

MR. MORRIS:  Good morning, Your Honor.  It's John Morris from Pachulski Stang Ziehl & Jones for the Movant.

THE COURT:  All right.  Thank you.  And who do we have appearing for Plaintiffs/Respondents?

MS. DEITSCH-PEREZ:  Good morning, Your Honor.  It's Deborah Deitsch-Perez from Stinson.

THE COURT:  All right.

MS. DEITSCH-PEREZ:  And I would ask:  Is anybody else having a little trouble hearing?  The volume seems lower than usual here.

THE COURT:  All right.  It's loud and clear for the Court.  What about you, Mr. Morris?

MR. MORRIS:  It's no problem for me, Your Honor.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  Okay.  I'll just listen hard.

THE COURT:  All right.  Well, I assume these are the only appearances we have.

As a reminder to folks on the WebEx, if you're a party in interest, fine, you can use both video and audio.  But if you are not a case party in interest, the rules from Washington say it's supposed to be only an audio listen-in format for you.

All right.  So let me quickly talk about our time issues. I have to give a CLE presentation on the other side of downtown at 12:00 noon today, so I really need to stop at about 11:30 or 11:35.  You all have given a two-hour time estimate, so do you all think that is what you're going to need, an hour each?

MR. MORRIS:  I do, Your Honor.  I don't know that I'll need all that time, but I'll try and limit my opening remarks to 45 minutes and save 15 for rebuttal.

THE COURT:  All right.  What about you, Ms. Deitsch-Perez?  Any issues there?

MS. DEITSCH-PEREZ:  I would say the same.

THE COURT:  Okay.  Very good.  Well, with that, Mr. Morris, I'll hear from you.

OPENING STATEMENT ON BEHALF OF THE MOVANTS

MR. MORRIS:  Thank you, Your Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the Movant, Highland

Capital.

Your Honor, in the famous words of an old New Yorker, Yogi Berra, this is déjà vu all over again.  Less than eight months ago, this Court issued rulings that held that HMIT was not a Claimant Trust beneficiary because its contingent interests have not vested.  This Court ruled that HMIT was not in the money.  This Court ruled that HMIT's rights as a contingent trust holder were determined solely with reference to the Claimant Trust agreement, and under the Claimant Trust agreement's clear and unambiguous provisions, they have no rights today.

Now, in their complaint, HMIT and Dugaboy basically ask for the same relief that they sought last year.  They want information for the purported purpose of establishing that they are in the money, even though they told this Court last summer, based on available information, that they were in the money.  They want a declaration that the value of trust assets exceeds the value of the trust liabilities, and they want a declaration that their contingent interests are likely to vest.

And I'll talk more about this in a moment, but it's really interesting, if you look at the last footnote of their complaint, they expressly ask the Court not to rule as to whether or not they are Claimant Trust beneficiaries.  They only want the Court to rule in a declaratory judgment that

they're likely to vest.  We'll talk about that more in a minute.

We need clear rulings on each of these matters, on each of the bases for which Highland moves to dismiss this complaint, because, you know, obviously, saying it once or twice hasn't been enough, so we need to say it one more time, loudly and clearly.

I've got a deck that I'll ask Andrea Bates to put up on the screen.  I hope to go through it fairly quickly.

THE COURT:  Okay.

MR. MORRIS:  Ms. Bates, if you can put our deck up, please.

And I'd like to begin, once it's on the screen, just going through the three counts of the complaint.  These are the counts that we're seeking to dismiss.  They're -- they are, frankly, fairly straightforward.

(Pause.)

MS. BATES:  Apologies.  I got kicked out of the WebEx.

MR. MORRIS:  Okay.  (Pause.)  Okay, great.  If we can go to the next slide, please.

So, the first count, Your Honor, the first count of the complaint seeks the disclosure of trust assets and accounting, and an accounting.  In Paragraph 83, they make it clear, they say, due to the lack of transparency into the assets of the

Claimant Trust, Plaintiffs are unable to determine whether the contingent Claimant Trust interests may vest into Claimant Trust interests. That's really an important allegation, because it's a concession. And there are other concessions. If you look at Paragraph 66, for example, it's a concession that they're not Claimant Trust beneficiaries. They know that. Right? No dispute. But they're seeking information to determine whether they may vest. That's what they're asking for.

And the next piece of this slide is also important because they're not just asking for information about assets and liabilities. They're asking for "details of all transactions that have occurred." Even under their theory of trying to figure out if they're in the money, why could that possibly be relevant? Details of transactions that have occurred. You know, Your Honor, we were here before the Court last spring on the mediation motion, and I recall Your Honor specifically asking Ms. Ruhland, what information? Because they were seeking information then for the mediation. What information could you possibly need other than assets and liabilities? And she didn't really have an answer.

Your Honor asked us -- and ordered us, frankly -- to produce that information, and we did. And that's the information that we'll talk about in a moment that HMIT relied upon to represent to the Court that it believed that the

entity was in the money.

But the important point here is why are they asking for details about transactions that have occurred?  It's just a -- it's just -- when we talk about the equities at the end, I'm going to come back to that.

The important point here for Count One, Your Honor, they don't cite to or rely on any provision of the plan.  They don't cite to or rely upon any provision of the Claimant Trust agreement.  They don't cite to or rely upon any statute.  This is a purely equitable claim.

If we can go to the next slide, please.

Count Two seeks a declaratory judgment concerning the value of the assets relative to the liabilities, but it's a conditional request.  It requires that the Defendants be compelled to provide the information.  And that's what it says in Paragraph 90.  And it flows from that, according to them, that if assets exceed liabilities, all kinds of great things are going to happen.  All affirmative proceedings can be deemed unnecessary.  The bankruptcy court -- case can be brought to a close, and the bloodshed will stop.

But what's really interesting about this, and it portrays the intent of Hunter Mountain in this proceeding, is that they only want the affirmative proceeding to stop.  If you look at Paragraph 91, and it's quoted there in the footnote, they only want pending adversary proceedings and get recovering value of

the HCMF -- HC -- the Highland estate.

So, presumably, they'll be allowed, right, they'll get paid.  All creditors, according to them, if assets exceed liabilities, they get paid.  And then all of the indemnified parties have nothing to use to defend themselves under the indemnities.  That's what they're looking to do.  It's really clear.  And the Court should understand that they're not really ambiguous here.  They want to look at all of the transactions.  They want to, even under their theory that Class 8 and Class 9 should get paid, they should get everything else, there should be nothing left, and they should be able to continue to sue Mr. Seery and the Reorganized Debtor and the Claimant Trust and my firm from now until the end of time.  That's the motivation here.

Let's look at Count Three.  Count Three, they want a declaratory judgment regarding the nature of their interests in the Claimant Trust.  But not really.  But not really.  What they want is a declaration and a determination that there are conditions, that the conditions are such that the contingent interests are "likely to vest."  Again, if you look at the footnote, and we'll look at it in detail, they're again not asking the Court, because they know what the answer is going to be, they're not asking the Court to find that they are Claimant Trust beneficiaries, just that they are likely to vest at some point in the future.

They don't cite to or rely upon any provision of the plan. Again, they don't cite to or rely upon any provision in the Claimant Trust agreement or in any statute.  It's a purely equitable claim.

If we can go to the next slide.

The terms of the Claimant Trust agreement determine when and if Plaintiffs are Claimant Trust beneficiaries, full stop. Under the Delaware Statutory Trust Act, whether a party is a beneficiary here, a Claimant Trust beneficiary, is determined by the plain language of the governing instrument -- here, the Claimant Trust agreement.  And the plan, frankly, because the plan provisions matter in Articles III and IV.  They also provide the same conditions for vesting.

We cited in our papers a case called *Paul Capital Advisors*.  *Paul Capital Advisors* is from the Delaware Chancery Court.  And what's really interesting about that case, Your Honor, is in that case the plaintiff was seeking to remove a trustee.  A lawyer by the name of Michael Hurst defended that case, and Mr. Hurst -- who's a -- Mr. Ellington's counsel today; he was before Your Honor in December on the Ellington stalking matter; he's a longtime lawyer for Mr. Dondero -- Mr. Hurst actually urged the court to dismiss the case on the grounds that the plaintiff wasn't a beneficiary under the plain terms of that trust agreement.  And the court granted the motion to dismiss, just like the Court should grant the

motion to dismiss today.

So one of Mr. Dondero's own lawyers was in the Delaware Chancery Court making the exact same argument that we're making today, and that is, even referring to the *Restatement*, a trust's beneficiaries are the people who are defined as beneficiaries in the trust governing documents or that are otherwise reflective of the settlor's intent.  That's what *Paul Capital Advisors* holds.

Here, the settlor specifically decided to exclude HMIT and Dugaboy as holders of the Class 10 and 11 claims from the definition of Claimant Trust beneficiaries.  We know that. We're going to look at that language in a moment.

The Claimant Trust agreement includes very specific provisions concerning vesting, none of which refer to, concern, or are dependent on the value of the trust assets and liabilities at any moment in time.

Being in the money is legally irrelevant under the plain terms of the plan and under the plain terms of the Claimant Trust agreement and on the plain terms of the case that Mr. Hurst successfully argued in the Delaware Chancery Court known as *Paul Capital Advisors*.

If we can go to the next slide.

Let's look at the provisions.  Let's see.  Right?  Because one of the bases for the motion to dismiss is that they have no rights under the plan.  Neither Hunter Mountain nor Dugaboy

have any rights under the plan.  And, you know, if you follow *Capital Advisors*, and, really, just as the Court did last summer when it decided, I think properly and appropriately, that Hunter Mountain and Dugaboy's rights are determined solely under the provisions of the plan, let's just look at those provisions.

The Claimant Trust agreement, in Section 3.12, specifically says that the agreement doesn't require the Claimant Trustee to file any accounting.  That's the reasoning sought in Count One.  Can't do it.  No.  Right?  There's no obligation to do it.

If we can go to the next slide.

Section 3.12(b) provides -- requires the Claimant Trustee to provide quarterly reporting to Oversight Board and Claimant Trust beneficiaries.  Again, no allegation that Hunter Mountain or Dugaboy is an Oversight Board member.  No allegation that they're Claimant Trust beneficiaries.  In fact, the whole purpose of the complaint, supposedly, is to get information so that they can determine whether or not they're likely to vest.

So, there's a concession that they're not Claimant Trust beneficiaries.  And so only those two groups of people, Oversight Board members and Claimant Trust beneficiaries, are entitled to receive these quarterly reports.  And because Hunter Mountain and Dugaboy don't fall into either group, they

have no rights under Section 3.12(b).

Just to make it abundantly clear -- if we go to the next slide -- let's look at the definition of Claimant Trust beneficiary.  Again, this is right out of the Claimant Trust agreement, Section 1.1(h).  And it says, holders of allowed general unsecured claims or allowed subordinated claims, and only upon the certification of the Claimant Trustee that all holders of claims have been paid indefeasibly in full.  That's a reference to Class 10 and 11 with the holders of the former limited partnership interests.  Only then do they vest.  That's how they vest.  You've got to file this certification saying that everybody has been paid in full.

And they say, oh, gee, well, if assets exceed liabilities, that must mean they're in the money and the Trustee should just pay them in full.

But that's not what that trust agreement says.  And let's be clear.  The trust agreement and the plan were adopted and confirmed by this Court more than three years ago now.  It was the first week of February 2021.  Those documents were subject to appeal, but nothing we're talking about today is -- was ever the subject of appeals.  Right?  So these are the agreements.  They're sacrosanct.  The Delaware Chancery Court says you've got to follow the agreement.  So let's do that.

If we can go to the next slide.

Distributions.  So, right, the Claimant Trustee has to

certify that everybody has been paid in full.  But what about distributions?  When are they going to get paid in full? According to the plain and unambiguous terms of the Claimant Trust agreement, the Claimant Trust agreement shall distribute to holders of trust interests at least annually the cash on hand -- here's the important word:  net -- net of any amounts that, among other things, if you go down to (d), are necessary to satisfy or reserve for other liabilities incurred or anticipated by the Claimant Trustee, in accordance with the plan and this agreement, including but not limited to indemnification obligations.

So it doesn't matter if assets exceed liabilities.  We don't believe that they do.  We don't believe that there is any reason to even engage in the debate.  And the reason for that is because we've got substantial indemnification obligations that must be reserved for.  And if -- and -- and -- we'll talk about that more in a moment.

But that's the key.  That's the key here.  They don't vest.  Right?  Class 10 and 11 does not vest until the Claimant Trustee certifies that everybody has been paid in full.  And nobody is going to be paid in full as long as the Claimant Trust has indemnification obligations that must be satisfied.  The Claimant Trustee is a fiduciary.  He owes the beneficiaries of indemnification rights the duty to make sure that the Claimant Trust has sufficient assets to satisfy the

indemnification obligations.

And do you know who's not here today, Your Honor?  Any Claimant Trust beneficiary.  Any Claimant Trust beneficiary who would -- there is nobody here complaining that Mr. Seery is abusing his rights.  There's no -- nobody is complaining that he should be distributing the cash.  Nobody is complaining that, you know, he's overwithholding.  And we'll talk more about why, actually, what he's doing is proper, although that's not an issue before the Court today.  The only issue before the Court, frankly, is Section 6.1.  And it says the trust must reserve amounts necessary or deemed necessary to satisfy indemnity obligations.

If we can go to the next slide, please.

So now let's get to the motion to dismiss itself now that we have an understanding of exactly what the Claimant Trust agreement and the plan provide.  Let's look back at what the Court did.  The Court issued two very important rulings last year on these very issues.  And in the Court's lengthy decision on the Hunter Mountain motion for leave, the Court concluded, quote, HMIT's status as a beneficiary of the Claimant Trust was designed by the Claimant Trust agreement itself, pure and simple.  The Court was right then, and the Court will be right today when presumably it stands by its prior ruling.

Under the Claimant Trust agreement, contingent trust

interests have no rights until they vest.  And there's no dispute that they have not vested because the Claimant Trustee has not filed a certification that everybody is getting paid in full.  That's what the language of the document says.  We really are done here.

But there's more, because after that hearing Hunter Mountain made another motion and said, wait, Your Honor, those disclosures that you required Highland to make in support of mediation, they show we're in the money.  They've already swung and they've missed at this.  They said, oh, we're in the money.  And Your Honor, unlike HMIT, actually read the disclosures and actually saw all of the contingencies in there.

It's ironic that HMIT, of all people, would be telling the Court that they're in the money when their beneficial owners are actually appealing the $70 million Notes Litigation, when their beneficial owners are playing fast and loose with the value of assets that they control, such as HCRE.  Right?  But they're still here with the same tired story, maybe we're in the money.

Your Honor, you've ruled on this and we're done, as far as I'm concerned.  You found, among other things, that they failed to give proper attention to the notes to the financial statements that were integral to understanding the numbers.  I hope that they've done that now.

Your Honor ruled that they failed to take into account the widespread litigation that's caused massive indemnification claims and legal fees, all of which must be satisfied.

Based on this Court's decision less than five months ago -- I think it was actually eight months ago -- Counts One and Three are moot and they're otherwise barred by collateral estoppel.

If we can go to the next slide, please.

Count Two must also be dismissed because it depends on Highland being "compelled to provide information about the Claimant Trust assets."  That's in Paragraph 90.  So if the Court doesn't compel Highland, the Court has no ability to make the declaration that's sought.

But even if you could, right, there's -- Plaintiffs have no legally cognizable right.  They don't cite to anything. They don't have an equitable claim to compel Highland to provide trust -- the information.  There is no underlying controversy to be resolved.  They have no right to this information.  They have no equitable claim to this information.

As we set forth in Paragraph 39 of our moving brief, they can't come here seeking equity that's barred by the plain terms of the trust agreement.  The trust agreement, again, reflects the settlor's intent.  The settlor intended that he would provide or that the Claimant Trustee would provide

limited information to the claimant board members and Claimant Trust beneficiaries, of which neither Hunter Mountain nor Dugaboy are one.  They can't use equity to just override the very plain meaning of the operative documents and the intent of the settlor.

The Claimant Trust agreement is determinative.  Since the value of the trust assets and liabilities at any moment in time is irrelevant to the question of vesting, there is no justiciable controversy to resolve.

So, two reasons.  I don't think the Court can order Highland to produce any information, so it fails for that reason.  And even if it did, the whole issue is completely irrelevant, given the plain terms of the trust agreement and the plan, so there is no justiciable controversy.

If we can go to the next slide.

Some other grounds to dismiss Count One.  Right?  Again, no legal right to the information or an accounting.  Again, the request for equitable relief is barred by the plain terms of the trust agreement since they're not Claimant Trust beneficiaries.

And it's worth noting, as I mentioned earlier when we saw the very provision in the trust agreement, even Claimant Trust beneficiaries have no right to an accounting, or any right to any information beyond that provided in Section 3.12.  But, again, I don't want to suggest that Hunter Mountain or Dugaboy

have any entitlement.  It's just to contrast where actual trust beneficiaries lie vis-à-vis Hunter Mountain and Dugaboy.

If we can go to the next slide.

Other grounds to dismiss Count Three.  Again, in Count Three, Plaintiffs seek a declaration as to whether or not the Claimant Trust beneficiaries may be indefeasibly paid and whether the conditions are such that their claimant -- you know, contingent Claimant Trust interests are likely to vest into Claimant Trust interests, making them Claimant Trust beneficiaries, yet another admission that they're not Claimant Trust beneficiaries today.

These are inquiries that would require the Court to, among other things, handicap the likelihood of Mr. Dondero's appeal in the Notes Litigation and the amount that is going to be needed to satisfy future indemnity obligations.

I have a reference in this bullet to Docket No. 3880.  Your Honor, that's the other piece of information that I think the Court required Highland to produce in connection with the mediation, where we identified all of the outstanding litigation that we have.  You know, we are here today.  I was in Dallas two weeks ago before Judge Scholer to have oral argument on the Advisors' appeal of the judgment that was entered in favor of Highland and against them a couple of years ago.

We obviously had a lot of paperwork to deal with on the

motion for leave, you know, to sue my firm that was withdrawn in the face of a Rule 11 motion.

You know, these are all things that weren't even on that list.  We've got the appeal now of the original Hunter Mountain decision.  Again, with so many issues on appeal, I don't even know if the District Court will ever get to the standing question, because there's like literally dozens of issues on appeal.

We were in Houston last week for a Fifth Circuit argument on Your Honor's order conforming the plan to the original Fifth Circuit decision on confirmation.

All of these things are expensive.  Mr. Dondero is famous for complaining about how expensive this is, and yet he continues to drive these costs.  This hearing is making it much less -- it's making it less likely that he's ever going to be in the money.  Every time we have another court appearance, every time he files another complaint, every time he, you know, does things to cause us to spend money, his being in the money -- not that it's legally relevant; I don't want to make any suggestion that it is -- but that's why we need these indemnification reserves, because there is no end in sight.

We do have a vexatious litigant motion, Your Honor.  Hopefully, that will be successful.  Hopefully, that will curtail things in the future.  But, you know, remains to be

seen.  That's just something that we feel we need to do.

The Plaintiffs tacitly admit that these requests are for impermissible advisory opinions.  Obviously, they are.  Any time you're asking the Court to make a determination about what's likely to happen in the future that has no legal significance whatsoever, it's an advisory opinion.

And, again, this is what I referred to earlier.  If you look at Footnote 6 to Paragraph 94 of the complaint, oddly, they don't ask the Court to  determine that they're Claimant Trust beneficiaries.  Maybe it's because they've already admitted that they're not.  I don't know.  They're not asking the Court to convert their contingent interests into noncontingent interests.  Again, maybe because they're -- it's an acknowledgement and an admission that that can't happen.  But here's the tell, because those issues must be done in accordance with the plan and the CTA.  We agreed.  There's no dispute.  There is no judiciable, justiciable dispute here.  We agreed that all of these issues are decided by the plain terms of the plan.

I think that's my last slide, so you can take this down.

I just briefly want to finish up with just some observations about equities.  As a matter of law, equity can't trump contractual terms.  But if for some reason the Court even wanted to consider the question, I would ask the Court to take very seriously Hunter Mountain and Dugaboy's pleadings

where they're asking not for information regarding assets and liabilities, but they want a review of all of the prior transactions. They want to second-guess everything the Claimant Trustee has done to date. That smells. Right? And it's not the first time we've dealt with this issue. You know, Your Honor can take judicial notice of their pleadings in the Fifth Circuit when they were appealing that 2015.3 ruling. They explicitly told the Fifth Circuit they want information so that they can bring more claims. Right?

So there's not a good faith basis for this. There's not a legal basis for it. There's not an equitable basis for it. The Court has ruled on these issues multiple times already. There is no judiciable controversy before the Court. And for all of those reasons, the Court should just dismiss this complaint.

I have nothing further, Your Honor.

THE COURT: All right. Mr. Morris, you referred to the list of pending matters. And last night at 10:00 o'clock in bed, I meant to pull this up because it was referred to in one of the pleadings as well, and I didn't do it. Could you tell me the docket entry that appears at?

MR. MORRIS: Yeah, I think it's 3880. I apologize. I'm actually looking at my phone. I wouldn't typically do this, but I'm going to see if I can quickly find that. But I believe it's 3880.

THE COURT:  Okay.

(Court confers with Clerk.)

THE COURT:  Okay.  All right.  Ms. Deitsch-Perez?

OPENING STATEMENT ON BEHALF OF RESPONDENTS

MS. DEITSCH-PEREZ:  Thank you.  This adversary proceeding actually has deep roots.  It was started by motion a long time ago, long before that balance sheet was filed. And it was done because the Claimant Trustee and the estate have consistently obscured the available resources in order to make it harder for the residual equity holders to investigate whether the estate has been mismanaged, to their detriment.

THE COURT:  Did you say --

MS. DEITSCH-PEREZ:  Mr. Morris talked --

THE COURT:  Can I -- you said they've obscured the resources?

MS. DEITSCH-PEREZ:  Yes.  They've obscured what's in the estate.  If you -- we'll look more closely at that balance sheet, Your Honor.  In addition to not having filed the 2015 reports, the balance sheet, you're right, has a number of notes on it.  But the notes -- and we'll look at those and go through them -- don't -- don't -- aren't illuminating.  If you look at the face of the balance sheet, there is enough money to pay everybody and have money left over.

You have to rely on obscure, undetailed notes and assertions and assumptions to say maybe, maybe there won't be

money left over.  But on the face of the balance sheet, there is enough money to pay everybody.

And if there's enough money to pay everybody, the leftover money is HMIT's.  It's not -- it's not the professionals'.  It's not the Claimant Trustee's.  What's being used now is the residual -- old residual equity's money.

So Mr. Morris brought up mediation, and that was an interesting point, because in the papers, arguing about whether or not Your Honor should grant mediation, the estate and Mr. Seery made it very clear there would only be a resolution if there were complete and total releases given and all litigation stopped.  So that was clear.  We understood that.  And what was at stake, obviously, in any mediation is what's left.  So, what are the residual -- what's the residual?

But if we can't find out what the residual is and we can't find out what actually is being released, this estate can't ever end.  It's not the Plaintiffs here who are keeping the engine going.  It's the Defendants, because they know exactly how to push the buttons to raise suspicions about whether something untoward has gone on.

And so let me test the premise of the Defendants here with a hypothetical.  Because, remember, Defendants arguments for dismissal turn on the contention that the Claimant Trust agreement prevents Plaintiffs from being considered

beneficiaries, no matter how much money the Claimant Trust has -- or squandered, for that matter -- if Mr. Seery doesn't authorize payment of Class 8 and 9 creditors in full and affirmatively certify that Classes 10 and 11 are beneficiaries. So, unless he does that, it's the Defendants' position Plaintiffs have no means of redress.

So let's test that with a hypothetical. Let's say that Mr. Seery, let's say that the Claimant Trustee, to keep earning his $150,000 a month indefinitely, massively overspends professional fees to justify an objectively unreasonable indemnity reserve of $125 million. And let's say he deliberately dribbles out payments to Class 8 and 9 so that eventually the combination of interest, administration, and professional fees is sufficient to eliminate the amounts that would otherwise be payable to the last dollar of 8 and 9, much less Classes 10 and 11.

And let's make the hypothetical even more extreme. What if Mr. Seery moved money into the Indemnity Subtrust and paid it to phantom vendors? I'm not saying he did that. I don't want stories about how we're accusing him of something. This is a hypothetical. But let's say he did that. He put it in the subtrust, paid it to phantom vendors, who kicked it back to him, in order to keep the amount low enough to pay the last dollar to Classes 8 and 9.

Under the Defendants' theory here, that can't ever be

discovered, much less remedied.  And so that's why, that's why there is an equitable argument here, and a practical argument, Your Honor.

Because Your Honor has said you want this to end.  This has to end.  Well, the only way it can end is if there's sunshine, if there's enough disclosure and investigation so everybody can get comfortable that releases are appropriate and the money that could be left is left there, and then everybody can go home.  Because we are all really tired of this.  But it's the Defendants that are keeping it going.

THE COURT:  Let me interrupt you.  There are many jurisdictional arguments, as you all know.  Many issues for this Court, legal issues here.  But here are two things that stand out above all.  And one is do the Plaintiffs have a contractual right to the information they seek or not.  Why should the Court look beyond the Creditor Trust agreement, the plan, the confirmation order, which are final?  These issues were never complained about.  There's not enough transparency in the trust agreement language:  No one ever made that argument.  It's not on appeal.

So, again, many jurisdictional arguments here, but why should I ignore clear contractual terms here?  It almost feels like modifying the plan three years down the road.  So --

MS. DEITSCH-PEREZ:  It's not --

THE COURT:  So, --

MS. DEITSCH-PEREZ:  I'll say it's not, Your Honor. It's not, Your Honor, because under Delaware law and under the good faith and fair dealing, every contract in Delaware -- we're not in -- it's not a Texas contract -- in Delaware, there's a covenant of good faith and fair dealing.  And when a party to a contract actually does things that prevent someone else from obtaining the benefits under the contract, then you don't read the contract literally, you read it to prevent the wrongdoer from getting the benefit of their wrongdoing.  And that's --

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  That's the reason Your Honor can and must allow this case to go forward.  Because, otherwise, there is a terrible, terrible law that's being created.  It enables somebody to --

THE COURT:  Well, you say it's terrible law, but, again, the trust agreement was out there for consumption before the confirmation hearing.  And your clients --

MS. DEITSCH-PEREZ:  Well, --

THE COURT:  -- or others could have come in and said, this just doesn't work, this lack of transparency, this lack of oversight, this lack of access to information.  And you didn't.

MS. DEITSCH-PEREZ:  Your Honor, who would have thought that the --

THE COURT:  And not only that, but this is not -- I have no reason to believe this is atypical language.  In the dozens if not hundreds of post-confirmation liquidating trust agreements I've seen, it looks like standard fare.

MS. DEITSCH-PEREZ:  Your Honor, there is no -- no one could have contemplated at the time that we would be in the situation that we are now, with information not having been provided.  Many Chapter 11s are much more cooperative. They're not liquidations.  They're reorganizations.  They're -- people are trying to end the estate, so they're sharing information.  This is not a circumstance that could have been contemplated.  And Your Honor can do something about it now.

THE COURT:  Well, which brings me to my second sort of overarching issue that stands out, of all the different issues.  And these are my own words more than anything I think I've read.  It feels like what you're asking for, if there's a jurisdictional way to get there, if there's a legal way to get there, it feels like it would be a meaningless exercise, because the value in the trust is going down daily.  It's going down hourly, as we speak.  The value I could determine, if this goes to trial, would be completely meaningless a month, two months, five months, three years later, because of all the litiga...

MS. DEITSCH-PEREZ:  Your Honor, but on that theory --

THE COURT:  Please don't interrupt until I finish.  I

want to make sure my point is clear.  My law clerk --

MS. DEITSCH-PEREZ:  Okay.

THE COURT:  -- did bring in to me the list --

MS. DEITSCH-PEREZ:  I understand.

THE COURT:  -- the list of litigation.  And even this, if we pulled up the right one, it's several months old, so even this is very dated.

But let me put it in very plain terms.  It kind of feels like your client is its worst enemy in getting this relief, because your client, because of the fifty-something appeals and because of the motions for leave to bring litigation, is causing the value of this trust to plummet.  And we're never -- it seems like a meaningless exercise.  I'll never be able to make a declaratory judgment as your client wants me to, if I can get there legally and jurisdictionally.  How could I get to a point of being able to value the trust and value the likelihood, determine the likelihood that your client is in the money when the legal fees are going up hourly because of all of these appeals?

I'm not saying your client isn't entitled to appeal, but I'm just saying he may be his own worst enemy.  That strategy means he's probably never going to be in the money.

So these are my -- I just, I'm wanting you hopefully to focus on these two biggest overarching issues in my brain.  The trust agreement --

MS. DEITSCH-PEREZ:  Okay.

THE COURT:  -- says what it says.

MS. DEITSCH-PEREZ:  And I can do that, Your Honor.

THE COURT:  I'm supposed to respect contractual terms.  So that's overarching issue number one in my mind.

But second, again, I don't know what the legal term would be for meaningless exercise, but it's just, it's almost like an impossibility thing to ever declare a value that means anything when it's going to be different two weeks from now, --

MS. DEITSCH-PEREZ:  Your Honor, --

THE COURT:  -- a month from now, a year from now.

MS. DEITSCH-PEREZ:  Your Honor, it's not an impossibility.  That, one, we would endeavor to do this really quickly and efficiently so that the cost of this is not material to what's in the estate.

But secondly, these kinds of exercises are done all the time in litigation.  You estimate the future values.  You -- an expert can assist Your Honor in determining what is a reasonable indemnification reserve.  These are things that can be done.  This is what lawyers and judges do.

THE COURT:  This is off the chart.  This is not like any other situation I can think of.  This is off the chart with the amount of post-confirmation litigation.  I mean, if you can point me to something analogous out there, I'd love to

see it.

MS. DEITSCH-PEREZ:  The fact that there isn't a case exactly like this doesn't change the fact that there are professionals who can look at this, can look at what has been spent so far, can look at whether hearings could have two or three lawyers instead of ten, and make an estimate of the amount that's appropriate for an indemnity reserve.  That's something that's susceptible of proof and determination.

It's not impossible for Your Honor to decide that, and it's not fruitless.  Someone can say, hey, wait a minute, every hearing you had, you know, ten people from Pachulski and ten people from Quinn, even though they're no longer really involved, and ten people from Willkie.  And so if you can rein that in, the Court can say, this is what a reasonable indemnification would be and this is what's left.  And so, yes, it will finally create a path for us to resolve this estate.

But without this information, we're left with suspicion and uncertainty.  How do you resolve something when you don't even know what's left?  We don't -- because the reporting is quarterly, we've heard rumors in the marketplace that Class 8 has been paid in full.  So I would ask Mr. Morris, is that correct?  Has Class 8 already been paid in full?  We don't know.  I mean, can you tell us, what's the amount of the estate right now?  We don't know.  Because we don't know what

those notes mean.  And Your Honor isn't -- and Your Honor doesn't know and can't know without shedding a light on this what that balance sheet really means.

And Mr. Morris makes a big deal about, oh, there are admissions in the complaint then they don't know if they're in the money.  Your Honor, the complaint was filed before the balance sheet.  So when in the last proceeding HMIT said it's in the money, that's because it knew from the balance sheet it's in the money.  So you know now, you can look at that balance sheet and say on the face of it, okay, there is more -- there are more assets than liabilities.  In order to determine that that wouldn't be the case, you'd need a lot more information about what those notes that you point to in the denial of reconsideration actually mean.

But here, the estate is trying to say no, not only do the Plaintiffs not get to know that information, we're not telling Your Honor, either.  We're just putting a lid on it.  And so we can all go on fighting because we don't have the disinfectant of information.

And so -- and now we'll get into more of the law.  Your Honor asked, how can I do this?  Delaware law requires this Court to afford standing to all beneficiaries, including contingent ones.  And especially when it's alleged that vested status is being withheld in contravention of the duty of good faith and fair dealing.

So let's go to Slide 3.

Okay.  Let's take a look at where we started and why, why we're so upset about this.  If you look at the value of the estate as of June of '22, there was somewhere in the mid-$600 million in assets.  And at the start, there was something under $400 million in claims.  And so now, as of the end of '23 -- go back a second, go back, Mike, one more -- as of the end of '23, there was about $120 million of Class 8 and 9 remaining.  But remember, there was -- you know, if you subtract 400 from 650, you've got $250 million.  That's a pretty big cushion.

So let's go forward and look at what we know from the balance sheet.  So, if we -- and we've put references there.  But if we go through -- you can see from the face of the balance sheet there is a net value -- that's after everybody, 8 and 9 have been paid off -- of $122 million.  So, in order to get rid of that, you have to assume the indemnification is going to eat up all of that.

Now, think about what the indemnification means.  If in fact there was no wrongdoing, well, there'll be no judgment to indemnify.

THE COURT:  But what about the --

MS. DEITSCH-PEREZ:  If in fact --

THE COURT:  What about the professional fees?

MS. DEITSCH-PEREZ:  $122 million, Your Honor?

THE COURT:  Well, we're three years post-confirmation, with no end in sight to these appeals.

MS. DEITSCH-PEREZ:  Your Honor, I think it defies belief that they could reasonably spend $122 million.  And the point is, if we can get this information and really have satisfaction that maybe there's really nothing bad that's happened and there are no -- there's no hidden money anywhere, and we know what's there, this can end.  This can end.

THE COURT:  Do you --

MS. DEITSCH-PEREZ:  We can finally see the light at the end of the tunnel.

THE COURT:  I mean, again, we're here for legal argument, but you're saying this could end.  This is never going to end.  This is never going to end.  I stayed things in 2023, at your client's request, to take another crack at mediation.  Okay?  Even though we did mediation, even though I stayed everything in 2020 before confirmation and ordered global mediation and things didn't work out, your clients and Mr. Dondero convinced me, two years post-confirmation, stay everything again, because we don't think we got attention or respect from the mediators.  The Debtor was focused on other people, like UBS and the Redeemer Committee and Joshua Terry.

So I don't know what happened, and I don't want to know what happened.  It's not my role to know what happened in the most recent mediation exercise.  But I do know that it's

enough to convince me this will never end.  When things were stayed --

MS. DEITSCH-PEREZ:  And Your Honor, --

THE COURT:  When things were stayed and the legal fees weren't -- well, they were probably continuing to accrue because there were still appeal deadlines out there right and left that had to be addressed.  But it's not going to settle.  It's going to go on forever whether you get this information or not.

MS. DEITSCH-PEREZ:  Your Honor, I'm telling you, and I represent the Plaintiffs, that the only thing that can enable this to end is to have sufficient information to be able to say, okay, I know what this all means, I know what we'll get, I know what we're foregoing.

How can anything ever settle if you don't know what you're giving up and you don't know what you're getting?  How would that be possible?  How would that be fair to parties to say, you should settle but you don't know what you're giving up and you don't know what you're getting?  We're trying to get to the point where we could end this.

Shall I go on, Your Honor?

THE COURT:  Yes, please.

MS. DEITSCH-PEREZ:  Okay.  Mike, next slide.

Okay.  This is just a quick summary of the Defendants' arguments.  Mootness, collateral estoppel, advisory opinion,

standing, failure to state a claim, and unclean hands.

Let's go to the next.

Okay.  So, ironically, the Defendants argue that the balance sheet filed on July 6th eliminates the controversy among the party, parties, mooting the claims.  But that can't be true, and Defendants won't provide the information to fill out the notes on the balance sheet and when -- when the balance sheet on its face shows assets exceed liabilities but the Defendants continue to maintain that they don't but without any analysis of why that's so.

Let's go on to the next.

But the Defendants shouldn't be able to have it both ways. If the balance sheet and financial statements are insufficient to determine whether assets exceed liabilities, as they claim, then the claims can't be moot.  And, of course, a claim can't be dismissed simply because a defendant says in a pleading that a particular document shows that plaintiffs lack standing when the document itself does no such thing.

On its face, the balance sheet shows assets exceed liabilities.  But if there's any doubt or ambiguity, that means discovery is needed, not that claims should be dismissed.  This is a fact issue on which Plaintiffs are entitled to discovery and trial.

The next slide.

So, I mean, in response to the mootness arguments,

Plaintiffs cite cases that -- uncontroversial cases that say, when there's still a controversy, that claims are not moot. And if you'll look at Defendants' reply, they don't address any of that.

The Defendants also rely on the Court's order denying reconsideration of the HMIT gatekeeper regarding insider trading to say that it either moots Count Three or is the basis to collaterally estop Plaintiffs from proceeding. And there are numerous reasons that that's wrong.

So, one, the Court's dicta -- and it was dicta, because the Court had a lot of other reasons that it disposed of the matter -- is based on information that the Defendants now refuse to stand behind. And the Court's order doesn't address whether HMIT is in the money now or when the complaint was filed or whether it will ever. And it certainly doesn't exclude the potential that Plaintiffs would certainly be in the money but for Claimant Trustee's alleged breaches of good faith and fair dealing. So there's nothing about the Court's original or reconsideration order that precludes standing here.

Moreover, the order is obviously one that's on appeal and may be overturned.

Next slide.

If we look more closely at the requirements of collateral estoppel, Defendants are ignoring the basic elements of the

doctrine.  So, one, the question is, are the claims identical? And they're not, for the reasons that I mentioned.  The issues were obviously not necessary to the reconsideration decision since the Court stated it had several grounds for its decision.

More importantly, the Court's decision was made on a summary record in a gatekeeper proceeding.  The -- so there was no discovery on that issue.  And the Defendants have never fully detailed to the Plaintiff or the Court what's in the Claimant Trust, what's in the Indemnity Subtrust.  We don't know.

So the balance sheet is summary information.  The notes are not explained.  And no one, not the Plaintiffs, not the Court, has had an opportunity to test the data and assumptions there, including undisclosed contingent liabilities and $198 million in off-balance-sheet adjustments.

So let's go to the next slide.

So I just urge the Court to go back and look at the balance sheet.  And we have a picture of it up here.  But if you look at it, you'll see notes.  For example, Note 3.  Value reflected herein consists primarily of ownership in private funds and subsidiaries.  What funds?  What are their assets? How liquid?  Have they been sold?  For a loss or gain?  What's the resulting change in cash balance?

There's another note for other liabilities.  To whom are

they owed?  Note 5.  The amount of further incremental indemnification reserves are currently expected to exceed $90 million and may be greater.  $50 million?  $90 million?  $125 million?  What's the math?  What's the math behind that and how much has been used?  What's been put aside?  Who is getting it?

It says $35 million has been funded into the Indemnity Trust.  What's the balance now?  Did the additional funds reduce the value of the Claimant Trust?  Did the money come out of current earnings, so maybe it hasn't reduced it?

Incremental springing contingent liabilities that range from $5 to $15 million.  What are they?  How much?  When are they likely to crystallize?

These are among the questions that are unanswered from that balance sheet.

And let's go to Slide 12.

And so while -- Your Honor has pointed out many times that the August 25, 2023 opinion is very long, over a hundred pages, very detailed.  And I concede:  It is over a hundred pages.  It is long.  It has many sentences in it, and it has a lot of discussion.  But there's no analysis about the value of the assets and liabilities or the net value of the Claimant Trust or what has been moved into the Indemnity Subtrust or why and was it justified.  None of that is addressed.

The Court's October 6th opinion is short and it's cursory,

because it also doesn't analyze the value of the assets or liabilities or the net value of the Claimant Trust or what has been moved into the Indemnity Subtrust or why and whether it's justified.  It simply states HMIT does not give proper attention to the voluminous supplemental notes in the balance sheet that were allegedly, this is a quote, "integral to understanding the numbers therein."

But what do those supplemental notes mean?  The Debtor is vigorously shielding any scrutiny, while at the same time arguing that this Court's nonsubstantive reference to those notes collaterally estops Plaintiffs from bringing this action.  But without access to information with which to challenge the other side, a party doesn't have a full and fair opportunity to be heard, and therefore any ruling based on that kind of proceeding can't have collateral estoppel effect.

Okay.  So, again, this is just a summary.  No full and fair opportunity prevents collateral estoppel, and the fact that there were numerous other grounds and a lack of reasoning to the issue that's being asserted here should serve collateral estoppel makes collateral estoppel inappropriate.

Okay.  The Debtor also -- the Defendants argue that Count Three seeks an advisory opinion.  It doesn't.  It seeks a declaration concerning Plaintiffs' status that could be based on simple math from the face of the balance sheet that presently, presently there's enough money to pay everybody.

And so there would be a -- need to be a whole lot more explanation for the Defendants justifying why that's not the case.

So let's look at a hypothetical to see if Defendants' assertions about standing make sense. So let's say in a breach of contract case a broker fails to sell the plaintiff a million dollars' worth of shares that are at that time selling for a dollar each. Can the defendant move to dismiss, saying that plaintiff has no standing because the shares might go down in value, eliminating any damages? I'm sure Your Honor would say obviously not. But isn't that what the Defendants here are saying? It's -- they're saying it's possible they'll spend enough money to prevent the former equity from getting anything. But that doesn't mean that Plaintiffs lack standing now.

The Claimant Trust had sufficient assets to pay unsecured creditors in Class 8 and 9 in full, with interest, at least as early as mid-2023, maybe as early as September '22. Had Mr. Seery fulfilled his mandate, he should have distributed that and made the GUC certification. So Plaintiffs' contingent interests should have officially vested many months ago. And because of the duty of good faith and fair dealing, the Court --

THE COURT: What about Section 6.1 of the credit trust agreement?

MS. DEITSCH-PEREZ:  You have to imply -- you have to add into that a duty of good faith and fair dealing.  And so if Mr. -- if the Claimant Trustee has not taken those actions for the express purpose of making sure to silence -- trying to silence Class 10 and 11 and prevent them from getting money and being able to spend it all, you know, paying -- holding back enough to eventually pay a dollar -- a dollar less to Class 9, and using the rest of the money.  So, Your Honor, because of the duty of good faith and fair dealing, 6.1 does not tie Your Honor's hands.

And let's look at the Slide 16.

THE COURT:  The Trustee is required to reserve amounts necessary for indemnification obligations and the administration expenses of the trust are entitled to payment ahead of any classes under the plan.  Class 8, Class 9, as well as --

MS. DEITSCH-PEREZ:  Uh-huh.

THE COURT:  -- 10, 11.

MS. DEITSCH-PEREZ:  Your Honor, but is not -- is there not any limit on how much can be set aside?  Let's say there were -- there was $300 million left over.

THE COURT:  This is where I go back --

MS. DEITSCH-PEREZ:  Could a Claimant --

THE COURT:  -- to your client is in control of its own destiny here.  This --

MS. DEITSCH-PEREZ:  Well, basically, is Your Honor saying --

THE COURT:  This should all be over.  This should all be over, three years post-confirmation.  It should all be over.

MS. DEITSCH-PEREZ:  Yes.  And --

THE COURT:  They stayed --

MS. DEITSCH-PEREZ:  Yes.  And if we --

THE COURT:  They stayed the mega-lawsuit.  They stayed the mega-lawsuit for the reasons you are suggesting.

MS. DEITSCH-PEREZ:  The unjustified mega-lawsuit that shouldn't have been brought in the first place.  They stayed it.  Very nice.  They stayed it because they didn't -- they knew they didn't need that money.  They knew it was unjustified.  So they stayed it.

THE COURT:  So that would suggest to me proper exercise of business judgment, litigation judgment.  But they have no control over all of these appeals and all of the --

MS. DEITSCH-PEREZ:  But --

THE COURT:  -- litigation that your clients pursue.

MS. DEITSCH-PEREZ:  Your Honor, my clients pursue litigation because they don't have the information to know whether they're -- wrongdoing is occurring.  And the hallmark of this bankruptcy --

THE COURT:  That doesn't apply with regard to the

appeals.  And, again, --

MS. DEITSCH-PEREZ:  Yes.  And the appeals --

THE COURT:  -- if your client wants to appeal, that is what's beautiful about our system.  You can appeal and maybe get judgments overturned.  But --

MS. DEITSCH-PEREZ:  That's right.

THE COURT:  -- it's a strategy here.  Right?  As long as you keep doing that, --

MS. DEITSCH-PEREZ:  No, it's --

THE COURT:  As long as you keep doing that, HMIT and Dugaboy's contingent interests, any recovery on them is going to continue to become less and less likely.

MS. DEITSCH-PEREZ:  But so Your Honor, is Your Honor actually suggesting that they should lie down and not challenge anything to save a buck, and so if things have happened --

THE COURT:  No.  You heard what I said.  Appeal away. Appeal away.  No trial judge, no bankruptcy judge gets things right a hundred percent of the time.  So appeal away.  But don't complain about maybe not being in the money, when the greatest risk, it sounds like, to your client not being in the money is the professional fees continuing to impair value. And we could never get to a point in time where we could -- you know, again, my words earlier, meaningless exercise.  How could I ever make a declaratory judgment about value or the

likelihood of your client recovering as long as there are dozens of appeals continuing to cause the liabilities to increase, the expenses to increase?

MS. DEITSCH-PEREZ:  Your Honor, that's, I mean, --

THE COURT:  You're asking the Court to do something impossible.

MS. DEITSCH-PEREZ:  It's not impossible, because these appeals -- appeals like this happen all the time, and there are certainly professionals who are involved --

THE COURT:  Name one bankruptcy case in history where there have been this many appeals.

MS. DEITSCH-PEREZ:  It -- there don't -- there doesn't have to be another one with this many appeals.  You just look at the cost of an appeal in any case and figure out whether, with what's going on here, what is the appropriate amount to set aside for that cost.  It's eminently doable.  It doesn't -- we don't have to have an exact case to match it to.  We just need to have -- are there ever appeals of whether a release is overbroad?  Sure.  Are there ever appeals about whether a gatekeeper is appropriate?  Sure.  Are there ever appeals about whether the dismissal of a claim is appropriate?  Sure.  Those are all things that someone can look at and say, well, this is an appropriate amount to be spent on that, and so this is an appropriate amount to hold aside for resolving it.

But what we're saying is if we can get sufficient disclosure, we can figure out whether or not there -- it ought to be ended.  But without that, we're left saying, what's being hidden here?  What's actually left?  What's been done?  And so that's why -- and this is a problem that comes up in trusts all the time when there's not sufficient disclosure of what's in the trust.  So that's why, under the *Restatement of Trusts*, --

THE COURT:  Wait, wait, wait.  This is what happens all the time?  I don't know what kind of --

MS. DEITSCH-PEREZ:  Yeah.  In other words, that --

THE COURT:  What post-confirmation trust agreement that's been approved as part of a plan does this happen all the time?

MS. DEITSCH-PEREZ:  I'm not talking about -- about trusts in bankruptcies in particular.  I'm talking about --

THE COURT:  That's what we're dealing with here.

MS. DEITSCH-PEREZ:  Well, --

THE COURT:  And I'm just telling you:  One time, I've wracked my brains, and one time since I've been on the bench -- I'm coming up on my 18-year anniversary.

MS. DEITSCH-PEREZ:  Uh-huh.

THE COURT:  I'm old.  But one time I have had litigation about what the heck is going on with the post-confirmation creditor trust.

MS. DEITSCH-PEREZ:  Uh-huh.

THE COURT:  The facts were so very different.  It was a creditor trust agreement, and I think it had a three-year term on it.  The trust was going to be wrapped up in three years.  And Year 3 came along and there was a motion to extend it.  We're not done, we want to expand it, I don't know, six months, maybe a year.  And then that time frame went by and there was another motion to extend it.  So it was extended another year.  And then it happened again.

And a creditor objected, saying, I want to know what the heck is going on.  And I looked at the docket sheet and I'm like, gosh, there aren't any appeals out there, there's hardly any activity that's going on.  And so we had a hearing.  And the trustee was getting a flat fee that was rather large for the size of that estate, where unsecured creditors were probably going to get less than ten cents on the dollar.  And we ended up having another hearing where we find out that the oversight committee hadn't met in like three years and these creditors who are likely to get five cents on the dollar, they had just mentally checked out a long time ago.

And even in that situation, I was struggling with my power, my jurisdiction, to put any equitable oversight mechanisms in place when the creditors had voted on this, when the creditors got to see the creditor trust agreement before the confirmation hearing and no one complained.  And luckily,

that situation was resolved.  The creditor trustee said, we're going to wrap it up in six months.  I'm no longer going to take my compensation.  And it was some tax issue that no one had been focusing on properly, like I think maybe the company hadn't done tax returns in a gazillion years before confirmation.

But the point I'm getting at is, again, many, many legal issues out there, but the overarching issue I keep coming back to is there's a creditor trust agreement that everyone got notice of and the Court approved.  And contractual terms are something I'm supposed to respect.  And you're asking me, on an equitable basis, to overrule this.  This has maybe far-reaching effects for everyone who strikes a bargain in Chapter 11 with, Here's our plan, here's what the liquidating trust is going to be governed by, here's the hearing, speak now or forever hold your peace, I approve it.  And --

MS. DEITSCH-PEREZ:  You're right, Your Honor, that it has far-reaching effects.  And if you don't do something to shine a light on this and enable the disclosure and the hearing, you will embolden claimant trustees to do exactly what's happening here, maybe in even worse circumstances.  And the difference between the case you mention and the case here is -- actually weighs in favor of intercession sooner here because there is so much money involved.

So there's -- it's not a piddling amount that, you know,

where creditors are only getting a couple cents on the dollar anyway, so, you know, they're going to get three cents or two cents.  It's of less magnitude.  Here, there is an enormous amount of money that may be squandered.  And so it's more important to look hard at this and impose the covenant of good faith and fair dealing.

And that's why the *Restatement of Trusts* says that beneficiaries of a trust are -- include contingent beneficiaries.  And then if you take --

Let's go to the next slide, Mike.

Okay.  Delaware courts also look to *Black's Law Dictionary*.  And that's important here, because it actually includes contingent beneficiaries and direct beneficiaries within the definition, without any qualification, but expressly distinguishes an incidental beneficiary or someone who's going to be a beneficiary by virtue of a separate contract.  And nothing in the Claimant Trust agreement indicates that Plaintiffs are merely incidental beneficiaries.  And that's important because in that *Paul* case that Defendants rely on so heavily, they were incidental beneficiaries.  It was a separate document, not the trust agreement itself, that would give rise to the status of the plaintiffs.

And so Delaware -- go to 18 -- Delaware courts make a point of not -- of not reading statutory language restrictively to exclude classes of beneficiaries.  And so

while they are not absolutely on point, they are thematically on point, and to say that if someone is even a contingent beneficiary, they ought to have the rights that one has under the Delaware law.

And so -- go to -- move -- next slide.

And the duty of good faith and fair dealing is not disclaimed in the Claimant Trust agreement, and moreover, it cannot be disclaimed.  So that's something Your Honor has to take into account.  And the impact of a duty of good faith and fair dealing is that a party is basically estopped from raising a provision that they are using in conjunction with their own wrongdoing.

So if the Claimant Trustee is deliberately not paying out $8 million in full in order to keep an unreasonable amount in reserve and be able to be employed at $150,000 a month, you know, being paid the same thing now, when most of the liquidation has already been done, as, you know, when there were a million things going on and a lot of management.  So it does seem unreasonable, and the Claimant Trustee has the power to keep that going basically forever.

Next slide.

And so -- and when I said earlier, you know, this is a common thing, what I meant was cases like *Estate of Cornell* and *Edwards*.  It's just a -- it's a universal problem that you can prevent or postpone vesting unreasonably and prevent

distribution by your own acts.

And if you look at the Defendants' reply, there is not one word about these concepts, about whether or not the Court has the power and, really, must stop a trustee from raising their own interest over the interests of the beneficiaries, including the contingent beneficiaries.

Next slide.

So, and I really covered this to some degree, but Defendants' reliance on *Paul Capital*, which is an unpublished case, is misplaced.  The interests here are not incidental.  They're not derived from an outside contract.  The court in *Paul Capital* also relied on the fact that the trust agreement -- agreements in that case were fully integrated, which was a reason they didn't look to that outside contract.  But in fact, there's no merger clause in the CTA, so that's another difference.

Next.

Defendants' entire argument that Plaintiffs are not entitled to an accounting turns on its erroneous conclusion that Plaintiffs are not beneficiaries under the CTA.  And now they also point to -- which I don't believe they did in their papers -- they also point to the general rule that an accounting is not done as a matter of course.  But this Court has the power under Texas law to impose an accounting when there are questions, as there are here, that need to be

answered in order for the parties to make sensible decisions about what ought to be done going forward.

Then, unclean hands, it's a one-sentence argument in the Defendants' brief referring to the Kirschner litigation, which it doesn't actually identify by name and doesn't say anything about the fact that it was voluntarily stayed.  And the claim against HMIT, and it is breach of contract, so it's really hard to understand how being a defendant in a breach of contract action is unclean hands.  And the Plaintiffs made these points in response to Defendants' motion, and Defendants' reply brief is conspicuously silent of any rebuttal.

Okay.  So, Defendants' motion to dismiss needs to be denied so that Plaintiffs finally have a full and fair opportunity to challenge Defendants' assertion.

Even if this Court disdains Plaintiffs and sympathizes with the Claimant Trustee, the Court is making law here.  And as we've pointed out, the law would create this platform for claimant trustees to enshrine themselves and to do things under a veil of secrecy.  And that's not something that I would think this Court would want to do.

If there's enough money to pay all of Classes 8 and 9, the remainder belongs to Classes 10 and 11, not the estate professionals.  Money left over after --

THE COURT:  Let me ask you.

MS. DEITSCH-PEREZ:  -- Class 8 and 9 are paid --

THE COURT:  Again, that's just not entirely correct, because of 6.1.  It is in there that indemnification obligations must be reserved for.  And let me ask you:  How many times have your clients tried to sue Mr. Seery?

MS. DEITSCH-PEREZ:  I -- a couple.  And the point is if he --

THE COURT:  Only a couple?

MS. DEITSCH-PEREZ:  Yes.

THE COURT:  Only a couple?  So, --

MS. DEITSCH-PEREZ:  Yes.  But --

THE COURT:  So they're required to reserve amounts necessary.  How much is your client or your clients seeking to recover from Mr. Seery in those couple of lawsuits?  I think there have been more than two attempts.

MS. DEITSCH-PEREZ:  I don't think it's -- I don't think the -- I don't think the amounts sought are the issue.  It's -- it's there's -- and I'm not counsel of record in the insider trading case, but I don't remember a large amount.  The -- in the case we're bringing to --

THE COURT:  The insider trading case?  The insider trading case?  Are you talking about the Stonehill/Farallon thing?

MS. DEITSCH-PEREZ:  Yeah.  Yes.  I don't -- that -- you asked about every case where Mr. Seery is mentioned.  So I

don't think there's a big number there.  And the case --

THE COURT:  Wait, wait, wait.

MS. DEITSCH-PEREZ:  -- that I have --

THE COURT:  You don't think there is a big number there?  You don't remember the prayer for relief in that?

MS. DEITSCH-PEREZ:  I don't, Your Honor.  It's not -- I'm not the lawyer of record in the case.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  But let me point out, if --

THE COURT:  I think it was rather open-ended and large.  Okay?  But, and then there's the professional fees and expenses that have priority.

MS. DEITSCH-PEREZ:  Your Honor, --

THE COURT:  I mean, I just, I want to hear:  Are you asking me to disregard Section 6.1 on equitable grounds?  I think at bottom you are, and I just want to hear you answer that question.

MS. DEITSCH-PEREZ:  Your Honor, I'm going to answer that question, but I'm also going to point out that the indemnification, if in fact there is intentional wrongdoing that occurred, the estate is not obligated to indemnify.  If in fact the Claimant Trustee prevails in a claim or Mr. Seery prevails in a claim, there is no judgment to indemnify.  So we're only talking about professional fees.

And yes, Your Honor, you don't ignore 6.1.  You read it

with a duty of good faith and fair dealing applied in it, and that enables you to allow this case to proceed, which is necessary if we are ever going to end this matter.

And I will tell you, you asked about what's being sought from Mr. Seery.

THE COURT:  Can someone on your team -- can someone on your team tell me how many pending appeals there are right now?  Because the chart that I asked my law clerk to pull is several months old.

MS. DEITSCH-PEREZ:  We can -- I'm -- we can submit it after the fact, Your Honor.

THE COURT:  Okay.  I wanted to know right now, but --

MS. DEITSCH-PEREZ:  We'll send something.

THE COURT:  I wanted to know right now, when I'm --

MS. DEITSCH-PEREZ:  I mean, I don't know right now how many there are.

THE COURT:  Is -- are there a dozen?

MS. DEITSCH-PEREZ:  And I wouldn't want to try and count while I'm sitting here.

THE COURT:  Are there a dozen?  Can you say, are there more than a dozen?

MS. DEITSCH-PEREZ:  I don't know, Your Honor.  I think many of them have wound down, and so the only -- we're awaiting decision.  So I don't know.

But appeals, of their nature, are generally not that

expensive.  There's no discovery.  You write a brief.  You go and argue it.

THE COURT:  That is not my recollection whatsoever from reviewing fee apps for 18 years or for practicing law 17 years.  You know.  If --

MS. DEITSCH-PEREZ:  Your Honor, I agree, if there were not -- if the Defendants didn't bring six or seven people to New Orleans or Houston when there is an appeal, I would think that it would cost less.  There's no reason, in this day and age, where you can -- if you're only listening, you can -- you can do that from your office, because the Court provides an audio link.  There's no reason to have that many people travel clear across the country to go sit and listen to arguments.  So, is there a reason things cost more than they should?  Absolutely.  But that's not the Plaintiffs.

THE COURT:  Okay.

MS. DEITSCH-PEREZ:  This Court could look at what is left and say, you know what, in my experience, taking into account your 18 years, this is -- this is what this many proceedings should cost.  That's the amount of -- and even if you add a little cushion -- that's the appropriate amount of indemnity, and everything else can be distributed.  You can do that, Your Honor.  You have the -- there are professionals who could give expert testimony, and with that, between that and Your Honor's experience, you can figure that out.  It's not a

black box.

THE COURT:  All right.  Mr. Morris, your rebuttal, please.

MR. MORRIS:  Thank you, Your Honor.

If nothing else, counsel's presentation proved one thing, and that is this proceeding should be dismissed.  She insists -- she had her presentation up on the board -- that they're in the money.  We disagree.  We disagree both with the analysis and with its legal significance.

But just as HMIT contended last summer that they were in the money, counsel today is ratifying that and saying they're in the money.  If they're in the money, why do they need this information?  They don't.

Let me just start with the rebuttal, because it's going to be some random points just because I'm -- I've taken some notes.

The concept that three-plus years ago Heller Draper, Munsch Hardt, Bonds Ellis couldn't foresee that we would be here is mind-boggling, and, then, legally irrelevant.  You know who had the foresight to see that we might be here?  The Creditors' Committee.  They're actually the ones who drove this process on the Claimant Trust agreement.  It's why the agreement says exactly what it says.  It's an agreement between parties that defines the beneficial owners' rights and the limitations on those rights.

There is a reason that contingent trust beneficiaries are not owed any duty whatsoever until their claims vest and that they have no rights under the Claimant Trust agreement or the plan, at least as it pertains to the Claimant Trust agreement, until their rights vest.  The vesting process was not an accident.  It was intended to make sure that Mr. Dondero could not do exactly what counsel is making plain she wants to do today, and that is get information in order to second-guess every decision that Mr. Seery has made.  Okay?

Everybody on our side of the table knew, based on Mr. Dondero's very long history of litigation, that this was a possible end result, and they prepared for it.  That Mr. Dondero's lawyers did not is on them.  The Court should not be rewriting the agreement today.

Ms. Deitsch-Perez contends that somehow we have obscured resources.  No such thing has ever occurred.  Okay?  The plan and the Claimant Trust agreement provide very specific rules on what must be disclosed.  There are other rules that require disclosures.  There is no allegation whatsoever that the Claimant Trustee or the Claimant Trust has failed to meet its obligations to make the disclosures required under the Claimant Trust agreement and under the law.

And in fact -- this is another point that just gets obscured in all of this, like a suggestion that somehow Mr. Seery is some rogue guy doing stuff all by himself.  That's

false.  It's baseless.  There is a Claimant Oversight Board with an independent member and with two members who have a substantial stake in the Claimant Trust.  And there are many Claimant Trust beneficiaries, not one of whom is here to complain, not one of whom is concerned about the lack of disclosure, not one of whom is concerned about the reserves that have been made in this case.

There's really nothing more to talk about, but I have to respond to certain of the other points.  This notion that somehow assets that exceed liabilities are the property of HMIT is legally incorrect.  That's as polite as I can say it.  Your Honor focused on it.  6.1.  It is what it is.  But I do need to make the point that there is no way that anybody could make a reasonable estimate of indemnification claims.  It's not just appeals, Your Honor.  That's one aspect, and I appreciate Your Honor focusing on it.  But we have litigation in Guernsey.  We have litigation in the Southern District of New York.  We have, you know, these suits.  He doesn't want -- he is just looking for information.

He tried to sue my firm on this ridiculous theory that we were actually his lawyer way back in September 2019.  Like, really?  It was withdrawn in the face of a Rule 11 motion.  But you know what?  My firm incurred expenses defending itself.

These things don't stop.  There is another lawsuit to

remove Mr. Seery.  That's been stayed pending the outcome here, because just like they have no legal right or equitable claim to obtain any information from the trust, they have no legal right or equitable claim to remove Mr. Seery.  But we're going to have to do that.

The money in the trust is not HMIT's.  They have no legal or equitable claim to that money unless and until all senior claims and expenses are satisfied.  And that will not happen as long as there's pending litigation.

You know, you're encouraged to make an estimate.  What happens if your estimate is wrong, Your Honor?  What happens if you come up with a ruling and say the estimate is $50 million and that's what Mr. Seery reserves, because he's going to comply with any order this Court issues, and at the end of $50 million there's still litigation and he or other indemnified parties have been sued?  And now what?  Now what happens then?

That's why this is completely untenable and it has no basis in law, fact, or equity.

Dicta?  Your Honor's decision that HMIT was not in the money was dicta?  That was the whole basis for the motion. The motion sought reconsideration on the basis that they were in the money and therefore had standing.  It's not dicta. It's the holding, after an analysis of the balance sheet, after showing the faulty logic in HMIT's presentation.  That

it's a balance sheet, Your Honor.  It's not cash.  You don't spend what's on a balance sheet, you can't buy anything with what's on the balance sheet, because what's on the balance sheet is a bunch of contingent stuff.  Like the Notes Litigation.  $70 million.  They're here telling you they're in the money, and they treat that $70 million as being in the Claimant Trust's pocket.  It's not.  Not only is it not in the Claimant Trust's pocket, Mr. Dondero is doing everything he can to make sure it never gets in the Claimant Trust's pocket.

This is their disingenuous theory of what the balance sheet means.

Again, apologies for the somewhat disparate nature of the rebuttal.

Duty of good faith and fair dealing.  You've heard that a lot.  Where is it in the complaint?  What cause of action here is dependent on duty of good faith and fair dealing?  Nothing. You won't find it.  The words aren't there.  This is a request for information and two requests for declaratory judgment that assets exceed liabilities and that they may vest someday in the future.  Their complaint, the only thing that's the subject of this motion, has nothing to do with the duty of good faith and fair dealing.

The Kirschner action.  It was stayed.  But you know what, Your Honor?  It wasn't dismissed.  It was stayed because responsible parties like Mr. Kirschner and Mr. Seery said,

let's pause and see what happens.  There may come a time when we start that litigation.  There may come a time.  Right?  It wasn't dismissed.

So the notion that we've made a decision that it's not necessary is wrong.  The decision was made that we don't have to spend that money today.  Let's keep it on ice and let's see if we need to in the future.

Willkie.  We heard some disparaging remarks about Willkie's participation in these proceedings.  Well, you know what, Your Honor?  Mr. Seery, God bless him, never retained personal counsel in this case until HMIT sought leave to sue him.  Willkie is in this case only because Mr. Dondero made the decision to go after Mr. Seery.  Mr. Seery is entitled to indemnification, he has indemnification, and I'm delighted that the Willkie firm is by my side.

If Mr. Seery -- if Mr. Dondero has regrets about Willkie's participation, he shouldn't sue Mr. Seery anymore.  Maybe they wouldn't have such a role.

Listen to what they're saying, Your Honor.  Listen to Ms. Deitsch-Perez's hypotheticals.  What if they find out that there's overpayments to professionals?  What if there's payments to phantom vendors?  What if they learn someday that Mr. Dondero -- Mr. Seery has engaged in wrongdoing?  If this is what they want to hold out for, if this is what they want to continue to litigate for, because they think one day maybe

they might have something, somebody did something wrong, it's Mr. Dondero's prerogative.  But this is not a vehicle to give him information to pursue those claims.  It's just not.

Standing.  There's no standing motion here. We're not saying dismiss this because they don't have standing to spring the claims.  We're saying that they don't have any legal right to seek information because of the plain terms of the Claimant Trust agreement and the plan.  It's not a standing question, it's about whether they have a legal right, and the plain terms of the operative documents state definitively that they do not.

They can't settle without the information.

(Pause.)

THE COURT:  Whoops.  We just lost you, Mr. Morris. We just lost your sound.

MR. MORRIS:  Okay.  Am I back?

THE COURT:  You're back.

MR. MORRIS:  Okay.  People settle claims, known and unknown, all the time.  Okay?  Mr. Dondero should look at his success rate in litigation in this case and decide what he's really holding out for.  He should look at the success in bringing the suit against my firm.  He should look at what happened when we had the evidentiary hearing in Hunter Mountain and it was revealed that he was actually the party who engaged in inside information.  He was actually the person

who lied to Mr. Seery about what was happening with MGM.  He should think about his lack of success, the lack of merit, what happened in the Notes Litigation, how ridiculous the supposed oral agreement defense was.  He should ask Mr. Rukavina how the hearing went in front of Judge Scholer last week on the appeal.

And he's holding out for more claims?  This is what he wants to do for his life?  God bless him.  We will reserve everything.

Mr. Dondero is not the principal.  He doesn't get some final say over the propriety of the actions of the Claimant Trustee or my firm.  He doesn't have that right.  That's what the Claimant Trust agreement was intended to do.  It reflects the settlor's intent.  And the settlor's intent was that Mr. Dondero or Hunter Mountain or Dugaboy would get a check at the end of the day if and when all senior claims and expenses were paid and satisfied.  That has not happened, so they don't get a check.  It's really that simple.  It may be hard for him to take, and I appreciate that, but he should have thought about these issues three-plus years ago when all of this was proposed, because other people thought about it, and here we are.

And the Court has, I respectfully say, no authority, no jurisdiction to override the plain terms of an agreement that has been affirmed by this Court and has been affirmed by the

Fifth Circuit Court of Appeals.  There has never been a challenge to these provisions that they just want you to completely ignore.

Just one moment, Your Honor.

(Pause.)

MR. MORRIS:  Your Honor, I actually have nothing further unless the Court has any questions.

THE COURT:  Okay.  I only have one question.  And let me preface it by saying that I don't pay much attention to appeals and satellite litigation unless something is brought to me.  I mean, there just are not enough hours in the day for me.  Plus it's just, it's not of my concern.  Right?  An appellate court is going to do what it's going to do and issue a mandate to me at some point, if appropriate.  And the same with satellite litigation.  It's either going to somehow be brought before me or not.

So you may think that I'm aware, lawyers, parties may think that I'm aware at all times of different things going on out there, but I'm really only sort of aware.  I don't know how many pending appeals there are right now.  But I do know that someone who seemed to know what he was talking about, another judge in Texas, not here, told me that Highland has spawned more appeals at the Fifth Circuit than any other -- I don't know if he said bankruptcy case in history or Chapter 11.  And he said, are you proud of that?  Hahaha.  And I said

no.  I'm not even remotely proud of that.  And I haven't double-checked his figures, but he's kind of a numbers wonky lovable geek, so I think he probably knew what he was talking about.

But finally getting to my question, Mr. Morris:  You alluded to there's a vexatious litigant motion pending, and you reminded me I heard about that at a hearing many months ago.  I think you said it was before Judge Brantley Starr, a district judge here in this district.  Is that correct?

MR. MORRIS:  It is correct, Your Honor.  And we filed our reply papers last Friday, so it's been fully briefed.

THE COURT:  Okay.  Well, even though I don't closely monitor appeals, satellite litigation, I may be monitoring that.

MS. DEITSCH-PEREZ:  Your Honor, may I make one rebuttal, by the way, to Mr. Morris's presentation?  I just have one comment.

THE COURT:  If it's 30 seconds.  But this is out of order.  Usually, Movant goes last.  I assume this is going to be hugely important.

MS. DEITSCH-PEREZ:  It is important.  It's something Your Honor raised and Mr. Morris raised, so I want to point something out so there is no misunderstanding.  There was a lot of talk about, well, the Plaintiff should have done something about this at the time of the plan.  If Your Honor

recalls, at the time of the plan the projections were that Classes 8 and 9 would recover a fraction of their value.  So there was no reason Classes 10 and 11 should be -- should have anticipated the issues that have arisen now.  And I just want to remind everybody of that.

MR. MORRIS:  And just one sentence, Your Honor.  Mr. Dondero acquired every single asset that Highland has.  He was in Highland's offices with full access to all information through October.  He had Mr. Waterhouse, the CFO, onsite until just before the confirmation hearing, and there was no objection to those projections.

What happened is Mr. Seery and his team did a great job and benefited from a rising market, and yet here we're going to be subjected to more litigation.  It's brilliant.

THE COURT:  All right.  Well, I am finished hearing everything.  And with respect to that comment for the Plaintiffs, I continue to think this is a very important issue, of the many issues, of the many jurisdictional issues here.  And there are so many issues, I'm not sure, if you prioritize the issues, where this one falls on the list.  And yet as a bankruptcy judge I am obsessed a bit with the issue of the impact on the Chapter 11 world.

We have liquidating Chapter 11s with -- or even if they're not liquidating, we have Chapter 11s where there's a litigation trust like this one where there is sometimes a

discussion, when are you going to get the creditor trust agreement on file?  Oh, it's going to be part of a plan supplement, and the plan supplement will be filed, you know, ten days before the confirmation hearing.  Whatever.  I'm just giving you a typical fact pattern.  And it's part of the evidence.  It's part of the information.  It's not just evidence at the confirmation hearing.  It's usually on file several days before the confirmation hearing, where it's out there for consumption, for people to complain about if they think there are objectionable terms.  And we just have this in dozens and dozens of cases.

And I can even go further back in my brain here.  I mean, Chapter 11, very soon after the case was filed, we had a U.S. Trustee saying conversion to Chapter 7 or appointment of a Chapter 11 trustee.  You know, we can't have Mr. Dondero as the manager of this Debtor anymore.  And despite that argument, we put in place a corporate governance mechanism that Mr. Dondero agreed to.  And my point is there's always been a huge amount of oversight by what we considered the fulcrum security here, the unsecured creditors.  A huge amount of oversight.  A huge amount of oversight in this case that was negotiated in response to a very active Creditors' Committee and a U.S. Trustee saying can't have a debtor-in-possession here.

So why do I go back?  I mean, it's really troublesome for

any judge to hear, We have suspicion.  We are worried about a breach of good faith and fair dealing.  What if there are fictional vendors?

I mean, this case has been full of extensive oversight. And not only could the Plaintiffs here have complained about the terms of the creditor trust agreement, heck, they could have said convert this sucker to Chapter 7, because a Chapter 7 trustee will have -- there will be a lot of transparency for everything that happens in winding down this estate.

So, rambling, yes, I'm rambling.  I do that.  But the philosophical issue here, I just, it's hard for me to ignore, because, looming, we have the jurisdictional issues, but what you're asking me to do is something that it's just a fact pattern we see all the time of plans with litigation trust agreements.  And we all know what the terms are going to be, and we can all argue about those terms if we don't think they're appropriate, and we all know that the future is uncertain and things could change, and that's just the way it is.  Here it is.  Live with it or not.

Anyway, but so that's a big deal, the contractual rights here.

And as I said earlier, another kind of overarching issue is it feels like kind of a meaningless exercise when we have the asset side of the balance sheet but the liabilities just grow unlike any other case.  It's fair to say unlike any case.

There have been more appeals generated at the Fifth Circuit from this case than any Chapter 11 ever, and maybe any bankruptcy ever.

There was a reference to, well, yeah, there are lots of appeals, but you don't need to send six lawyers to New Orleans or have people.  But I was just writing down as I was thinking through this, and Mr. Morris alluded to some of it, we've had at least the following law firms involved for either Mr. Dondero or entities he controls:  Munsch Hardt; Bonds Ellis; Heller Draper; Louis Phillips' firm, I think that's Kelly Hart; the Stinson law firm; Sawnie McEntire's law firm; Ms. Ruhland, Amy Ruhland; Lang Winshew; and I forget the name of the lawyers who represented the Charitable Trusts.

MR. MORRIS:  Mazin Sbaiti.

THE COURT:  The Sbaiti law firm.

So I've just rattled off from memory nine law firms, okay?  I'm not even sure I've captured them all.  Probably not.  So it's, on all sides of this, I can't remember if I've said this in court or I've just maybe said it back in chambers, but I'll say it:  This feels like the Disneyland case.  Have I ever said that in court yet?  Do you know what I mean by that?  I probably haven't.

The famous quote of Walt Disney, when someone asked him about the theme park and when it would be finished, and he said, Disneyland will never be finished as long as there are

creative people with imaginations.  I mean, this is like the Disneyland case.  It will never be finished as long as there are certain parties and lawyers who have imagination and keep filing stuff.  I don't mean to be flippant, but I really am trying to emphasize what I said.  Sure, people are entitled to appeal, but how can you complain about 'I don't know if I'm in the money or not' when there's just no end in sight?

So I'm going to obviously take this under advisement, and we will carefully look at every argument and every case, because that's what we do.  That's what we're duty-bound to do.  We don't knee-jerk anything around here.  But I am very, very troubled by some of the arguments.  And it's what made me ask about the vexatious litigant motion and its status, because it just feels so beyond the pale to make accusations of some sort of breach of good faith and fair dealing and raise the specter of lack of transparency and something untoward may be going on, when these were the terms negotiated as far as post-confirmation oversight, we have an Oversight Committee, and I think every rational person knows that the professional fees and the indemnification obligations and the appeals and the satellite litigation are why we can't wrap this up.  Okay?

So let that soak in.  And we will get an opinion out as soon as we can make it happen.

All right.  We're adjourned.

THE CLERK:  All rise.

(Proceedings concluded at 11:28 a.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling**                                    **02/20/2024**

_____     _____
Kathy Rehling, CETD-444                                 Date
Certified Electronic Court Transcriber

73

INDEX

PROCEEDINGS                                                      3

OPENING STATEMENTS

By Mr. Morris                                                    4
By Ms. Deitsch-Perez                                           23

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

The Highland Parties' Motion to Dismiss Complaint to          67
(I) Compel Disclosures About the Assets of the Highland
Claimant Trust and (II) Determine (A) Relative Value
of Those Assets, and (B) Nature of Plaintiffs' Interest
in the Claimant Trust [13] - *Taken Under Advisement*

END OF PROCEEDINGS                                             72

INDEX                                                          73