

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 25, 2023**

_____
**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | **Case No. 19-34054-sgj-11** |
| Reorganized Debtor. | § | |

**MEMORANDUM OPINION AND ORDER PURSUANT TO PLAN "GATEKEEPER
PROVISION" AND PRE-CONFIRMATION "GATEKEEPER ORDERS": DENYING
HUNTER MOUNTAIN INVESTMENT TRUST'S EMERGENCY MOTION FOR
LEAVE TO FILE VERIFIED ADVERSARY PROCEEDING[1]
[BANKR. DKT. NOS. 3699, 3760, 3815, and 3816]**

## I.    INTRODUCTION

BEFORE THIS COURT is yet another post-confirmation dispute relating to the Chapter

11 bankruptcy case of Highland Capital Management, L.P. ("Highland" or "Reorganized Debtor").

_____

[1] On August 2, 2023, this court signed an Order [Bankr. Dkt. No. 3897] that was agreed to among various parties, after the filing of a Motion to Stay and Compel Mediation [Bankr. Dkt. No. 3752] filed by James D. Dondero and related entities. Pursuant to paragraph 7 of that order, certain pending matters in the bankruptcy court are stayed pending mediation. The parties did not agree to stay the matter addressed in this Memorandum Opinion and Order.

It is now more than two and half years since the confirmation of Highland's Plan[2]—the Plan having been confirmed on February 22, 2021.[3] The Plan was never stayed; it went effective on August 11, 2021 ("Effective Date"), and it was affirmed almost in its entirety by the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit"), in late summer 2022, including an approval of the so-called Gatekeeper Provision[4] therein. The Gatekeeper Provision—and how and whether it should now be exercised or interpreted to allow a certain lawsuit to be filed—is at the heart of the current *Emergency Motion for Leave to File Verified Adversary Proceeding* [Bankr. Dkt. Nos. 3699, 3760, 3815, 3816] (collectively, the "Motion for Leave") filed by a movant known as Hunter Mountain Investment Trust ("HMIT").

*A.      Who is the Movant, HMIT?*

Who is HMIT? It is undisputed that it is a former equity owner of Highland. It held 99.5% of Highland's Class B/C limited partnership interests and was classified in a Class 10 under the confirmed Plan, which class treatment provided it with a contingent interest in the Highland Claimant Trust ("Claimant Trust") created under the Plan, and as defined in the Claimant Trust Agreement. This means that HMIT could receive consideration under the Plan if all claims against Highland are ultimately paid in full, with interest. As later further discussed, it is undisputed that

---

[2] Capitalized terms not defined in this introduction shall have the meaning ascribed to them below.

[3] The court entered its *Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (II) Granting Related Relief* ("Confirmation Order")[Bankr. Dkt. No. 1943].

[4] In an initial opinion dated August 19, 2022, the Fifth Circuit affirmed the Confirmation Order in large part, "revers[ing] only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties from the plan's exculpation, and affirm[ing] on all remaining grounds." *In re Highland Capital Management, L.P.*, No. 21-10449, 2022 WL 3571094, at *1 (5th Cir. Aug. 19, 2022). On September 7, 2022, following a petition for limited panel rehearing filed by certain appellants on September 2, 2022, "for the limited purpose of clarifying and confirming one part of its August 19, 2022 opinion," the Fifth Circuit withdrew its original opinion and replaced it with its opinion reported at *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th 419, 424 (5th Cir. 2022). The substituted opinion differed from the original opinion only by the replacement of one sentence from section "IV(E)(2) – *Injunction and Gatekeeper Provisions*" of the original opinion: "The injunction and gatekeeper provisions are, on the other hand, perfectly lawful." was replaced with "We now turn to the Plan's injunction and gatekeeper provisions." In all other respects, the Fifth Circuit panel's original ruling remained unchanged. Petitions for writs of certiorari regarding the Confirmation Order have been pending at the United States Supreme Court since January 2023.

HMIT's only asset is its contingent interest in the Claimant Trust.  It has no employees or revenue. HMIT's representative has testified that HMIT is liable on more than $62 million of indebtedness owed to The Dugaboy Investment Trust ("Dugaboy"), a family trust of which James Dondero ("Dondero"), the co-founder and former chief executive officer ("CEO") of Highland, and his family members are beneficiaries, and that Dugaboy also is paying HMIT's legal fees.  HMIT vehemently disputes the suggestion that it is controlled by Dondero.

> B.      *What Does the Movant HMIT Seek Leave to File?*

HMIT seeks leave to file an adversary proceeding ("Proposed Complaint")[5] in the bankruptcy court to bring claims on behalf of itself and, derivatively, on behalf of the Reorganized Debtor and the Claimant Trust for alleged breach of fiduciary duties by the Reorganized Debtor's CEO and Claimant Trustee, James P. Seery, Jr. ("Seery") and conspiracy against: (1) Seery; and (2) purchasers of $365 million face amount of ***allowed*** unsecured claims in this case, who purchased their claims post-confirmation but prior to the occurrence of the Effective Date of the Plan ("Claims Purchasers,"[6] and with Seery, the "Proposed Defendants"). To be clear (and as later further explained), the claims acquired by the Claims Purchasers were acquired by them after extensive litigation, mediation, and settlements were approved by the bankruptcy court and after the original claims-holders had voted on the Plan and after Plan confirmation.  As later explained,

---

[5] In its original Motion for Leave filed at Bankruptcy Docket No. 3699 on March 28, 2023, HMIT sought leave to file the proposed complaint ("Initial Proposed Complaint") attached as Exhibit 1 to the Motion for Leave.  Nearly a month later, on April 23, 2023, HMIT filed a *Supplement to Emergency Motion for Leave to File Verified Adversary Proceeding* ("Supplement") [Bankr. Dkt. No. 3760], a revised proposed complaint as Exhibit 1-A, and stating that "[t]he Supplement is not intended to supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action." Supplement, ¶ 1 and Exhibit 1-A.  It is this revised proposed complaint to which this court will refer, when it uses the defined term "Proposed Complaint," even though HMIT filed redacted versions of its Motion for Leave on June 5, 2023 at Bankruptcy Docket Nos. 3815 and 3816 that attached the Initial Proposed Complaint as Exhibit 1.

[6] The Claims Purchasers identified in the Proposed Complaint are Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which is a special purpose entity created by Farallon to purchase allowed unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which is a special purpose entity created by Stonehill to purchase allowed unsecured claims against Highland.

3

the Claims Purchasers filed notices of their purchases as required by Bankruptcy Rule 3001(e)(2), and no objections were filed thereto. In any event, various damages or remedies are sought against the Proposed Defendants revolving around the Claims Purchasers' claims purchasing activities.

C.     *Why Does HMIT Need to Seek Leave?*

As alluded to above, HMIT filed its Motion for Leave to comply with the provision in the Plan known as a "gatekeeper" provision ("Gatekeeper Provision") and with this court's prior gatekeeper orders entered in January and July 2020, which all require that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain (1) a finding from the bankruptcy court that its proposed claims ("Proposed Claims") are "colorable"; and (2) specific authorization by the bankruptcy court to pursue the Proposed Claims.[7] The Gatekeeper Provision was not included in the Plan *sans raison*. Indeed, as the Fifth Circuit recognized in affirming confirmation of the Plan, the Gatekeeper Provision (along with the other "protection provisions" in the Plan) had been included in the Plan to address the "continued litigiousness" of Mr. James Dondero ("Dondero"), Highland's co-founder and former chief executive officer ("CEO"), that began prepetition and escalated following the post-petition "nasty breakup" between Highland and Dondero, by "screen[ing] and prevent[ing] bad-faith litigation against Highland Capital, its successors, and other bankruptcy participants that could disrupt the Plan's effectiveness."[8]

---

[7] To be clear, the Gatekeeper Provision in the Plan was not the first or even second injunction of its type issued in this bankruptcy case. The Gatekeeper Orders were entered by the bankruptcy court pre-confirmation: (a) in January 2020, just a few months into the case, as part of this court's order approving a corporate governance settlement between Highland and its unsecured creditors committee, in which Dondero, Highland's co-founder and former CEO, was removed from any management role at Highland and three independent directors ("Independent Directors") were appointed in lieu of a chapter 11 trustee being appointed ("January 2020 Order"); and (b) in July 2020, in this court's order authorizing the employment of Seery (one of the three Independent Directors) as the Debtor's new Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative ("July 2020 Order," together with the January 2020 Order, the "Gatekeeper Orders").

[8] *See Highland Capital*, 48 F.4th at 427, 435.

4

   D.      *Some Further Context Regarding Post-Confirmation Litigation Generally.*

   Since confirmation of the Plan, hundreds of millions of dollars have been paid out to creditors under the Plan, and there are numerous adversary proceedings and contested matters still pending, at various stages of litigation, in the bankruptcy court, the district court, and the Fifth Circuit, almost exclusively involving Dondero and entities that he owns or controls.   To be sure, the post-confirmation litigation in this case does not consist of the usual adversaries and contested matters one typically sees by and against a reorganized debtor and/or litigation trustee, such as preference or other avoidance actions and litigation over objections to claims that are still pending after confirmation of a plan.   Indeed, the claims of the largest creditors in this case (with claims asserted in the aggregate of more than one billion dollars) were successfully mediated and incorporated into the Plan—a plan which was ultimately accepted by the votes of an overwhelming majority of Highland's non-insider creditors.   Dondero and entities under his control were the only parties who appealed the Confirmation Order, and Dondero and entities under his control have been the appellants in virtually every appeal that has been filed regarding this bankruptcy case. Petitions for writs of mandamus (which have been denied) have been filed in the district court and in the Fifth Circuit by some of these same entities, including one by HMIT, when this court denied setting an ***emergency*** hearing on the instant Motion for Leave (HMIT had sought a setting on three-days' notice).

   A recent list of active matters involving Dondero and/or entities and/or individuals affiliated or associated with him, filed in the bankruptcy case by Highland and the Claimant Trust, reveals that there were at least 30 pending and "Active Dondero-Related Litigation" matters as of July 14, 2023:  six (6) proceedings in this court; six (6) active appeals or actions are pending in the District Court for the Northern District of Texas; seven (7) appeals in the Fifth Circuit; two (2)

petitions for writs of certiorari in the United States Supreme Court; and nine (9) other proceedings

or actions with or affecting the Highland Parties ("Highland," the "Claimant Trust," and "Seery")

in various other state, federal, and foreign jurisdictions.[9]

The above-described context is included because the Proposed Defendants assert that the

Motion for Leave is just a continuation of Dondero's unrelenting barrage of meritless and

harassing litigation, making good on his oft-mentioned alleged threat to "burn down the place"

after not achieving the results he wanted in the Highland bankruptcy case. Indeed, the Motion for

Leave was filed after two years of unsuccessful attempts by, first, Dondero personally, and then

HMIT to obtain pre-suit discovery from the Proposed Defendants (i.e., the Claims Purchasers)

through two different Texas state court proceedings, pursuant to Tex. R. Civ. P. 202 ("Rule 202").

In each of these Rule 202 proceedings, Dondero and HMIT espoused the same Seery/Claims

---

[9] *See* Bankr. Dkt. No. 3880 (filed on July 14, 2023, providing a list of "Active Dondero-Related Litigation" and noting that the list is "a summary of active pending actions only and does not include actions that were resolved by final orders, including actions finally resolved after appeals to the U.S. District Court for the Northern District of Texas and/or the U.S. Court of Appeals for the Fifth Circuit."). Just since the filing by the Highland Parties of the list, ***three*** of the appeals pending in the Fifth Circuit have been decided against the Dondero-related appellants, two of which upheld the district court's dismissal of appeals by Dondero-related entities of bankruptcy court orders based on the lack of bankruptcy appellate standing on behalf of the appellant. On July 19, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by NexPoint Advisors, L.P. ("NexPoint") of bankruptcy court orders approving professional compensation on the basis that NexPoint did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the orders. *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, 74 F.4th 361 (5th Cir. 2023). On July 31, 2023, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy—the Dondero family trust that, like the movant here in this Motion for Leave, was the holder of a limited partnership interest in Highland, and, as such, now has a contingent interest in the Claimant Trust—which had appealed a bankruptcy court order approving a Rule 9019 settlement on the same basis:  Dugaboy did not meet the bankruptcy appellate standing test of being a "person aggrieved" by the entry of the settlement order. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10960, 2023 WL 4861770 (5th Cir. July 31, 2023). The July 31, 2023 ruling followed the Fifth Circuit's ruling on February 21, 2023, affirming the district court's dismissal of an appeal by Dugaboy of yet another bankruptcy court order for lack of bankruptcy appellate standing. *The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023). These rulings by the Fifth Circuit are discussed in greater detail below. The third ruling by the Fifth Circuit since July 14, 2023, was issued by the Fifth Circuit in a per curium opinion not designated for publication on July 26, 2023, this one affirming the district court's affirmance of yet another Rule 9019 settlement order of the bankruptcy court that was appealed by Dugaboy, agreeing with the district court that the bankruptcy court had jurisdiction to approve a settlement among the Debtor, an entity affiliated with the Debtor but not a debtor itself, and UBS (the Debtor's largest prepetition creditor and the seller of its claims to the Claims Purchasers, which is one of the claims trading transactions HMIT complains about in the Proposed Complaint). *See The Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P.*, No. 22-10983, 2023 WL 4842320 (5th Cir. July 26, 2023).

Purchasers conspiracy theory espoused in the Motion for Leave—that Seery must have provided one or more of the Claims Purchasers with material nonpublic information to induce them to want to purchase large, allowed, unsecured claims at a discount; a *quid pro quo* is suggested, such that the Claims Purchasers were allegedly told they would make a hefty profit on the claims they purchased and, in return, they would gladly "rubber stamp" Seery's "excessive compensation" as the Claimant Trustee of the Claimant Trust. In sum, HMIT alleges this constituted wrongful "insider trading" of the bankruptcy claims. In addition, certain lawyers for Dondero and Dugaboy sent letters reporting this alleged conspiracy and "insider trading" to the Texas State Securities Board ("TSSB") and the Executive Office of the United States Trustee ("EOUST").

It is against this background and in this context that the court must analyze, in the exercise of its gatekeeping function under the confirmed Plan and its prior Gatekeeping Orders, whether HMIT should be allowed to pursue the Proposed Claims (i.e., whether the Proposed Claims are "colorable" claims as contemplated under the Gatekeeper Orders and the Gatekeeper Provision of the Plan). The court held an evidentiary hearing on the Motion for Leave on June 8, 2023 ("June 8 Hearing"), during which the court admitted exhibits and heard testimony from three witnesses both in support of and in opposition to the Motion for Leave. Having considered the Motion for Leave, the response of the Proposed Defendants thereto, HMIT's reply to the response, and the arguments and evidence presented at the hearing on the Motion for Leave, the court denies HMIT's request for leave to pursue its Proposed Claims. The court's reasoning is set forth below.

## II.      BACKGROUND

### A. *Highland's Bankruptcy Case, Dondero's Removal as CEO, and the Plan*

Highland was co-founded in Dallas in 1993 by Dondero and Mark Okada ("Okada"). It operated as a global investment adviser that provided investment management and advisory services and managed billions of dollars of assets, both directly and indirectly through numerous

affiliates.   Highland's equity interest holders included HMIT (99.5%), Dugaboy (0.1866%),

Okada, personally and through trusts (0.0627%), and Strand Advisors, Inc. ("Strand"), which was

wholly owned by Dondero and was the only general partner of Highland (0.25%).  On October 16,

2019 (the "Petition Date"), Highland, with Dondero in control[10] and acting as its CEO, president,

and portfolio manager, and facing a myriad of massive, business litigation claims – many of which

had finally become or were about to be liquidated (after a decade or more of contentious litigation

in multiple fora all over the world—filed for relief under chapter 11 of the United States

Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The

bankruptcy case was transferred to the Northern District of Texas, Dallas Division in December

2019.  The official committee of unsecured creditors (the "Committee") (and later, the United

States Trustee) expressed a desire for the appointment of a chapter 11 trustee due to concerns over

and distrust of Dondero, his numerous conflicts of interest, and his history of alleged

mismanagement (and perhaps worse).

　　　After many weeks under the specter of a possible appointment of a trustee, Highland and

the Committee engaged in substantial and lengthy negotiations, resulting in a corporate governance

settlement approved by this court on January 9, 2020.[11]  As a result of this settlement, Dondero

relinquished control of Highland and resigned his positions as officer or director of Highland and

its general partner, Strand,[12] and three independent directors ("Independent Directors") were

---

[10] Mark Okada resigned from his role with Highland prior to the Petition Date.

[11] This order is hereinafter referred to as the "January 2020 Order" and was entered by the court on January 9, 2020 [Bankr. Dkt. No. 339] pursuant to the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding the Governance of the Debtor and Procedures for Operation in the Ordinary Course* [Bankr. Dkt. No. 281].

[12] Dondero agreed to this settlement pursuant to a stipulation he executed and that was filed in connection with Highland's motion to approve the settlement. *See Stipulation in Support of Motion of the Debtor for Approval of Settlement With the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in Ordinary Course* [Bankr. Dkt. No. 338].

chosen to lead Highland through its chapter 11 case:  Seery, John S. Dubel, and retired bankruptcy judge Russell Nelms.  Given the Debtor's perceived culture of constant litigation while Dondero was at the helm, it was purportedly not easy to get such highly qualified persons to serve as independent board members.  At the hearing on the corporate governance settlement motion, the court heard credible testimony that none of the Independent Directors would have taken on the role without (1) an adequate directors and officers' ("D&O") insurance policy protecting them; (2) indemnification from Strand that would be guaranteed by the Debtor; (3) exculpation from mere negligence claims; and (4) a gatekeeper provision prohibiting the commencement of litigation against the Independent Directors without the bankruptcy court's prior authority.  The gatekeeper provision approved by the court in its January 9 Order states,[13]

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Dondero agreed to remain with Highland as an unpaid portfolio manager following his resignation and did so "subject at all times to the supervision, direction and authority of the Independent Directors" and to his agreement to "resign immediately" "[i]n the event the Independent Directors determine for any reason that the Debtor shall no longer retain Dondero as an employee"[14] and to "not cause any Related Entity to terminate any agreements with the Debtor."[15]  The court later

---

[13] January 2020 Order, 3-4, ¶ 10.

[14] January 2020 Order, 3, ¶ 8.

[15] *Id.* at ¶ 9.

entered, on July 16, 2020, an order approving the appointment of Seery as Highland's Chief

Executive Officer, Chief Restructuring Officer, and Foreign Representative,[16] which included

essentially the same "gatekeeper" language with respect to the pursuit of claims against Seery

acting in these roles.  The gatekeeper provision in the July 2020 Order was essentially the same as

the gatekeeper provision in the January 2020 Order:

> No entity may commence or pursue a claim or cause of action of any kind against Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Seery, and (ii) specifically authorizing such entity to bring such claim.  The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

July 2020 Order, 3, ¶5.  Neither the January 2020 Order nor the July 2020 Order were appealed.

Throughout the summer of 2020, Dondero informally proposed several reorganization

plans, none of which were embraced by the Committee or the Independent Directors.  When

Dondero's plans failed to gain support, he and entities under his control engaged in substantial,

costly, and time-consuming litigation for Highland.[17]  As the Fifth Circuit described the situation,

after Dondero's plans failed "he and other creditors began to frustrate the proceedings by objecting

to settlements, appealing orders, seeking writs of mandamus, interfering with Highland Capital's

management, threatening employees, and canceling trades between Highland Capital and its

clients."[18] On October 9, 2020, Dondero resigned from all positions with the Debtor and its

---

[16] *See* the July 16, 2020 order approving the retention by Highland of Seery as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative, *nunc pro tunc*, to March 15, 2020 ("July 2020 Order") [Bankr. Dkt. No. 854].

[17] According to Seery's credible testimony during the hearing on confirmation of the Plan that had been negotiated between the Committee and the Independent Directors, Dondero had threatened to "burn the place down" if his proposed plan was not accepted. *See* Transcript of Confirmation Hearing dated February 3, 2021 at 105:10-20. Bankr. Dkt. #1894.

[18] *Highland Capital*, 48 F.4th at 426 (citing *Highland Cap. Mgmt., L.P. v. Dondero (In re Highland Capital Mgmt., L.P.)*, Ch. 11 Case No. 19-34054-SGJ11, Adv. No. 20-03190-SGJ11, 2021 WL 2326350, at *1, *26 (Bankr. N.D. Tex.

affiliates in response to a demand by the Independent Directors made after Dondero's purported threats and disruptions to the Debtor's operations.[19]

The Independent Directors and the Committee had negotiated their own plan of reorganization which culminated in the filing by Highland of its *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* (the "Plan") [Bankr. Dkt. No. 1808] on January 22, 2021.[20] Highland had negotiated settlements with most of its major creditors following mediation and had amended its initially proposed plan to address the objections of most of its creditors, leaving only the objections of Dondero and entities under his control (the "Dondero Parties") at the time of the confirmation hearing,[21] which was held over two days in early February 2021. The Plan is essentially an "asset monetization" plan pursuant to which the Committee was dissolved, and four new entities were created:  the Reorganized Debtor; a new general partner for the Reorganized Debtor called HCMLP GP, LLC; the Claimant Trust (administered by Seery, its trustee); and a Litigation Sub-Trust (administered by its trustee, Marc Kirschner). Highland's various servicing agreements were vested in the Reorganized Debtor, which continues to manage collateralized loan obligation vehicles ("CLOs") and various other investments postconfirmation. The Claimant Trust owns the limited partnership interests in the Reorganized Debtor, HCMLP GP LLC, and the Litigation Sub-Trust and is charged with winding down the Reorganized Debtor over a three-year period by monetizing its assets and making

---

June 7, 2021) where this court "h[eld] Dondero in civil contempt, sanctioning him $100,000, and comparing this case to a 'nasty divorce.'").

[19] *See* Highland Ex. 13. The court shall refer to exhibits offered and admitted at the June 8 Hearing on the Motion for Leave by the Highland Parties as "Highland Ex. ___" and to exhibits offered and admitted by HMIT as "HMIT Ex. ___."

[20] The *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* was filed on November 24, 2020 ("Disclosure Statement") [Bankr. Dkt. No. 1473].

[21] The only other objection remaining was the objection of the United States Trustee to the Plan's exculpation, injunction, and release provisions.

distributions to Class 8 and Class 9 creditors as Claimant Trust Beneficiaries. The Claimant Trust is overseen by a Claimant Trust Oversight Board ("CTOB"), and pursuant to the terms of the Plan and the Claimant Trust Agreement ("CTA"),[22] the CTOB approved Seery's compensation package as the CEO of the Reorganized Debtor and the Claimant Trustee. Following their acquisition of their unsecured claims, representatives of Claims Purchasers Muck and Jessup became members of the CTOB.[23] Seery's compensation included the same base salary that he was receiving as CEO and CRO of Highland, plus an added incentive bonus tiered to recoveries and distributions to the creditors under the Plan. The Plan provides for the cancellation of the limited partnership interests in Highland held by HMIT, Dugaboy, and Okada and his family trusts in exchange for each holder's pro rata share of a contingent interest in the Claimant Trust ("Contingent Claimant Trust Interest"), as holders of allowed interests in Class 10 (holders of Class B/C limited partnership interests) or Class 11 (holders of Class A limited partnership interests) under the Plan.

B. *Dondero Communicates Alleged Material Non-Public Information ("MNPI") to Seery, and Seery Allegedly Provides the MNPI to the Claims Purchasers in Furtherance of an Alleged Fraudulent Scheme to Have the Claims Purchasers "Rubber Stamp" His Compensation as Claimant Trustee Post-Confirmation*

1. The December 17, 2020 MGM Email

Between Dondero's forced resignation from Highland in October 2020 and the confirmation hearing in February 2021, Dondero engaged in what appeared to be attempts to thwart, impede, and otherwise interfere with the Plan being proposed by the Independent Directors and the Committee. In the midst of this, on December 17, 2020, Dondero sent Seery[24] an email

---

[22] Highland Ex. 38

[23] The CTOB had three members: a representative of Muck (Michael Linn), a representative of Jessup (Christopher Provost), and an independent member (Richard Katz). *See* Joint Opposition ¶ 79.

[24] Dondero sent the email to others as well but did not copy counsel for the Independent Directors (including Seery) in violation of the terms of an existing temporary restraining order that enjoined Dondero from, among other things, "communicating . . . with any Board member" (including Seery) without including Debtor's counsel. Morris Dec. Ex. 23 ¶ 2(a). Citations to "Morris Dec. Ex. _" are to the exhibits attached to the *Declaration of John A. Morris in Support*

(the "MGM Email") that featured prominently in HMIT's Motion for Leave.  According to HMIT

and Dondero, the MGM Email contained material nonpublic information ("MNPI") regarding the

possibility of an imminent acquisition of Metro-Goldwyn-Mayer Studios, Inc. ("MGM"), likely

by either Amazon or Apple.[25] At the time Dondero sent the MGM Email, Dondero sat on the board

of directors of MGM, and the Debtor owned MGM stock directly.  The Debtor also managed and

partially owned a couple of other entities that owned MGM stock and managed various CLOs that

owned some MGM stock as well.  HMIT alleges now that Seery later misused and wrongfully

disclosed to the Claims Purchasers this purported MNPI as part of a *quid pro quo* scheme, whereby

the Claims Purchasers agreed to approve excessive compensation for Seery in the future (in

exchange for him providing this allegedly "insider" information that inspired them to purchase

unsecured claims with an alleged expectation of future large profits).[26]  A timeline of events (in

late 2020) in the weeks leading up to Dondero's MGM Email to Seery, following Dondero's

departure from Highland, helps to put the email in full context:

- October 16: Dondero and his affiliates attempt to impede the Debtor's trading activities by demanding—with no legal basis—that Seery cease selling certain assets;[27]

- November 24: Bankruptcy Court enters an Order approving the Debtor's Disclosure Statement, scheduling the confirmation hearing on the Debtor's Plan for January 13, 2021, and granting related relief;[28]

- November 24–27: Dondero personally interferes with the Debtor's

---

*of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding*, Bankr. Dkt. No. 3784.

[25] *See* Proposed Complaint ¶ 45.

[26] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the [Claims Purchasers], with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims."); ¶ 4 ("As part of the scheme, the [Claims Purchasers] obtained a position to approve Seery's ongoing compensation – to Seery's benefit and also to the detriment of the Claimant Trust, the Reorganized Debtor, and HMIT.").

[27] *See* Highland Ex. 14, Dondero-Related Entities' October 16, 2020 Letter; Highland Ex. 15, *Memorandum Opinion and Order Holding Dondero in Contempt for Violation of TRO*, 13-15.

[28] *See* Bankr. Dkt. No. 1476.

implementation of certain securities trades ordered by Seery;[29]

- November 30: The Debtor provides written notice of termination of certain shared services agreements it had with Dondero's two non-debtor affiliates, NexPoint Advisors, L.P. ("NexPoint") and Highland Capital Management Fund Advisors, L.P. ("HCMFA"; together with NexPoint, the "Advisors");[30]

- December 3: The Debtor makes written demands to Dondero and certain affiliates for payment of all amounts due under certain promissory notes they owed to the Debtor, that had an aggregate face amount of more than $60 million—this was part of creating liquidity for the Debtor's Plan;[31]

- December 3: Dondero responds with what appeared to be a threat of some sort to Seery in a text message: "***Be careful what you do -- last warning***;"[32]

- December 10: Dondero's interference and apparent threat cause the Debtor to seek and obtain a temporary restraining order ("TRO") against Dondero;[33]

- December 16: This court denies as "frivolous" a motion filed by certain affiliates of Dondero, in which they sought "temporary restrictions" on certain asset sales;[34] and

- December 17: Dondero sends the unsolicited MGM Email[35] to Seery, which violates the TRO entered just a week earlier.[36]

---

[29] *See* Highland Ex. 15, 30-36.

[30] Morris Decl. Ex. 17; *see also* Transcript of June 8, 2023 Hearing on HMIT's Motion for Leave ("June 8 Hearing Transcript"), 273:23-24.

[31] Morris Decl. Exs. 18-21; *see also* June 8 Hearing Transcript, 273:23-274:1.

[32] Morris Decl. Ex. 22 (emphasis added); *see also* June 8 Hearing Transcript, 273:1-12 (where Seery testified about receiving the threat from Dondero:  "A: [T]his came after he threatened me. He threatened me in writing. I'd never been threatened in my career. I've never heard of anyone else in this business who's been threatened in their career. So anything I would get from him, I was going to be highly suspicious.").

[33] *See* Morris Decl. Ex. 23, *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* entered December 10, 2020 [Adv. Pro. No. 20-3190 Dkt. No. 10].

[34] *See* Morris Decl. Ex. 24, Transcript of December 16, 2020 Hearing, 63:5-64:15.

[35] Highland Ex. 11.

[36] Seery testified at the June 8 Hearing that Dondero knowingly violated the TRO when he sent the MGM Email:

> [The MGM Email] . . . followed the imposition of a TRO for interfering with the business. He knew what was in the TRO and he knew what it applied to, and it restricted him from communicating with me or any of the other independent directors without Pachulski [Debtor's counsel] being on it. Furthermore, Pachulski had advised Dondero's counsel that not only could they not communicate with us, if they wanted to communicate they had to prescreen the topics. And how do we know that? Because Dondero filed a motion to modify the TRO. And that was all before this email.

June 8 Hearing Transcript, 273:13-22.

The MGM Email had the subject line "Trading Restriction re MGM – material non public

information" and stated:

> Just got off a pre board call, board call at 3:00. Update is as follows: Amazon and
> Apple actively diligencing in Data Room. Both continue to express material
> interest. Probably first quarter event, will update as facts change. Note also any
> sales are subject to a shareholder agreement.[37]

Seery credibly testified at the June 8 Hearing that he was "highly suspicious" when he

received the MGM Email.  This was because, among other reasons, Dondero sent it ***after***: (i)

unsuccessful efforts to impede the Debtor's trading activities (followed by the TRO); (ii) the "be

careful what you do" text to Seery by Dondero: (iii) Highland's termination of its shared service

arrangements with Dondero's various affiliated entities; (iv) the bankruptcy court's approval of

the disclosure statement; and (v) Highland's demand to collect on the demand notes for which

Dondero and his entities were liable.[38]  Highland's Chapter 11 case was fast approaching the finish

line.  Moreover, MGM was already on the restricted list at Highland Capital, and had been for a

long time, and Dondero would know this.[39]  Still further, as of December 17, 2020 (the date

Dondero sent the unsolicited MGM Email to Seery), Dondero no longer owed a duty of any kind

to the Debtor or any entity controlled by the Debtor, having surrendered in January 2020 direct

and indirect control of the Debtor to the Independent Board as part of the corporate governance

settlement[40] and having resigned from all roles at the Debtor and affiliates in October 2020.  Still

further, Dondero—to the extent he was sharing with Seery MNPI that he obtained as a member of

the board of directors of MGM—would have been violating his own fiduciary duties to MGM.

---

[37] Highland Ex. 11.

[38] June 8 Hearing Transcript, 273:1-274:4.

[39] June 8 Hearing, 215:21-216:9.

[40] *See* Bankr. Dkt. Nos. 339, 354-1 (Term Sheet)).

In any event, in a declaration filed by Dondero in support of HMIT's Rule 202 petition in Texas state court for pre-suit discovery,[41] he indicated that his goal in sending the MGM E-mail was to impede the Debtor and Seery from engaging in any transactions involving MGM:

> On December 17, 2020, I sent an email to employees at HCM, including the then Chief Executive Officer and Chief Restructuring Officer Jim Seery, containing non-public information regarding Amazon and Apple's interest in acquiring MGM. I became aware of this information due to my involvement as a member of the board of MGM. *My purpose was to alert Seery and others that MGM stock, which was owned either directly or indirectly by HCM, should be on a restricted list and not be involved in any trades*.

It is noteworthy that *Dondero's labeling of the MGM Email (in the subject line) as a communication containing "material non public information" did not make it so*.  In fact, it appears from the credible evidence presented at the June 8, 2023 hearing on HMIT's Motion for Leave that the MGM Email did not disclose information to Seery that was not already made available to the public at the time it was sent. Seery testified that he did not think the MGM Email contained MNPI and that he did not personally "take any steps . . . to make sure that MGM stock was placed on a restricted list at Highland Capital after [he] received [the MGM Email]" because—as earlier noted—"MGM was already on the restricted list at Highland Capital . . . before I got to Highland."[42]   Indeed, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months[43] and that was officially

---

[41] Highland Ex. 9 ¶ 3 (emphasis added).

[42] June 8 Hearing Transcript, 215:21-216:9.  Seery elaborated upon further questioning from HMIT's counsel that he did not think the indications in the MGM Email (that came from a member of the board of directors of MGM) that "it was probably a first-quarter event" and that "Amazon and Apple were actively diligencing – are diligencing in the data room, both continue to express material interest" were not MNPI. *Id.*, 217:23-218:10.  He testified that "it was clear [before he received the MGM Email] from the media reports and the actual quotes from Kevin Ulrich of Anchorage, who was the chairman at MGM, that a transaction would have to take place very quickly. And, in fact, the transaction did not take place in the first quarter." *Id.*, 219:3-7.

[43] *See* Highland Ex. 25 ("MGM has held preliminary talks with Apple, Netflix and other larger media companies . . . . MGM, in particular, seems like a logical candidate to sell this year. Its owners include Anchorage Capital, Highland Capital and Solus Alternative Asset Management, hedge funds that acquired the company out of bankruptcy in 2010.") (article dated 1/26/20); Highland Ex. 26 (describing prospects of an MGM sale, noting that, among its largest

announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[44]  For example, as early as January 2020, Apple and Amazon were identified as being among a new group of "Big 6" global media companies, and MGM was identified as being a leading media acquisition target. Indeed, according to at least one media report on January 26, 2020, "MGM, in particular, seems like a logical candidate to sell this year" having already held "preliminary talks with Apple, Netflix and other larger media companies."[45]  In October 2020, the Wall Street Journal reported that MGM's largest shareholder, Anchorage Capital Group ("Anchorage"), was facing mounting pressure to sell the company.  Anchorage was led by Kevin Ulrich, who also served as Chairman of MGM's Board.  The article reported that "[i]n recent months, Mr. Ulrich has said he is working toward a deal," and he specifically named Amazon and Apple as being among four possible buyers.[46]  Thus, no one following the MGM story would have been surprised to learn in December 2020 that Apple and Amazon were conducting due diligence and had expressed "material interest" in acquiring MGM.  Dondero testified during the June 8 Hearing that, at the time he sent the MGM Email, he "knew with certainty from the board level that Amazon had hit our price, and it was going to close in the next couple of months,"[47] that "as of December 17th, Amazon had made an offer that was acceptable to MGM, [and that] that's what the board meeting was.  We were going into exclusive negotiations to culminate the merger with

---

shareholders, was "Highland Capital Management, LP") (article October 11, 2020).  *See also* Highland Exs. 27-30 & 34 (various other articles regarding possible sale/suitors of MGM, dated in years 2020 and 2021, and ultimately announcing sale to Amazon on May 26, 2021, for $8.4 billion).

[44] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid.

[45] Highland Ex. 25.

[46] Highland Ex. 26.

[47] June 8 Hearing Transcript, 127:2-4.

them."[48] Notwithstanding this testimony, Dondero eventually admitted (after a lengthy and torturous cross examination) that he did not actually communicate this supposed "inside" information to Seery in the MGM Email. He did not "say anything about Amazon hitting the price." He did not say anything about the MGM board going into exclusive negotiations with Amazon "to culminate the merger with them." Rather, he communicated information that Seery and any member of the public who cared to look could have gleaned from publicly available information as of December 17, 2020, regarding a much-written-about potential MGM transaction that involved interest from numerous companies, including, specifically, Amazon and Apple. When questioned why "[he felt] the need to mention Apple [in the MGM Email] if Amazon had already hit the price," Dondero simply answered, "The only way you generally get something done at attractive levels in business is if two people are interested," suggesting that he specifically ***did not*** communicate the purported inside information he obtained as a MGM board member—that Amazon had met MGM's strike price and that the MGM board was moving forward with exclusive negotiations with Amazon—because he wanted it to appear that there was still a competitive process going on that included both Amazon and Apple.[49]

Even if the MGM Email contained MNPI on the day it was sent (four months prior to the first of the Claim Purchases that occurred in April 2021), the information was fully and publicly disclosed to the market in the days and weeks that followed. For example, on December 21, 2020, just four days later, a Wall Street Journal article titled *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale*, reported that MGM had "tapped investment banks Morgan Stanley and LionTree LLC and begun a formal sale process," and had "a market value of around $5.5 billion, based on privately traded shares and including debt." The Wall Street Journal Article reiterated

---

[48] *Id.*, 161:10-14.
[49] June 8 Hearing Transcript, 162:2-6.

that (i) Anchorage "has come under pressure in recent years from weak performance and defecting clients, and its illiquid investment in MGM has become a larger percentage of its hedge fund as it shrinks," and (ii) "Mr. Ulrich has told clients in recent months he was working toward a deal for the studio and has spoken of big technology companies as logical buyers."[50] (*Id*. Ex. 27.)   The Wall Street Journal's reporting was picked up and expanded upon in other publications soon after. For example:

- On December 23, 2020, Business Matters published an article specifically identifying Amazon as a potential suitor for MGM. The article, titled *The world is net enough! Amazon joins other streaming services in £4bn bidding war for Bond films as MGM considers selling back catalogue*, cited the Wall Street Journal article and further reported that MGM "hopes to spark a battle that could interest streaming services such as Amazon Prime";[51]

- On December 24, 2020, an article in iDropNews specifically identified Apple as entering the fray. In an article titled *Could Apple be Ready to Gobble Up MGM Studios Entirely?*, the author observed that "it's now become apparent that MGM is actually up on the auction block," noting that the Wall Street Journal was "reporting that the studio has begun a formal sale process" and that Apple—with a long history of exploratory interest in MGM—would be a likely bidder;[52] and

- On January 15, 2021, Bulwark published an article entitled *MGM is For Sale (Again)* that identified attributes of MGM likely to appeal to potential purchasers and handicapped the odds of seven likely buyers—with Apple and Amazon named as two of three potential buyers most likely to close on an acquisition.[53]

Finally, Highland and entities it controlled did not sell their MGM stock while the MGM-Amazon deal was under discussion and/or not made public but, instead, they tendered their MGM holdings in connection with, and as part of, the ultimate MGM-Amazon transaction after it closed in March 2022.

---

[50] Highland Ex. 27.

[51] Highland Ex. 28.

[52] Highland Ex. 29.

[53] Highland Ex. 30.

19

2. <u>No Evidence to Support HMIT/Dondero's Assumptions that Seery Shared Alleged MNPI in the MGM Email with Claims Purchasers</u>

One of HMIT's allegations in the Proposed Complaint it seeks leave to file—which is central to HMIT's and Dondero's conspiracy theory—is that Seery shared the alleged MNPI from the MGM Email with the Claims Purchasers (or at least Farallon—the owner/affiliate of Muck, one of the Claims Purchasers) and that the Claims Purchasers only acquired the purchased claims ("Purchased Claims") based on, and because, of their receipt of the MNPI from Seery. HMIT essentially admits in the original version of its Motion for Leave that it has no direct evidence that Seery communicated the alleged MNPI to any of the Claims Purchasers. Rather, its allegation is based on inferences it wants the court to make based on "circumstantial" evidence and on the Dondero Declarations that were attached to the Motion for Leave, which described communications Dondero purportedly had with one or two representatives of Farallon in the "late spring" of 2021 concerning Farallon's recent acquisition of certain claims in the Highland bankruptcy case.[54] Based on these communications, HMIT and Dondero only assume Seery must have provided the MNPI about MGM to Farallon, which must have caused both Farallon and the other Claims Purchaser, Stonehill, to acquire the Purchased Claims.[55]

At the June 8 Hearing, HMIT offered Dondero's testimony that he had three telephone conversations with two representatives of Farallon, Mike Linn ("Linn") and Raj Patel ("Patel"),

---

[54] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 1 and Ex. 3; *see also* Highland Ex. 9, *Declaration of James Dondero* (with Exhibit 1) dated February 15, 2023.

[55] Motion for Leave (Bankr. Dkt. No. 3699) ¶ 28. HMIT subsequently filed the final version of the Motion for Leave that was revised to withdraw the Dondero Declarations and delete all references therein to the Dondero Declarations (but, notably, leaving in the allegations that were based on the Dondero Declaration(s)). This was done after the court ruled that it would allow the Proposed Defendants to examine Dondero regarding his Declarations. HMIT contended at that point that the court should consider the Motion for Leave on a no-evidence Rule 12(b)(6) type basis (but could not explain why it had attached the Dondero Declarations as evidence that "supported" the Motion for Leave, if it believed no evidence should be considered). *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 28; *see also infra* pages 45 to 47 regarding the "sideshow" litigation that occurred prior to the June 8 Hearing over whether the hearing on the Motion for Leave would be an evidentiary hearing.

who allegedly told him that they purchased the claims without conducting any due diligence and based solely on Seery's assurances that the claims were valuable.  These conversations allegedly took place on May 28, 2021—two days after the MGM-Amazon deal was officially announced to the public (on May 26, 2021).  Dondero also testified that a photocopy of handwritten notes ("Dondero Notes")[56] (which were partially cut off) were notes he took contemporaneously with these short telephone conversations he initiated (one with Patel and two follow-up conversations with Linn).[57]  He testified that his purpose in taking these notes and in initiating the phone calls was that "[w]e'd been trying nonstop to settle the case for two-plus years. . . . [a]nd when we heard the claims traded, we realized there were new parties to potentially negotiate to resolve the case . . . [s]o I reached out [to] the Farallon guys,"[58] and further, on *voir dire* from the Proposed Defendants' counsel, that the purpose of taking the notes was so that he had "a written record of the important points that [he] discussed . . . so I know how to address it the next time."[59]  The handwritten notes[60] stated:

| | |
|---|---|
| *Raj Patel bought it because of Seery* | *1* |
| *50-70¢ not compelling* | *2* |
| *Class 8* | *3* |
| *Asked what would be compelling* | *4* |
| *-- No Offer* | *5* |
| *Bought in Feb/March timeframe* | *6* |
| *Bought assets w/ Claims* | *7* |
| *Offered him 40-50% premium* | *8* |
| *130% of cost; "Not Compelling"* | *9* |
| *No Counter; Told Discovery coming* | *10* |

---

[56] HMIT Ex. 4.  The handwritten notes were admitted into evidence after *voir dire*, not for the truth of anything Patel or Linn allegedly said to him during the three telephone conversations, but as Dondero's "present sense impression" of the telephone conversations.

[57] June 8 Hearing Transcript, 133:1-136:3.

[58] *See id.*, 133:13-23.

[59] *See id.* (on *voir dire*), 144:1838-145:4.

[60] HMIT Ex. 4.  The court has placed in a table and numbered each line for ease of reference.  The table does not include the separate apparent partial date from the top left corner that Dondero testified was the date that he made the initial call to Patel: May 28, 2021.

On direct examination, Dondero testified that line 1 is what he wrote contemporaneously with the short call he initiated to Patel of Farallon in which Patel allegedly told Dondero "that he bought it because Seery told him to buy it and they had made money with Seery before"[61] and that Farallon "bought [the claim] because he was very optimistic regarding MGM"[62] before referring him to Linn, a portfolio manager at Farallon. Dondero testified that the rest of the handwritten notes (reflected in lines 2 through 10 of the table) were notes he took contemporaneously with two telephone conversations he had with Linn following his call to Patel, with lines 2-8 referring to Dondero's first call with Linn and lines 9 and 10 referring to his second call with Linn.[63] Dondero testified that the "50-70¢" in line 2 referred to his offer to Linn to pay 70 cents on the dollar to buy Farallon's[64] claims because "[w]e knew that they had – that the claims had traded around 50 cents" and "[w]e wanted to prevent the $5 million-a-month burn" (referring to attorney's fees in the Highland case) and that "not compelling Class 8" in lines 2-3 referred to Linn's response to him that the offer was not compelling.[65] Dondero testified that lines 4-5 referred to him asking Linn what amount would be compelling and to Linn's response that "he had no offer."[66] Dondero testified that lines 6-8 referred to Linn telling Dondero that Farallon bought the claims in the February, March timeframe and that Dondero told Linn that, given that the estate was spending $5 million a month on legal fees, Farallon should want to sell its claims and Linn's alleged response that "Seery told him it was worth a lot more."[67] Lastly, Dondero testified on direct examination

---

[61] June 8 Hearing Transcript, 134:7-10, 135:13-22.

[62] *Id.*, 139:3-11.

[63] *Id.*, 136:4-138:16.

[64] As noted above, Farallon did not acquire any of the Purchased Claims; rather, Farallon created a special purpose entity, Muck, to acquire the claims.

[65] June 8 Hearing Transcript, 136:4-16.

[66] *Id.*, 136:17-23.

[67] *Id.*, 137:6-138:7.

that the last two lines referred to a second telephone conversation he had with Linn in which Dondero offered 130 percent of cost for the claims and that Linn told him that the offer was not compelling, and he would not give a price at which he would sell.[68]

On cross-examination, Dondero acknowledged that, though he had testified that the handwritten notes were intended to be a written record of the important points from the telephone conversations he had with Patel and Linn, there was no mention in the notes of: (1) MGM: (2) or that Farallon was very optimistic about MGM; (3) the sharing of MNPI; (4) a *quid pro quo;* or (5) Seery's compensation, and that his last note—"Told Discovery coming"—was a reference to Dondero telling Linn (not Linn telling Dondero) that discovery was coming in response to Dondero's own supposition that Farallon must have traded on MNPI.[69]   Cross-examination also revealed that Farallon never told Dondero that Seery gave them MNPI, and that Dondero only **believed** Seery **must have** given Farallon MNPI, because Farallon (Patel and Linn) had told him that the only reason Farallon bought their claims was because of their prior dealings with Seery, which Dondero took to mean that they had conducted no due diligence on their own prior to acquiring the claims.  Dondero also testified that he did not have any personal knowledge as to how Seery's compensation package, as CEO of the Reorganized Debtor and Claimant Trustee, was determined because he was "not involved" in the setting of Seery's compensation pursuant to the Claimant Trust[70] and that he never discussed Seery's compensation with Farallon.[71]

As noted earlier, Dondero attempted to obtain discovery from the Claims Purchasers in a Texas state court pursuant to Rule 202 of the Texas Rules of Civil Procedure.   The Texas state

---

[68] *Id.*, 138:8-22.

[69] *Id.*, 190:14-191:25. Dondero testified that he told Linn that discovery "would be coming in the next few weeks" and noted that "this has been a couple years. . . . [w]e've been trying for two years to get . . . discovery in this."

[70] *Id.*, 200:13-201:1.

[71] *Id.*, 208:23-209:8.

court denied the First Rule 202 petition on June 1, 2022, after having considered the amended petition, the responses, the record, applicable authorities and having conducted a hearing on the petition on June 1, 2022.[72]

3. <u>Dondero Unsuccessfully Seeks Discovery and to Have Various Agencies and Courts Outside of the Bankruptcy Court Acknowledge His Insider Trading Theories</u>

Dondero acknowledged at the June 8 Hearing that the verified petition ("First Rule 202 Petition") he signed and filed on July 22, 2021, in the first Texas Rule 202 proceeding—just weeks after his telephone calls with Linn and Patel—was true and accurate. In it, he swore under oath as to what Linn told him in the telephone call concerning Farallon's purchase of the claims, and the only reason he gave for wanting discovery was that Linn told him Farallon bought the claims "sight unseen—relying entirely on Seery's advice solely because of their prior dealings."[73] Dondero acknowledged, as well, that his sworn statement that he filed in support of an amended verified Rule 202 petition filed in the same Texas Rule 202 proceeding, but nearly ten months later (in May 2022), described the same telephone conversation he had with Linn, and it did not mention MGM at all and did not say that Linn told him that Seery gave him MNPI; rather, the sworn statement stated only that "On a telephone call between Petitioner and Michael Lin[n], a representative of Farallon, Mr. Lin[n] informed Petitioner that Farallon had purchased the claims sight unseen and with no due diligence—100% relying on Seery's say-so because they had made so much money in the past when Seery told them to purchase claims" and that Linn did not tell him that Seery gave them MNPI, but he concluded that Seery gave Farallon MNPI based on what Linn did tell him.[74]

---

[72] Highland Ex. 7.

[73] *Id.*, 193:8-194:16; Highland Ex. 3, *Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 21. The first Texas Rule 202 proceeding in which Dondero sought discovery regarding the Farallon acquisition of its claims was brought by Dondero, individually, in the 95th Judicial District, Dallas County, Texas.

[74] *Id.*, 195:11-197:17; Highland Ex. 4, *Amended Verified Petition to Take Deposition before Suit and Seek Documents*, ¶ 23.

Nine days later, Dondero filed a declaration in the same proceeding, in which he described the

same call with Linn as follows:[75]

> Last year, I called Farallon's Michael Lin[n] about purchasing their claims in the
> bankruptcy. I offered them 30% more than what they paid. I was told by Michael
> Lin[n] of Farallon that they purchased the interests without doing any due diligence
> other than what Mr. James Seery—the CEO of Highland—told them, and that he
> told them that the interests would be worth far more than what Farallon paid. Given
> the value of those claims that Seery had testified in court, it made no sense to me
> that Mr. Lin[n] would think that the claims were worth more than what Seery
> testified under oath was the value of the bankruptcy claims.

Dondero further stated in his declaration that "I have an interest in ensuring that the claims

purchased by [Farallon] are not used as a means to deprive the equity holders of their share of the

funds," and that "[i]t has become obvious that despite the fact that the bankruptcy estate has enough

money to pay all claimants 100 cents on the dollar, there is plainly a movement afoot to drain the

bankrupt estate and deprive equity of their rights.  Accordingly, "I commissioned an investigation

by counsel who have been in communication with the Office of the United States Trustee."[76]

Dondero attached as Exhibit A to his declaration a letter from Douglas Draper ("Draper"), an

attorney with the law firm of Heller, Draper & Horn, L.L.C. in New Orleans, to the office of the

General Counsel, Executive Office for U.S. Trustees, dated October 5, 2021, in which Draper

opens the letter by stating that "[t]he purpose of this letter is to request that your office investigate

the circumstances surrounding the sale of claims by members of the [Creditors' Committee] in the

bankruptcy of [Highland]," and later noted that he "became involved in Highland's bankruptcy

through my representation of [Dugaboy], an irrevocable trust of which Dondero is the primary

beneficiary."[77]  Mr. Draper laid out the same allegations of insider claims trading, breach of

---

[75] Highland Ex. 5, ¶ 2.

[76] *Id.*, ¶¶ 3-4.

[77] *Id.*, Ex. A, 1-2.

fiduciary duties, and conspiracy that HMIT seeks to bring in the Proposed Complaint.[78] The U.S. Trustee's office took no action. Dondero made a second and third attempt to get the U.S. Trustee's office to conduct an investigation into the same allegations laid out in Draper's letter, this time in "follow-up" letters to the Office of the U.S. Trustee on November 3, 2021, and six months later, on May 11, 2022, through another lawyer, Davor Rukavina ("Rukavina"), in which Rukavina wrote "to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the [Highland] bankruptcy."[79] Again, the U.S. Trustee's office took no action.

On February 15, 2023, Dondero filed yet another sworn statement about his alleged conversation with Linn, this time in support of a Verified Rule 202 Petition *filed by HMIT* ("Second Rule 202 Petition"), filed in a different Texas state court (Texas District Court, 191st Judicial District, Dallas County, Texas), following Dondero's unsuccessful attempts throughout 2021 and 2022 to obtain discovery in the First Rule 202 proceeding and based on the same allegations of misconduct by Seery and Farallon.[80] In this new sworn statement, Dondero describes for the first time the "call" he had with Linn as having been "phone calls" with Patel and Linn and *mentions MGM* and Farallon's alleged optimism about the *expected sale of MGM*:[81]

> In late Spring of 2021, I had phone calls with two principals at Farallon Capital Management, LLC ("Farallon"), Raj Patel and Michael Linn. During these phone calls, Mr. Patel and Mr. Linn informed me that Farallon had a deal in place to purchase the Acis and HarbourVest claims, which I understood to refer to claims that were a part of settlements in the HCM Bankruptcy Proceedings. Mr. Patel and Mr. Linn stated that Farallon agreed to purchase these claims based solely on conversations with Seery because they had made significant profits when Seery told them to purchase other claims in the past. They also stated that they were particularly optimistic because of the expected sale of MGM.

---

[78] *Id.*, Ex. A, 6-11.

[79] HMIT Ex. 61.

[80] Highland Ex. 9.

[81] *Id.*, ¶ 4.

The Second Rule 202 Petition was also denied by the second Texas state court on March 8, 2023.[82]

HMIT, in an apparent attempt to provide support for its argument that the Proposed Claims are "colorable," stated in its Motion for Leave that "[t]he Court also should be aware that the Texas States [sic] Securities Board ("TSSB") opened an investigation into the subject matter of the insider trades at issue, and this investigation has not been closed. The continuing nature of this investigation underscores HMIT's position that the claims described in the attached Adversary Proceeding are plausible and certainly far more than merely 'colorable.'"[83] But, two days before opposition briefing was due, on May 9, 2023, the TSSB issued a letter ("TSSB Letter") to Highland, informing it that "[t]he staff of the [TSSB] has completed its review of the complaint received by the Staff against [Highland]. The issues raised in the complaint and information provided to our Agency were given full consideration, and a decision was made that no further regulatory action is warranted at this time."[84] HMIT's counsel (frankly, to the astonishment of the court) objected to the admission of the TSSB Letter at the June 8 Hearing "on the grounds of relevance, 403, hearsay, and authenticity . . . [a]nd I also . . . think it's important that the decision by a regulatory body has no bearing on this cause of action or the colorability of this claim, and the Texas State Securities Board will tell you that. This is completely and utterly irrelevant to your inquiry."[85] The court overruled HMIT's objection to the relevance of this exhibit—considering, among other things, that HMIT, in its Motion for Leave, specifically mentioned the allegedly open TSSB "investigation" as relevant evidence the court "should be aware" of in making its determination of whether the Proposed Claims were "colorable."[86]

---

[82] Highland Ex. 10.

[83] Motion for Leave, ¶ 37.

[84] *See* Highland Ex. 33.

[85]  June 8 Hearing Transcript, 323:22-324:3.

[86] *Id.*, 324:4-328:2.

*C. Claims Purchasers Purchase Claims and File Notices of Transfers of Claims*

To be clear about the time line here, it was after confirmation of the Plan but prior to the Effective Date of the Plan, that the Claims Purchasers: (1) purchased several large unsecured claims that had been allowed following, and as part of, Rule 9019 settlements, each of which were approved by the bankruptcy court, after notice and hearing, prior to the confirmation hearing; and (2) filed notices of the transfers of those claims pursuant to Rule 3001(e)(2) of the Federal Rules of Bankruptcy Procedure. The noticing of the claims transfers began on April 16, 2021, with the notice of transfer of the claim held by Acis Capital Management to Muck, and ended on August 9, 2021, with the notices of transfers of the claims held by UBS Securities to Muck and Jessup:

| Claimant(s) | Date Filed/ Claim No. | Asserted Amount | Claim Settled/Allowed? If so, Amount | Date Filed/ Rule 3001 Notice Dkt. No. |
|---|---|---|---|---|
| Acis Capital Management LP and Acis Capital Management, GP LLC (together, "Acis") | 12/31/2019 Claim No. 23 | $23,000,000 | Yes[87] $23,000,000 | 4/16/2021 Bankr. Dkt. No. 2215 (Muck) |
| Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee") | 4/3/2020 Claim No. 72 | $190,824,557 | Yes[88] $137,696,610 | 4/30/2021 Bankr. Dkt. No. 2261 (Jessup) |
| HarbourVest 2017 Global Fund, LP, HarbourVest 2017 Global AIF, LP, HarbourVest Partners LP, HarbourVest Dover Street IX Investment LP, HV International VIII Secondary LP, HarbourVest Skew Base AIF LP (the "HarbourVest Parties") | 4/8/2020 Claim Nos. 143, 147, 149, 150, 153, 154 | Unliquidated | Yes[89] $80,000,000 in aggregate ($45,000,000 General Unsecured Claim, and $35,000,000 subordinated claim) | 4/30/2021 Bankr. Dkt. No. 2263 (Muck) |

---

[87] Bankr. Dkt. No. 1302. The Debtor's settlement with Acis was approved over the objection of Dondero. Bankr. Dkt. No. 1121.

[88] Bankr. Dkt. No. 1273.

[89] Bankr. Dkt. No. 1788. The Debtor's settlement with the HarbourVest Parties was approved over the objections of Dondero, Bankr. Dkt. No. 1697, and Dugaboy and the Get Good Trust. Bankr. Dkt. No. 1706.

| UBS Securities LLC, UBS AG, London Branch (the "UBS Parties") | 6/26/2020<br><br>Claim Nos. 190, 191 | $1,039,957,799.40 | Yes[90]<br><br>$125,000,000 in aggregate ($65,000,000 General | 8/9/2021<br>Bankr. Dkt. No. 2698<br>(Muck) and<br>Bankr. Dkt. No. 2697<br>(Jessup) |
|---|---|---|---|---|

HMIT insists that it "made no sense" for the Claims Purchasers to buy the Purchased Claims because "the publicly available information [] did not offer a sufficient potential profit to justify the publicly disclosed risk," and "their investment was projected to yield a small return with virtually no margin for error."[91] Dondero testified that it was *his* view that there was insufficient information in the public to justify the claims purchases.[92] But, HMIT's arguments here are contradicted by the information that was publicly available to Farallon and Stonehill at the time of their purchases and by HMIT's own allegations. In advance of Plan confirmation, Highland projected that Class 8 general unsecured creditors would recover 71.32% on their allowed claims. In the Proposed Complaint, HMIT sets forth the amounts the Claims Purchasers purportedly paid for their claims.[93] Taking into account the face amount of the allowed claims, the Claims Purchasers' projected profits (in millions of dollars) were as follows:

| Creditor | Class 8 | Class 9 | Ascribed Value[94] | Purchaser | Purchase Price | Projected Profit |
|---|---|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | $97.71 | Stonehill | $78.0 | $19.71 |
| Acis | $23.0 | $0.0 | $16.4 | Farallon | $8.0 | $8.40 |

[90] Bankr. Dkt. No. 2389. The Debtor's settlement with the UBS Parties was approved over the objections of Dondero, Dkt. No. 2295, and Dugaboy and the Get Good Trust. Bankr. Dkt. Nos. 2268, 2293.

[91] Proposed Complaint, ¶ 3.

[92] June 8 Hearing Transcript, 187:3-7 ("Q: And it's your testimony that there wasn't sufficient information in the public for them to buy – this is your view – that there wasn't sufficient information in the public to justify their purchases. Is that your view? A: Correct.).

[93] *Id.*, ¶ 42.

[94] "Ascribed Value" is derived by multiplying the Class 8 amount by the projected recovery of 71.32% for that class.

| HarbourVest | $45.0 | $35.0 | $32.09 | Farallon | $27.0 | $5.09 |
| UBS | $65.0 | $60.0 | $46.39 | Stonehill & Farallon | $50.0 | ($3.61) |

As HMIT acknowledges, by the time Dondero spoke with Farallon in the "late spring" of 2021, the Claims Purchasers had acquired the allowed claims previously held by Acis, Redeemer, and HarbourVest.[95]  Based on an aggregate purchase price of $113 million for these three claims, the Claims Purchasers would have expected to net over $33 million in profits, or nearly 30% on their investment, had Highland met its projections. The Claims Purchasers would make even more money if Highland beat its projections, because they also purchased the Class 9 claims and would therefore capture any upside.  In this context, HMIT's and Dondero's assertions that it did not "make any sense" for the Claims Purchasers to purchase their claims when they did does not pass muster—given the publicly available information about potential recoveries under the Plan. Dondero even acknowledged, on cross-examination, that he was prepared to pay *30 percent more* than Farallon had paid, even though he did not think there was sufficient public information available to justify Farallon's purchase of the claims.[96]  Dondero essentially testified that he wanted to purchase Farallon's claims because he wanted to be in a position of control to force a settlement or resolution of the bankruptcy case, post-confirmation, under terms acceptable to him. He did not want to try to settle by negotiating with Farallon and Stonehill *as creditors*, but instead he wanted to purchase the claims because "if we owned all the claims, it would settle the case."[97]

---

[95] *See* Complaint, ¶ 41 n.12.  The UBS claims were not acquired until August 2021, long after the alleged "*quid pro quo*" was supposedly agreed upon and the MGM-Amazon deal was announced in the press in late May 2021. *See,* Highland Ex. 34, *Amazon's $8.45 Billion Deal for MGM is Historic But Feels Mundane* (dated May 26, 2021).

[96] June 8 Hearing Transcript, 187:8-11.

[97] *Id.*, 187:12-189:10.

D. *Fifth Circuit's Approval of the Gatekeeper Provision in Plan, Recognition of Res Judicata Effect of the Prior Gatekeeper Orders, and the Bankruptcy Court's Order Approving Highland's Motion to Conform Plan*

Harkening back to February 22, 2021, after a robust confirmation hearing, this court entered its order confirming the Plan, over the objections of Dondero and Dondero-Related Parties, specifically questioning the good faith of their objections. The court found, after noting "the remoteness of their economic interests" that "[it] has good reason to believe that [the Dondero Parties] are not objecting to protect economic interests they have in the Debtor but to be disruptors. Dondero wants his company back. This is understandable, but it is not a good faith basis to lob objections to the Plan."[94] The Plan became effective on August 11, 2021.

Of relevance to the Motion for Leave, the confirmed Plan included certain exculpations, releases, and injunctions designed to protect the Debtor and other bankruptcy participants from bad-faith litigation. These participants included: Highland's employees (with certain exceptions); Seery as Highland's CEO and CRO; Strand (after the appointment of the Independent Directors); the Independent Directors; the successor entities; the CTOB and its members; the Committee and its members; professionals retained in the case; and all "Related Persons." The injunction provisions contained a Gatekeeper Provision which is similar to the gatekeeper provisions in the prior Gatekeeper Orders in that it provided that the bankruptcy court will act as a "gatekeeper" to screen and prevent bad-faith litigation against the Protected Parties. The Gatekeeper Provision in the Plan states, in pertinent part:[98]

> No Enjoined Party may commence or pursue a claim or cause of action of any kind against any Protected Party that arose or arises from or is related to the Chapter 11 Case . . . without the Bankruptcy Court (i) first determining, after notice and a hearing, that such claim or cause of action represents ***a colorable claim of any kind***, including, but not limited to, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically

---

[98] Plan, 50-51 (emphasis added).

authorizing such Enjoined Party to bring such claim or cause of action against such Protected Party.

The Plan defines Protected Parties as,

collectively, (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the [CTOB] (in their official capacities), (xiii) [HCMLP GP LLC], (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); [but excluding Dondero and Okada and various entities including HMIT and Dugaboy].

The court notes that the Gatekeeper Provision in the Plan provides protection to a broader number of persons than the persons protected under the January 2020 Order (addressing the Independent Directors and their agents and advisors) and the July 2020 Order (addressing Seery in his role as CEO and CRO of the Debtor). But, at the same time, it is less restrictive than the gatekeeping provisions under the Gatekeeper Orders, in that the gatekeeping provisions in the prior orders shield the protected parties from any claim that is not both "colorable" *and* a claim for "willful misconduct or gross negligence," effectively providing the protected parties under the prior orders with a limited immunity from claims of simple negligence or breach of contract that do not rise to the level of "willful misconduct or gross negligence," whereas the Gatekeeping Provision under the Plan does not act as a release or exculpation of the Protected Parties in any way because it does not prohibit any party from bringing *any kind of claim* against a Protected Party, provided the proposed claimant first obtains a finding in the bankruptcy court that its proposed claims are "colorable."[99]

---

[99] It should be noted that--as discussed further below--there are, separately in the Plan, exculpations as to a smaller universe of persons--*e.g.,* the Debtor, the Committee and its members, and the Independent Directors.

Dondero and some of the entities under his control appealed[100] the Confirmation Order directly to the Fifth Circuit, arguing, among other issues, that the Plan's exculpation, release, and injunction provisions, including the Gatekeeper Provision (collectively, the "Protection Provisions") impermissibly provide certain non-debtor bankruptcy participants with a discharge, purportedly in contravention of the provisions of Bankruptcy Code § 524(e)'s statutory bar on non-debtor discharges. As noted above, the Fifth Circuit, "affirm[ed] the confirmation order in large part" and "reverse[d] *only insofar as the plan exculpates* certain non-debtors in violation of 11 U.S.C. § 524(e), strik[ing] those few parties *from the plan's exculpation*, and affirm[ed] on all remaining grounds."[101] The Fifth Circuit specifically found the "injunction and gatekeeping provisions [to be] sound" and found that it was only "the *exculpation* of certain non-debtors" that "exceed[ed] the bankruptcy court's authority," agreeing with the bankruptcy court's conclusions that the Protection Provisions were legal, necessary under the circumstances, and in the best interest of all parties" in part, and only disagreeing to the extent that the *exculpation* provision improperly extended to certain bankruptcy participants other than Highland, the Committee and its members, and the Independent Directors and "revers[ing] and strik[ing] the few unlawful parts

---

[100] On appeal, the appellant funds ("Funds"), whom this court found to be "owned and/or controlled" by Dondero despite their purported independence, also asked the Fifth Circuit to vacate this court's factual finding "because it threatens the Funds' compliance with federal law and damages their reputations and values" and because "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him." *NexPoint Advisors, L.P. v. Highland Capital Mgmt., L.P. (In re Highland Capital Mgmt., L.P.)*, 48 F.4th at 434. Applying the "clear error" standard of review, the Fifth Circuit "le[ft] the bankruptcy court's factual finding undisturbed" because "nothing in this record leaves us with a firm and definite conviction that the bankruptcy court made a mistake in finding that the Funds are 'owned and/or controlled by [Dondero]." *Id.* at 434-35.

[101] *See supra* note 4. The Fifth Circuit replaced its initial opinion with its final opinion a few days after certain appellants had filed a short (four-and-one-half pages) motion for rehearing (the "Motion for Rehearing") on September 2, 2022. The movants had asked the Fifth Circuit to "narrowly amend the [initial] Opinion in order to confirm the Court's holding that the impermissibly exculpated parties are similarly struck from the protections of the injunction and gatekeeper provisions of the plan (in other words, that such parties cannot constitute 'Protected Parties')." In the final Fifth Circuit opinion, same as the initial Fifth Circuit opinion, the Fifth Circuit stated that, with regard to the Confirmation Order, the panel would "reverse only insofar as the plan exculpates certain non-debtors in violation of 11 U.S.C. § 524(e), strike those few parties from the plan's exculpation, and affirm on all remaining grounds." *Highland Capital*, 48 F.4th at 424. No findings, discussion, or rulings regarding the injunction and gatekeeper provisions that were in the initial Fifth Circuit opinion were disturbed.

of the Plan's ***exculpation provision***."[102]  The Fifth Circuit then remanded to the Bankruptcy Court

"for further proceedings in accordance with the opinion."[103]

In the course of analyzing the Protection Provisions under the Plan, the Fifth Circuit noted

that the protection provisions in the January and July 2020 Orders appointing the Independent

Directors and Seery as CEO and CRO of Highland were *res judicata* and that "*those* orders have

the effect of exculpating the Independent Directors and Seery in his executive capacities" such that

"[d]espite removal from the exculpation provision in the confirmation order, the Independent

Directors' agents, advisors, and employees, as well as Seery in his official capacities are all

exculpated to the extent provided in the January and July 2020 Orders."[104]

The Reorganized Debtor filed a motion in the bankruptcy court to conform the plan to the

Fifth Circuit's mandate, proposing that only one change was needed to make the Plan compliant

with the Fifth Circuit's ruling:  narrow the defined term for "Exculpated Parties" to read as follows:

> "Exculpated Parties" means, collectively, (i) the Debtor, (ii) the Independent
> Directors, (iii) the Committee, and (iv) members of the Committee (in their official
> capacities).

The Reorganized Debtor proposed that this one simple revision of this defined term removed the

exculpations deemed by the Fifth Circuit to violate section 524(e) of the Bankruptcy Code, and

that no other changes would be required to conform the Plan and Confirmation Order to the Fifth

Circuit's mandate.  Some of the Dondero-related entities objected to the motion to conform,

arguing that the Fifth Circuit's ruling required more surgery on the Plan than simply narrowing

the defined term "Exculpated Parties."  On February 27, 2023, this court entered its order granting

---

[102] *Id.* at 435.

[103] *Id.* at 440. The Fifth Circuit's docket reflects that it issued its Judgment and mandate on September 12, 2022.

[104] *Highland Capital*, 48 F.4th at 438 n.15.  The Fifth Circuit stated, "To the extent Appellants seek to roll back the protections in the bankruptcy court's January 2020 and July 2020 orders (which is not clear from their briefing), such a collateral attack is precluded." *Id.*

34

Highland's motion to conform the Plan, ordering that one change be made to the Plan – revising the definition of "Exculpated Parties" – and no more.[105]   The objecting parties' direct appeal of this order has been certified to the Fifth Circuit and is one of the numerous currently active appeals by Dondero-related parties pending in the Fifth Circuit.

### E.  HMIT's Motion for Leave

HMIT filed its emergency Motion for Leave on March 28, 2023, which, with attachments, as first filed, was 387 pages in length, including an initial proposed complaint ("Initial Proposed Complaint") and two sworn declarations of Dondero that were attached as "objective evidence" in "support[ ]" of the Motion for Leave,[106] and with it, an application for an emergency setting on the hearing on the Motion to Leave.  On April 23, 2023, HMIT filed a pleading entitled a "supplement" to its Motion to Leave ("Supplement"),[107] to which it attached a revised proposed verified complaint ("Proposed Complaint")[108] as Exhibit 1-A to the Motion for Leave and stated that "[t]he Supplement is not intended to amend or supersede the [Motion for Leave]; rather, it is intended as a supplement to address procedural matters and to bring forth additional facts that further confirm the appropriateness of the derivative action."[109]   The HMIT Motion for Leave was later amended to eliminate the Dondero Declarations and references to the same (but not the underlying allegations that were supposedly supported by the Dondero Declarations).[110]

---

[105] Bankr. Dkt. No. 3672.

[106] Bankr. Dkt. No. 3699.

[107] Bankr. Dkt. No. 3760.

[108] *See supra* note 5.

[109] Supplement ¶ 1.

[110] Bankr. Dkt. Nos. 3815 and 3816.  Both of these filings had the Initial Proposed Complaint attached as Exhibit 1 to the Motion for Leave.

As earlier noted, HMIT desires leave to sue the Proposed Defendants regarding ***the post-confirmation, pre-Effective Date purchase of allowed unsecured claims***.   The Proposed Defendants would be:

> **Seery,** who was a stranger to Highland until approximately four months following the Petition Date when he was brought in as one of the three Independent Directors, and now serves as the CEO of the Reorganized Debtor and the Trustee of the Claimant Trust (and also was previously Highland's CRO during the case, then CEO, and, also, an Independent Board Member of Highland's general partner during the Highland case).  Seery is best understood as the man who took Dondero's place running Highland—per the request of the Committee.

> **Claims Purchasers,** who were strangers to Highland until the end of the bankruptcy case.  They are identified as Farallon Capital Management, LLC ("Farallon"); Muck Holdings, LLC ("Muck"), which was a special purpose entity created by Farallon to purchase unsecured claims against Highland; Stonehill Capital Management, LLC ("Stonehill"); and Jessup Holdings, LLC ("Jessup"), which was a special purpose entity created by Stonehill to purchase unsecured claims against Highland (collectively, the "Claims Purchasers").  The Claims Purchasers purchased $240 million face value of already-allowed unsecured claims post-confirmation and pre-Effective Date in the spring of 2021 and another $125 million face value of already-allowed unsecured claims in August 2021. Bankruptcy Rule 3001(e) notices—giving notice of same—were filed on the bankruptcy clerk's docket regarding these purchases.  The claims had previously been held by the creditors known as the Crusader Redeemer Committee, Acis Capital, HarbourVest, and UBS (three of these four creditors formerly served on the Committee during the Highland bankruptcy case).

> **John Doe Defendants Nos. 1-10**, which are described to be "currently unknown individuals or business entities who may be identified in discovery as involved in the wrongful transactions at issue."

> **Highland,** as a nominal defendant.  HMIT added Highland as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

> **Claimant Trust**, as a nominal defendant.  HMIT added the Claimant Trust as a nominal defendant in the Revised Proposed Complaint attached to the Supplement.

The proposed plaintiffs would be:

> **HMIT,** which, again, was the largest equity holder in Highland and held a 99.5% limited partnership interest (specifically, Class B/C limited partnership interests).  HMIT is the holder of a Class 10 interest under the Plan, pursuant to which HMIT's limited partnership interest in Highland was extinguished as of the Effective Date in exchange for a pro rata share of a contingent interest in the Claimant Trust.

**Highland,** as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Reorganized Debtor.

**Claimant Trust**, as a nominal party.  HMIT wishes to bring its complaint on behalf of itself and derivatively on behalf of the Claimant Trust.

In the Proposed Complaint, HMIT asserts the following six counts: Count I (against Seery) for breach of fiduciary duties; Count II (against the Claims Purchasers and John Doe Defendants) for knowing participation in breach of fiduciary duties; Count III (against all Proposed Defendants) for conspiracy; Count IV (against Muck and Jessup) for equitable disallowance of their claims; Count V (against all Proposed Defendants) for unjust enrichment and constructive trust; and Count VI (against all Proposed Defendants) for declaratory relief.[111]  The gist of the Proposed Complaint is as follows.  HMIT asserts that something seems amiss regarding the post-confirmation/pre-Effective Date purchase of claims by the Claims Purchasers.  Actually, more bluntly, HMIT asserts that "wrongful conduct occurred" and "improper trades" were made.[112]  HMIT believes the Claims Purchasers paid around $160 million for the $365 million face amount of claims they purchased. HMIT believes that this amount was too high for any rational claim purchaser (particularly hedge funds who expect high returns) to have paid for the claims—based on Highland's Disclosure Statement and Plan projections regarding the projected distributions under the Plan to holders of allowed unsecured claims.  And, of course, Dondero purports to have concluded from the three phone conversations he had with representatives of one of the Claims Purchasers that they did no due diligence before purchasing the claims.  Therefore, HMIT surmises, Seery must have given these Claims Purchasers MNPI regarding Highland that convinced them that it was to their economic advantage to purchase the claims.  In particular, HMIT surmises Seery must have shared

---

[111] In the Initial Proposed Complaint, HMIT proposed to bring claims against the various Proposed Defendants in seven counts, including a count for fraud by misrepresentation and material nondisclosure against all Proposed Defendants.  In the Proposed Complaint, HMIT abandons its claim for fraud by misrepresentation and material nondisclosure.

[112] Motion for Leave, 7.

37

MNPI regarding the likely imminent sale of MGM, in which Highland had, directly and indirectly, substantial holdings. As noted earlier, MGM was ultimately purchased by Amazon after a sale process that had been quite publicly discussed in media reports for several months and that was officially announced to the public in late May 2021 (just a few weeks after the Claims Purchasers purchased some of their claims, but a few months *before* certain of their claims—the UBS claims—were purchased).[113] In summary, while the Proposed Complaint is lengthy and at times hard to follow, it boils down to allegations that: (a) Seery filed (or caused to be filed) deflated, pessimistic, misleading projections regarding the value of the Debtor's estate in connection with the Plan, (b) then induced very sophisticated unsecured creditors to discount and sell their claims to the likewise very sophisticated Claims Purchasers, (c) which Claims Purchasers are allegedly friendly with Seery, and are now happily approving Seery's allegedly excessive compensation demands post-Effective Date (resulting in less money in the pot to pay off the creditor body in full, and, thus, a diminished likelihood that HMIT will realize any recovery on its contingent Class 10 interest). HMIT argues that Seery should be required to disgorge his compensation. It appears that HMIT also seeks other damages in the form of equitable disallowance of the Claims Purchasers' claims and disgorgement of distributions on account of those claims, the imposition of a constructive trust over all disgorged funds, and declaratory relief.

HMIT claims that, in seeking to file the Proposed Complaint, it is seeking to protect the rights and interests of the Reorganized Debtor, the Claimant Trust, and "innocent stakeholders" who were allegedly injured by Seery's and the Claims Purchasers' alleged conspiratorial and

---

[113] The MGM-Amazon deal was ultimately consummated in March 2022 for approximately $6.1 billion, net of cash acquired, plus approximately $2.5 billion in debt that Amazon assumed and immediately repaid. Credible testimony from Seery at the June 8 Hearing revealed that Highland and entities it controlled tendered their MGM holdings in connection with the Amazon transaction (they did not sell their holdings while the MGM-Amazon deal was under discussion and/or not made public).

fraudulent scheme to line Seery's pockets with excessive compensation for his role as Claimant Trustee.  In its Motion for Leave, HMIT states that "[t]he attached Adversary Proceeding alleges claims which are substantially more than 'colorable' based upon plausible allegations that the Proposed Defendants, acting in concert, perpetrated a fraud, including a fraud upon innocent stakeholders, as well as breaches of fiduciary duties and knowing participation in (or aiding or abetting) breaches of fiduciary duty."[114]

### F.  Is HMIT Really Dondero by Another Name?

The Proposed Defendants argue that HMIT's Motion for Leave is nothing more than a continuation of the harassing and bad-faith litigation by Dondero and his related entities that the Gatekeeper Provisions were intended to prevent and, thus, this is one of multiple reasons that the Motion for Leave should be denied.

To be clear, HMIT asserts that it is controlled by Mark Patrick ("Patrick"), who has been HMIT's administrator since August 2022.  Patrick asserts that he is not influenced or controlled by Dondero, in general, and specifically not in its efforts to pursue the Proposed Claims against Seery and the Claims Purchasers.  However, the testimony elicited at the June 8 Hearing—the hearing at which HMIT had the burden of showing the court that its Proposed Claims were "colorable" such that it should be allowed to pursue them through the filing of the Proposed Complaint—paints a different picture.  Somewhat tellingly, HMIT chose not to call Patrick— allegedly HMIT's only representative and control person—as a witness in support of its Motion for Leave.  Rather, Dondero was HMIT's first witness called in support of its motion, and the first

---

[114] *See* Motion for Leave (Bankr. Dkt. No. 3816) ¶ 3.  HMIT notes, in a footnote 6, that "Neither this Motion nor the proposed Adversary Complaint seeks to challenge the Court's Orders or the Plan. In addition, neither this Motion nor the proposed Adversary Complaint seeks to redistribute the assets of the Claimant Trust in a manner that would adversely impact innocent creditors.  Rather, the proposed Adversary Proceeding seeks to benefit all innocent stakeholders while working within the terms and provisions of the Plan, as well as the Claimant Trust Agreement."

questions on direct from HMIT's counsel were aimed at establishing that Dondero was not behind the filing of the Motion for Leave and the pursuit of the Proposed Claims.[115]  Dondero testified that he did not (i) "have any current official position" with HMIT, (ii) "attempt to exercise [control] on the business affairs of [HMIT]," (iii) "have any official legal relationship with [HMIT] where [he] can attempt to exercise either direct or indirect control over [HMIT]," or (iv) "participate in the decision of whether or not to file the proceedings that are currently pending before Judge Jernigan."[116]  After HMIT rested, Highland and the Claimant Trust called Patrick as a witness, and he testified that he was the administrator of HMIT, that HMIT does not have any employees, operations, or revenues, and, when asked if HMIT owned any assets, Patrick testified, with not a great deal of certainty, that "it's my understanding it has a contingent beneficiary interest in the Claimants [sic] Trust" and that is the only asset HMIT has.[117]  Patrick testified that HMIT did not owe any money to Dondero personally, but acknowledged that in 2015, HMIT had issued a secured promissory note in favor of Dondero's family trust, Dugaboy, in the amount of approximately $62.6 million (the "Dugaboy Note") in exchange for Dugaboy transferring a portion of its limited partner interests in Highland to HMIT; the Dugaboy Note was secured in part by the Highland limited partnership interests purchased from Dugaboy.[118]  Patrick admitted that, if HMIT's Class 10 interest has no value, HMIT would have no ability to pay the Dugaboy Note.[119]  He further testified that neither he nor any representative of HMIT had ever spoken with any representative of Farallon or Stonehill, that he had no personal knowledge about any *quid pro quo*, the amount of due diligence Farallon or Stonehill conducted prior to buying their claims, or the terms of

---

[115] *See* June 8 Hearing Transcript, 113:10-25.

[116] *Id.*

[117] June 8 Hearing Transcript, 307:7-308:2.

[118] *Id.*, 303:11-305:1; Highland Ex. 51, HMIT's $62,657,647.27 *Secured Promissory Note* dated December 24, 2015, in favor of Dugaboy.

[119] *Id.*, 308:3-16.

40

Seery's compensation package (until the terms were disclosed to them in opposition to the Motion for Leave).[120]  Patrick admitted that Dugaboy was paying HMIT's attorneys' fees pursuant to a settlement agreement between HMIT and Dugaboy.[121]

On cross-examination by HMIT's counsel, Patrick further testified that HMIT has not filed any litigation, as plaintiff, other than its efforts to be a plaintiff in the Motion for Leave and its action as a petitioner in the Texas Rule 202 proceeding filed earlier in 2023 in the Texas state court.[122] HMIT's counsel argued that the point of this questioning was that "they're just trying to draw Dondero into this and – this vexatious litigant argument, and we're just developing the fact that obviously Hunter Mountain has only filed – attempting to file this action and a Rule 202 proceeding.[123]  But, Dondero and HMIT's counsel referred during the June 8 Hearing to the First Rule 202 Petition (where Dondero was the petitioner) and the Second Rule 202 Petition (where HMIT was the petitioner) as "our" Rule 202 petitions, and also to the numerous attempts at getting the discovery (that Dondero had warned Linn was coming) in the collective.  For example, in objecting to the admission of Highland's Exhibit 10 – the Texas state court order denying and dismissing the Second Rule 202 Petition – on the basis of relevance, HMIT's counsel referred to the order as "an order denying *our second"* Rule 202 Petition.[124]  And, Dondero testified that his warning to Linn in May 2021 that "discovery was coming" was "my response to I knew they had traded on material nonpublic information" and that "I thought it would be a lot easier to get

---

[120] *Id.*, 308:18-312:12. This testimony from Patrick came after HMIT's counsel objection to counsel's line of questioning regarding Patrick's personal knowledge of the facts supporting the allegations in the Proposed Complaint on the basis that he was invading the attorney work product privilege, which was overruled by this court; HMIT's counsel argued (311:4-19) that the line of questioning was an "invasion of attorney work product . . . [b]ecause they might – he would have knowledge from the efforts and investigation through attorneys in the case."

[121] *Id.*, 312:24-313:18.

[122] *Id.*, 315:3-9.

[123] *Id.*, 316:6-11.

[124] *Id.*, 58:11-13.  The court overruled HMIT's relevance objection and admitted Highland's Exhibit 10 into evidence. *Id.*, 58:14-15.

discovery on a situation like this than it has been for the last two years" and that "*we've* been trying for two years to get . . . discovery."[125]

Dondero's use of an entity over which he exerts influence and control to pursue his own agenda in the bankruptcy case is not new. Rather, this has been part of Dondero's *modus operandi* since the "nasty breakup" between Dondero and Highland that culminated with Dondero's ouster in October 2020, whereby Dondero, after not getting his way in the bankruptcy court, continued to lob objections and create obstacles to Highland's implementation of the Plan through entities he owns or controls. As noted above, the Fifth Circuit specifically upheld this court's finding in the Confirmation Order that Dondero owned or controlled the various entities that had objected to confirmation of the Plan and appealed the Confirmation Order, where the Dondero-related appellants made similar protestations that they are not owned or controlled by Dondero and asked the Fifth Circuit to vacate this court's factual finding because, among other reasons, "[a]ccording to the Funds, the characterization is unfair, as *they* are not litigious like Dondero and are completely independent from him."[126] Based on the totality of the evidence in this proceeding, the court finds that, contrary to the protestations of HMIT's counsel and Patrick otherwise, Dondero is the driving force behind HMIT's Motion for Leave and the Proposed Complaint. The Motion for Leave is just one more attempt by Dondero to press his conspiracy theory that he has pressed for over two years now, unsuccessfully, in Texas state court through Rule 202 proceedings, with the Texas State Securities Board, and with the United States Trustee's office.

---

[125] *Id.*, 191:5-25.

[126] *Highland Capital*, 48 F.4th at 434-435.

G. *Opposition to Motion for Leave:  Arguing No Standing and No "Colorable" Claims*

Highland, the Claimant Trust, and Seery (together, the "Highland Parties") filed a joint

opposition ("Joint Opposition") to HMIT's Motion for Leave on May 11, 2023.[127]  The Claims

Purchasers filed a separate objection ("Claims Purchasers' Objection") to the Motion for Leave on

May 11, 2023, as well.[128]  In the Joint Opposition, the Highland Parties urge the court to deny

HMIT leave to pursue the Proposed Claims because, as a threshold matter, HMIT does not have

standing to bring them, directly or derivatively against the Proposed Defendants.  They argue, in

the alternative, that the Motion for Leave should be denied even if HMIT had standing to pursue

the Proposed Claims because none of the Proposed Claims are "colorable" claims as that term is

used in the Gatekeeper Provision of the Plan (and Gatekeeper Orders).[129]

The Claims Purchasers likewise argue that HMIT lacks standing to complain about claims

trading in the bankruptcy which occurred between sophisticated Claims Purchasers and

sophisticated sellers ("Claims Sellers"), represented by skilled bankruptcy and transactional

counsel.  Moreover, they argue HMIT cannot show that it or the Reorganized Debtor or the

Claimant Trust were injured by the claims trading at issue because the Purchased Claims had

already been adjudicated as allowed claims in the bankruptcy case—thus, distributions under the

Plan on account of the Purchased Claims remain the same, the only difference being who holds

the claims.  Moreover, even if HMIT could succeed in equitably subordinating the validly

transferred ***allowed*** claims, HMIT would still be in the same position it is today:  the holder of a

---

[127] Bankr. Dkt. Nos. 3783.  Highland, the Claimant Trust, and Seery also filed on May 11 a *Declaration of John A. Morris in Support of Highland Capital Management, L.P., Highland Claimant Trust, and James P. Seery, Jr.'s Joint Opposition to Hunter Mountain Investment Trust's Motion for Leave to File Verified Adversary Proceeding* ("Morris Declaration") that attached 44 Exhibits in support of the Joint Opposition. Bankr. Dkt. No. 3784.

[128] Bankr. Dkt. No. 3780.

[129] *See* Joint Opposition ¶ 139 ("Because HMIT lacks standing, this Court need not reach the merits of HMIT's proposed Adversary Complaint.  As a matter of judicial economy, however, the Highland Parties respectfully request that this Court address the lack of merit as an alternative basis to deny the Motion.").

contingent, speculative Class 10 interest that would only be paid after payment, in full, with interest, of all creditors under the Plan.  The Claims Purchasers argue in the alternative that the Proposed Claims are not "colorable."

Finally, the Proposed Defendants argue that the standard of review for assessing whether the Proposed Claims are "colorable" (as such term is used in the Gatekeeper Provision and Gatekeeping Orders) is a standard that is a higher than the "plausibility" standard applied to Rule 12(b)(6).  They argue that HMIT should be required to meet a higher bar with respect to colorability that includes making a *prima facie* showing that the Proposed Claims have merit (and/or are not without foundation) which requires HMIT to do more than meet the liberal notice-pleading standards.

### H.  HMIT's Reply to the Proposed Defendants' Opposition to the Motion for Leave

In its reply brief ("Reply"), filed by HMIT on May 18, 2023,[130] it argues that it has constitutional standing as an "aggrieved party" to bring the Proposed Claims on behalf of itself.[131] HMIT also argues that it has standing under Delaware Trust law to bring a derivative action on behalf of the Claimant Trust and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to bring the claims.[132]  Finally, HMIT maintains that the standard of review that the bankruptcy court should apply in assessing the "colorability" of the Proposed Claims is no greater than the standard of review applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), which would require the bankruptcy court to look only to the "four corners" of the Proposed Complaint

---

[130] Bankr. Dkt. No. 3785.

[131] *See* Reply ¶ 7.

[132] See, Reply ¶ 23 n.5, where HMIT argues "The nature of this injury, in addition to Seery's influence over the Claimant Trust, and the lack of prior action by the Claimant Trust to pursue the claims HMIT seeks to pursue derivatively, among other things, demonstrate that HMIT is not only a proper party to assert its derivative claims – but the best party to do so."

and "not weigh extraneous evidence,"[133] take all allegations as true, and view all allegations and inferences in a light most favorable to HMIT.  As discussed in greater length below, HMIT argues that, under this standard, the bankruptcy court should not consider evidence in making its determination as to whether the Proposed Complaint presents "colorable" claims.

### I.  Litigation within the Litigation:  The Pre- June 8 Hearing Skirmishes

Suffice it to say there was significant activity before the Motion for Leave actually was presented at the June 8 hearing.  HMIT sought an emergency hearing on its Motion for Leave (wanting a hearing on three days' notice).  When the bankruptcy court denied an emergency hearing, HMIT unsuccessfully pursued an interlocutory appeal of the denial of an emergency hearing to the district court. HMIT then petitioned for a writ of mandamus at the Fifth Circuit regarding the emergency hearing denial, which was denied by the Fifth Circuit on April 12, 2023.

Next, there were multiple pleadings and hearings regarding ***what kind of hearing*** the bankruptcy court should or should not hold on the Motion for Leave—particularly focusing on whether or not it would be an evidentiary hearing.[134]  The resolution of this issue turned on what standard of review the court should apply in exercising its gatekeeping function and determining the colorability of the Proposed Claims.  HMIT (although it had submitted two declarations of Dondero with its original Motion for Leave and approximately 350 pages of total evidentiary support) was adamant that there should be no evidence presented at the hearing on the Motion for Leave, arguing that the standard for review should be the plausibility standard under Rule 12(b)(6)

---

[133] *See* Reply ¶ 47.

[134] Highland, joined by Seery and the Claims Purchasers, had filed a motion asking the bankruptcy court to set a briefing schedule on the Motion for Leave and to schedule a status conference, indicating that Highland's proposed timetable for same was opposed by HMIT. HMIT subsequently filed a response unopposed to a briefing schedule and status conference, but, before the status conference, HMIT filed a brief, stating it was opposed to there being any evidence at the ultimate hearing on the HMIT Motion for Leave—arguing the bankruptcy court did not need evidence to exercise its gatekeeping function and determine if HMIT has a "colorable" claim.  Rather, the court need only engage in a Rule 12(b)(6)-type plausibility analysis.

motions to dismiss such that "the threshold inquiry is very, very low. Evidence is not allowed. . . . [S]imilar to a 12(b)(6) inquiry, [the court] is limited to the four corners of the principal pleading – in this case, the complaint, or now the revised complaint."[135] Counsel for the Proposed Defendants argued that the standard of review for colorability here, in the specific context of the court exercising its gatekeeping function under the Plan, is more akin to the standards applied under the Supreme Court's *Barton Doctrine*[136] pursuant to which that the bankruptcy court must apply a higher standard than the 12(b)(6) standard, including the consideration of evidence at the hearing on the motion for leave; if the standard of review presents no greater hurdle to the movant than the 12(b)(6) standard applied to every plaintiff in every case, then the gatekeeping provisions mean nothing and do nothing to protect the parties from the harassing, bad-faith litigation they were put in place to prevent.[137] On May 22, 2023, after receipt of post-hearing briefing on the issue, the court entered an order stating that "the court has determined that there may be mixed questions of fact and law implicated by the Motion for Leave" and "[t]herefore, the parties will be permitted to present evidence (including witness testimony) at the June 8, 2023 hearing [on the Motion to Leave] if they so choose."

Two days later, HMIT filed an emergency motion for expedited discovery or alternatively for continuance of the June 8, 2023 hearing, seeking expedited depositions of corporate

---

[135] Transcript of April 24, 2023 Status Conference, Bankr. Dkt. No. 3765 ("April 24 Transcript"), 14:6-11.

[136] The *Barton Doctrine* was established in the 19th century Supreme Court case of *Barton v. Barbour*, 104 U.S. 126 (1881), and states that a party wishing to sue a court-appointed trustee or receiver must first obtain leave of the appointing court by making a *prima facie* case that the claim it wishes to bring is not without foundation.

[137] *See* April 24 Transcript, 36:24-37:4 ("[W]e're exactly today where the Court had predicted in entering [the Confirmation Order], that the costs and distraction of this litigation are substantial. And if all we're doing is replicating a 12(b)(6) hearing on a motion for leave, we're actually not doing anything to reduce, as the Court made clear, the burdens, distractions, of litigation."); 37:5-13 ("The Fifth Circuit likewise cited *Barton* in its order affirming the confirmation order. Specifically, it also explained that the provisions, these gatekeeper provisions requiring advance approval were meant to 'screen and prevent bad-faith litigation.' Well that – if that means only what the Plaintiff[ ] say[s] it does, then it really doesn't do anything at all to screen. There's no gatekeeping because their version of what that means is always policed under 12(b)(6) standards.").

representatives of the Claims Purchasers and of Seery and production of documents pursuant to deposition notices and subpoenas duces tecum that HMIT had attached to the motion. On May 26, 2023, this court held yet another status conference. Following the status conference, the court granted in part and denied in part HMIT's request for expedited discovery by ordering only Seery and Dondero to be made available for depositions prior to the June 8 Hearing. The court reached what seemed like appropriate middle ground by allowing the deposition of Seery and allowing the other parties to depose Dondero (for whom sworn declarations had been submitted), but the court was not going to allow any more discovery (i.e., of the Claims Purchasers) at so late an hour. The court was aware that HMIT and Dondero had been seeking discovery relating to the very claims trades that are the subject of the Revised Proposed Complaint from the Claims Purchasers in Texas state court "Rule 202" proceedings for approximately two years, where their attempts were rebuffed.

Approximately 60 hours before the June 8 Hearing, HMIT filed its Witness and Exhibit List disclosing for the first time two potential expert witnesses (along with biographical information and a disclosure regarding the subject matter of their likely testimony). Highland, the Claimant Trust, and Seery filed a joint motion to exclude the expert testimony and documents ("Motion to Exclude"), which the court ultimately granted in a separate order.

During the full-day June 8 Hearing on the Motion to Leave, the court admitted over 50 HMIT exhibits and over 30 Highland/Claimant Trust exhibits. The court heard testimony from HMIT's witnesses Dondero and Seery (as an adverse witness) and from the Highland Parties' witness Mark Patrick, the administrator of HMIT since August 2022 (as an adverse witness). The bankruptcy court allowed HMIT to make a running objection to all evidence—as it continued to argue that evidence was not appropriate.

47

## III.    LEGAL ANALYSIS

In determining whether HMIT should be granted leave, pursuant to the Gatekeeper Provision of the Plan and the court's prior Gatekeeper Orders, to pursue the Proposed Claims, the court must address the issue of whether HMIT would have **standing** to bring the Proposed Claims in the first instance.  If so, the next question is whether the Proposed Claims are "**colorable**."  But prior to getting into the weeds on **standing** and "**colorability,**" some general discussion regarding the topic of claims trading in the bankruptcy world seems appropriate, given that HMIT's Proposed Claims are based, in large part, on allegations of **improper** claims trading.

### A.    Claims Trading in the Context of Bankruptcy Cases—Can It Be Tortious or Otherwise Actionable?

As noted, at the crux of HMIT's desired lawsuit is what this court will refer to as "claims trading activity" that occurred shortly after the Plan was confirmed, but before the Plan went effective.  HMIT believes that the claims trading activity gave rise to various torts:  breach of fiduciary duty on the part of Seery; knowing participation in breach of fiduciary duty by the other Proposed Defendants; and conspiracy by all Defendants.  HMIT also believes that the following remedies should be imposed: equitable disallowance of the Purchased Claims; disgorgement of the alleged profits the Claims Purchasers made on their purchases; and disgorgement of all Seery's compensation received since the beginning of his "collusion" with the other Defendants.   Without a doubt, the Motion for Leave and Proposed Complaint revolve almost entirely around the claims trading activity.

This begs the question:  ***When (or under what circumstances) might claims trading activity during a bankruptcy case give rise to a cause of action that either the bankruptcy estate or an economic stakeholder in the case might have standing to bring?***  Here, the claims trading

48

wasn't even "during a bankruptcy case" really—it was post-confirmation and pre-effective date, and it happened to be: (a) after mediation of the claims, (b) after Rule 9019 settlement motions, (c) after objections by Dondero and certain of his family trusts were lodged, (d) after evidentiary hearings, and (e) after orders were ultimately entered *allowing* the claims (and in most cases, such orders were appealed). The further crux of HMIT's desired lawsuit is that Seery allegedly "wrongfully facilitated and promoted the sale of large unsecured creditor claims to his close business allies and friends" by sharing *material non-public information* to them regarding the potential value of the claims (i.e., the potential value of the bankruptcy estate), and this is what made the claims trading activity particularly pernicious. The alleged sharing of MNPI allegedly caused the Claims Purchasers to purchase their claims without doing any due diligence and with knowledge that the claims would be worth much more than the Plan's "pessimistic" projections might have suggested, and also allowed Seery to plant friendly allies into the creditor constituency (and on the post-confirmation CTOB) that would "rubber stamp" his generous compensation. This is all referred to as "not arm's-length" and "collusive."  Notably, the MNPI mostly pertained to a likely future acquisition of MGM by Amazon (which transaction, indeed, occurred in 2022, after being publicly announced in Spring of 2021); as noted earlier, Highland owned, directly and indirectly, common stock in MGM.  Also notably, there had been rumors and media attention regarding a potential sale of MGM for many months.[138] In summary, to be clear, HMIT's desired lawsuit is laced with a theme of "insider trading"—although this isn't a situation of securities trading *per se* (i.e., the unsecured Purchased Claims were not securities), and, as noted earlier, the Texas State Securities Board has not seen fit to investigate the claims trading activity.

So, preliminarily, is claims trading in bankruptcy sinister *per se*?  The answer is no.

---

[138] *E.g.,* Benjamin Mullin, *MGM Holdings, Studio Behind 'James Bond,' Explores a Sale,* THE WALL STREET JOURNAL (Dec. 21, 2020, 6:38 p.m.).

The activity of investing in distressed debt (which frequently occurs during a bankruptcy case—sometimes referred to as "claims trading") is ubiquitous and, indeed, has been so for a very long time. As noted by one scholar:

> The creation of a market in bankruptcy claims is the single most important development in the bankruptcy world since the Bankruptcy Code's enactment in 1978. [Citations omitted.] Claims trading has revolutionized bankruptcy by making it a much more market-driven process. [Citations omitted.] . . . The development of a robust market for all types of claims against debtors has changed the cast of characters involved in bankruptcies. In addition to long-standing relational creditors, like trade creditors or a single senior secured bank or bank group, bankruptcy cases now involve professional distressed debt investors, whose interests and behavior are often quite different than traditional relational counterparty creditors.

Adam J. Levitin, *Bankruptcy* Markets*: Making Sense of Claims Trading*, 4 BROOK. J. CORP. FIN. & COM. L. 64, 65 (2010) (hereinafter "*Bankruptcy Markets*").[139]

As a pure policy matter, some practitioners have bemoaned this claims trading phenomenon, suggesting that "distressed debt traders may sacrifice the long-term viability of a debtor for the ability to realize substantial and quick returns on their investments."[140]   Others suggest that claims trading in bankruptcy is beneficial, in that it allows creditors of a debtor an early exit from a potentially long bankruptcy case, enabling them to save expense and administrative hassles, realize immediate liquidity on their claims (albeit discounted), and may

---

[139] *See also* Aaron Hammer & Michael Brandess, *Claims Trading:  The Wild West of Chapter 11s*, AM. BANKR. INST. JOURNAL 62 (Jul./Aug. 2010); Chaim Fortgang & Thomas Mayer, *Trading Claims and Taking Control of Corporations in Chapter 11,* 12 CARDOZO L. REV. 1, 25 (1990) (noting that "the first recorded instance of American fiduciaries trading claims against insolvent debtors predates all federal bankruptcy laws and goes back to 1790" when the original 13 colonies were insolvent, owing tremendous amounts of debt to various parties in connection with the Revolutionary War; early American investors purchased these debts for approximately 25% of their par value, hoping the claims would be paid at face value by the American government).

[140] Harvey R. Miller, *Chapter 11 Reorganization Cases and the Delaware Myth*, 55 VAND. L. REV. 1987, 2016 (2002). *See also* Harvey R. Miller & Shai Y. Waisman, *Does Chapter 11 Reorganization Remain a Viable Option for Distressed Businesses for the Twenty-First Century?*, 78 AM. BANKR. L.J. 153 (2004); Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. REV. 129 (2005).

even permit them to take advantage of a tax loss on their own desired timetable.[141]  On the flipside,
"[c]aims trading permits an entrance to the bankruptcy process for those investors who want to
take the time and effort to monitor the debtor and contribute expertise to the reorganization
process."[142]

So, what are the "rules of the road" here?  What does the Bankruptcy Code dictate
regarding claims trading? The answer is nothing. The Bankruptcy Code itself has no provisions
whatsoever regarding claims trading. The only thing resembling any regulation of claims trading
during a bankruptcy case is found at Federal Rule of Bankruptcy Procedure 3001(e)—the current
version of which went into effect in 1991—and it imposes extremely light regulation—if it could
even be called that.  This rule requires, in pertinent part (at subsection (2)), that "[i]f a claim other
than one based on a publicly traded note, bond, or debenture" is traded during the case after a proof
of claim is filed, notice/evidence of that trade must be filed with the bankruptcy clerk by the
transferee.  The transferor shall then be notified and given 21 days to object.  If there is an
objection, the bankruptcy court will hold a hearing regarding whether a transfer, in fact, took place.
If there is no objection, nothing further needs to happen, and the transferee will be considered
substituted for the transferor.

There are several things noteworthy about Rule 3001(e)(2).  First, the only party given the
opportunity to object is the ***transferor*** of the claim (presumably, in the situation of a dispute
regarding whether there was truly an agreement regarding the transfer of the claim).  Second, there
is no need for a bankruptcy court order approving the transfer (except in the event of an objection

---

[141]*See Bankruptcy Markets*, at 70.  *See also In re Kreisler,* 546 F.3d 863, 864 (7th Cir. 2008) ("Claims trading allows creditors to opt out of the bankruptcy system, trading an uncertain future payment for an immediate one, so long as they can find a purchaser.").

[142] *Bankruptcy Markets* at 70 (citing, among other authorities, Edith S. Hotchkiss & Robert M. Mooradian, *Vulture Investors and the Market for Control of Distressed Firms*, 43 J. FIN. ECON. 401, 401 (1997) (finding that "vulture investors add value by disciplining managers of distressed firms")).

by the alleged transferor).  Third, the ***economic consideration paid need not be disclosed to the court or anyone***.  Fourth, there is no requirement or definition of timeliness.  Finally, it explicitly does not apply with regard to publicly traded debt.  This, alone, means that many claims trades are not even reported in a bankruptcy case.  But it is not just publicly traded debt that will not be reflected with a Rule 3001(e) filing.  For example, bank debt, in modern times, is often syndicated (i.e., fragmented into many beneficial holders of portions of the debt) and only the administrative agent for the syndicate (or the "lead bank") will file a proof of claim in the bankruptcy—thus, as the syndicated interests (participations) change hands, and they frequently do, there typically will not be a Rule 3001(e) notice filed.[143]  To be clear here, this syndication-of-bank-debt fact, along with the fact that there are financial products whereby bank debt might be carved up into economic interests separate and apart from legal title to the loan, means there are many situations in which trading of claims during a bankruptcy case is not necessarily transparent or, for that matter, policed by the bankruptcy court. This is the world of modern bankruptcy.  Most of the claims trading that gets reported through a Rule 3001(e) notice is the trading of small vendor claims. And this is all regarded as private sale transactions for the most part.[144]

Suffice it to say that there is not a wealth of case law dealing with claims trading in a bankruptcy context.  Perhaps this is not surprising, since it is not prohibited and ***is mostly a matter of private contract between buyer and seller***.  The case law that does exist seems to arise in situations of perceived bad faith of a purchaser—for example, when there was an attempt to control voting and/or ultimate control of the debtor through the plan process (not always problematic, but

---

[143] Anne Marrs Huber & Thomas H. Young, *The Trading of Bank Debt in and Out of Chapter 11*, 15 J. BANKR. L. & PRAC. 1, 1, 3 (2006).

[144] Note that Bankruptcy Rule 3001(e) was very different before 1991.  Between 1983-1991, the rule required that parties transferring claims inform the court that a transfer of claims was taking place and also disclose the consideration paid for the transferred claims. A hearing would take place prior to the execution of a trade.  Judicial involvement was required and resulted in judicial scrutiny of transactions—something that simply does not exist today.

there are outlier cases where this was found to cross a line and result in consequences such as

disallowing votes on a plan or even equitable subordination of a claim).[145] Another type of case

that has generated case law is where the purchaser of claims occupied a fiduciary status with the

debtor.[146] Still another type of case that has generated case law is where there is an attempt to

cleanse claims that might have risks because of a seller's malfeasance, by trading the claim to a

new claim holder.[147]

The following is a potpourri of the more notable cases that have addressed claims trading

in different contexts. Most of them imposed no adverse consequences on claims traders: *In re*

*Kreisler*, 546 F.3d 863, 864 (7th Cir. 2008) (where a corporation named Garlin, that was owned

by the individual chapter 7 debtors' sister and close friend, purchased a $900,000 bank claim for

$16,500, and there was no disclosure of Garlin's connections to debtors and no Rule 3001(e)(2)

notice was filed, the Seventh Circuit reversed the bankruptcy court's invocation of the doctrine of

equitable subordination to the claim, stating: "Equitable subordination is generally appropriate

only if a creditor is guilty of misconduct that causes injury to the interests of other creditors;" the

Seventh Circuit further stated that it could "put to one side whether the court's finding of

inequitable conduct was correct" because even if there was misconduct, it did not harm the other

creditors, who were in the same position whether the original creditor or Garlin happened to own

the claim; the Seventh Circuit did note that Garlin's decision to purchase the original bank

---

[145] *In re Applegate Prop. Ltd.,* 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991) (designating votes of an affiliate of the debtor that purchased a blocking position to thwart a creditor's plan because it was done in bad faith); *In re Allegheny Int'l, Inc.,* 118 B.R. 282, 289–90 (Bankr. W.D. Pa. 1990) (because of bad faith activities, the court designated votes of a claims purchaser who purchased to get a blocking position on a plan). *But see In re First Humanics Corp.,* 124 B.R. 87, 92 (Bankr. W.D. Mo. 1991) (claims purchased by debtor's former management company to gain standing to file a plan to protect interest of the debtor was in good faith).

[146] *See In re Exec. Office Ctrs., Inc.*, 96 B.R. 642, 649-650 (Bankr. E.D. La. 1988) (and numerous old cites therein).

[147] *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 340 B.R. 180 (Bankr. S.D.N.Y. 2006), *vacated, Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.),* 379 B.R. 425 (S.D.N.Y 2007); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.),* 333 B.R. 205, 211 (Bankr. S.D.N.Y. 2005).

creditor's claim might have disadvantaged the other creditors if it interfered with the trustee's own potential settlement with the original bank creditor (note that the trustee argued that she had been negotiating a deal with bank under which bank might have reduced its claims); however, the trustee presented no evidence that any deal with the bank was imminent or even likely; thus, whether such a deal could have been reached was speculation; equitable subordination was therefore improper."); *Viking Assocs., L.L.C. v. Drewes (In re Olson),* 120 F.3d 98, 102 (8th Cir. 1997) (case involved the actions of an entity known as Viking in purchasing all of the unsecured claims against the bankruptcy estate of two chapter 7 debtors, Hugo and Jeraldine Olson; Viking was a related entity, owned by the debtors' children, and purchased $525,000 of unsecured claims for $67,000; while the bankruptcy court had discounted the claims down to the purchase amount and subordinated Viking's discounted claims to the claims of the other unsecured creditors, relying on section 105 of the Bankruptcy Code, the Eighth Circuit held that the bankruptcy court lacked the authority to do this, and, thus, reversed and remanded; the Eighth Circuit noted that in 1991, Bankruptcy Rule 3001(e)(2) was amended "to restrict the bankruptcy court's power to inspect the terms of" claims transfers. *Id.* at 101 (citing *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1314 n. 9 (1st Cir. 1993)); the text of the rule makes clear that the existence of a "dispute" depends upon an objection by the ***transferor***; where there is no objection by the ***transferor***, there is no longer any role for the court); *Citicorp. Venture Capital, Ltd. v. Official Committee of Unsecured Creditors (In re Papercraft Corp.),* 160 F.3d 982 (3d Cir. 1998) (large investor who held seat on board of directors of debtor and debtor's parent, and who also had nonpublic information regarding the debtor's value, anonymously purchased 40% of the unsecured claims at a steep discount during the chapter 11 case, and then, having obtained a blocking position for plan voting purposes, proposed a plan to acquire debtor; the claims purchaser's claims were equitably reduced to amount

54

paid for the claims since investor was a fiduciary who was deemed to have engaged in inequitable conduct); *Figter Ltd. v. Teachers Ins. & Annuity Ass'n of Am. (In re Figter),* 118 F.3d 635 (9th Cir. 1997) (Ninth Circuit affirmed bankruptcy court's ruling that a secured creditor's purchase of 21 out of 34 unsecured claims in the case was in good faith and it would not be prohibited from voting such claims on the debtor's plan, pursuant to Bankruptcy Code section 1126(e)); *In re Lorraine Castle Apartments Bldg. Corp.,* 145 F.2d 55, 57 & 58 (7th Cir. 1945) (in a case under the old Bankruptcy Act, in which there were more restrictions on claims trading, a debtor and two of its stockholders argued that the claims of purchasers of bonds should be limited to the amounts they paid for them; bankruptcy court special master found, "that, though he did not approve generally the ethics reflected by speculation in such bonds," there was no cause for limitation of the amounts of their claims, pointing out that the persons who had dealt in the bonds were not officials, directors, or stockholders of the corporation and owed no fiduciary duty to the estate or its beneficiaries—rather they were investors or speculators who thought the bonds were selling too cheaply and that they might make a legitimate profit upon them; the district court agreed, as did the Seventh Circuit, noting that "[t]o reduce the participation to the amount paid for securities, in the absence of exceptional circumstances which are not present here, would reduce the value of such bonds to those who have them and want to sell them. This would result in unearned, undeserved profit for the debtor, destroy or impair the sales value of securities by abolishing the profit motive, which inspires purchasers."); *In re Washington Mutual, Inc.*, 461 B.R. 200 (Bankr. Del. 2011), *vacated in part*, 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012) (discussion of an equity committee's potential standing to pursue equitable subordination or equitable disallowance of the claims of certain noteholders who had allegedly traded their claims during the chapter 11

55

case while having material non-public information; while bankruptcy court originally indicating these were viable tools, court later vacated its ruling on this after a settlement was reached).

Suffice it to say that the courts have, more often than not, been unwilling to impose legal consequences, for an actor's involvement with claims trading. At most, in outlier-type situations during a case, courts have taken steps to disallow claims for voting purposes or to subordinate claims to other unsecured creditors for distribution purposes.[148] But the case at bar does not present facts that are typical of any of the situations in reported cases.

For one thing, unlike in the reported cases this court has located, there ***seems to have been complete symmetry of sophistication among the claim sellers and claim purchasers here—and complete symmetry with HMIT for that matter***. All persons involved are highly sophisticated financial institutions, hedge funds, or private equity funds. No one was a "mom-and-pop" type business or vendor that might be vulnerable to chicanery. The claims ranged from being worth $10's of millions of dollars to $100's of millions of dollars in face value. And, of course, the sellers/transferors of the claims have never shown up, subsequent to the claims trading

---

[148] Note that, while some cases suggest that outright disallowance of an unsecured claim, in the case of "inequitable conduct" might be permitted (not merely equitable subordination to unsecured creditors)—usually citing to *Pepper v. Litton*, 308 U.S. 295 (1939)—the Fifth Circuit has suggested otherwise. *In re Mobile Steel Co., Inc.,* 563 F.2d 692, 699-700 (5th Cir. 1977) (cleaned up) (noting that "equitable considerations can justify only the subordination of claims, not their disallowance" and also noting that "three conditions must be satisfied before exercise of the power of equitable subordination is appropriate[:] (i) The claimant must have engaged in some type of inequitable conduct[;] (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant[; and] (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act." In *Mobile Steel*, the Fifth Circuit held that the bankruptcy judge exceeded the bounds of his equitable jurisdiction by disallowing a group of claims and also reversed the subordination of certain claims, on the grounds that the bankruptcy court had made clearly erroneous findings regarding alleged inequitable conduct and other necessary facts. *Contrast In re Lothian Oil Inc.,* 650 F.3d 539 (5th Cir. 2011) (involving the question of whether a bankruptcy court may ***recharacterize*** a claim as equity rather than debt; the court held yes, but it has nothing to do with inequitable conduct *per se*; rather section 502(b)'s language that a claim should be allowed unless it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law...." is the relevant authority; unlike equitable subordination, recharacterization is about looking at the true substance of a transaction not the conduct of a party (if it looks like a duck and quacks like a duck, it's a duck—i.e., equity); the court indicated that section 105 is not a basis to recharacterize debt as equity; it's a matter of looking at state law to determine if there is any basis and looking at the nature of the underlying transaction—as either a lending arrangement or equity infusion.

transactions, to complain about anything.  Everyone involved here is, essentially, a behemoth and there is literally no sign of innocent creditors getting harmed.  Second, the case at bar is unique in that the claims traded here **had all been allowed after objections, mediation, and Rule 9019 settlements during the bankruptcy case**.  Thus, the amounts that would be paid on them were "locked in," so to speak.  There was no risk to a hypothetical claims-purchaser of disallowance, offset, or any "claw-back" litigation (or—one might have reasonably assumed—any type of litigation). Third, the terms for distributions on unsecured claims had been established in a confirmed plan (although the claims were purchased before the effective date of the Plan).  Thus, there was a degree of certainty regarding return on investment for the Claims Purchasers here that was much higher than if the claims had been purchased early, during, or mid-way through the case.[149] **This was post-confirmation, pre-effective date claims purchasing.**  Interestingly, all three of these facts might suggest that little due diligence would be undertaken by any hypothetical purchaser.  The rules of the road had been set.  The court makes this observation because HMIT has suggested there is something highly suspicious about the fact that Farallon allegedly told Dondero that it did no due diligence before purchasing its claims (leading him to conclude that the Claims Purchasers must have purchased their claims based on receiving MNPI from Seery).  Not only has there been no colorable evidence suggesting that insider information was shared, but the lack of due diligence in this context does not reasonably seem suspicious. The claims purchases

---

[149] *See discussion* in BANKRUPTCY MARKETS, at 91:

> Some claims purchasers buy before the bankruptcy petition is filed, some at the beginning of the case, and some towards the end. For example, there are investors who look to purchase at low prices either when a business is failing or early in the bankruptcy and ride through the case until payouts are fairly certain. [Citations omitted.]  These investors might be hoping to buy at 30 cents on the dollar and get a payout at 70 cents on the dollar. Perhaps if they waited another six months, the payout would be 74 cents on the dollar, but the additional 4 cents on the dollar for six months might not be a worthwhile return for the time value of the investment. Other investors might not want to assume the risk that exists in the early days of a case when the fate of the debtor is much less certain, but they would gladly purchase at 70 cents on the dollar at the end of the case to get a payout of 74 cents on the dollar six months later.

were almost like passive investments, at this point—there was no risk of a claim objection and there was a confirmed plan, with a lengthy disclosure statement that described not only plan payment terms and projections, but essentially anything that any investor might want to know.

To reiterate, here, HMIT seeks leave to assert the following causes of action:

I.      Breach of Fiduciary Duties (Seery)

II.     Knowing Participation in Breach of Fiduciary Duties (Claims Purchasers)

III.    Conspiracy (all Proposed Defendants)

IV.     Equitable Disallowance (Claims Purchasers)

V.      Unjust Enrichment and Constructive Trust (all Proposed Defendants)

VI.     Declaratory Judgment (all Proposed Defendants)

***The court struggles to fathom how any of these proposed causes of action or remedies can be applied in the context of:  (a) post-confirmation claims trading; (b) where the claims have all been litigated and allowed***.

In reflecting on the case law and various Bankruptcy Code provisions, the court can fathom the following hypotheticals in which claims trading during a bankruptcy case might be somehow actionable:

**Hypothetical #1**:  The most obvious situation would be if a purchaser of a claim files a Rule 3001(e) Notice, and the seller/transferor then files an objection thereto. There would then be a contested hearing between purchaser and seller regarding the validity of the transfer with the bankruptcy court issuing an appropriate order after the hearing on the objection. ***As noted, there was no objection to the Rule 3001(e) notices here***.

**Hypothetical #2:** Alternatively, there could be a breach of contract suit between purchaser and seller if one thinks the other breached the purchase-sale agreement somehow.  Perhaps torts might also be alleged in such litigation. ***As noted, there is no dispute between purchasers and sellers here.***

**Hypothetical #3:** If there is believed to be fraud in connection with a plan, a party in interest might, pursuant to section 1144 of the Bankruptcy Code, move for

revocation of the plan "at any time before 180 days after the date of entry of the order for confirmation" and the court "may revoke such order if and only if such order was procured by fraud." *As noted, here HMIT has suggested that the "pessimistic" plan projections may have been fraudulent or misrepresentations somehow. The time elapsed long ago to seek revocation of the Plan.*

**Hypothetical #4:** As discussed above, in rare situations (bad faith), during a Chapter 11 case, before a plan is confirmed, a claims purchaser's claim might not be allowed for voting purposes. *See* Sections 1126(e) of the Bankruptcy Code ("the court may designate any entity whose acceptance or rejection of such plan was not in good faith"). *Obviously, in this case, this is not applicable—the claims were purchased post-confirmation.*

**Hypothetical #5:** As discussed above, in rare situations (inequitable conduct), a court might equitably subordinate **claims** to **other claims**. *See* Section 510(c) of the Bankruptcy Code. But here**,** HMIT is seeking either: (a) equitable subordination of the **claims** of the Claims Purchaser to HMIT's ***Class 10 former equity interest*** (in contravention of the explicit terms of section 510(c)) or, (b) *equitable disallowance* of the claims of the Claims Purchasers (in contravention of *Mobile Steel*).

**Hypothetical #6:** Bankruptcy Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case may permit "recharacterization" of a claim from debt to equity in certain circumstances, but not in circumstances like the ones in this case. Here, the claims have already been adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders). The only way to reconsider a claim in a bankruptcy case that has already been allowed is through Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be reconsidered for cause. . . according to the equities of the case."). The problem here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing or disallowing a claim against the estate *entered without a contest* is not subject to the one year limitation prescribed in Rule 60(c)" (emphasis added). Here there was most definitely "a contest" with regard to all of these purchased claims. *Thus, it would appear that any effort to have a court reconsider these claims pursuant to section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

**Hypothetical #7:** If a party believes "insider trading" occurred there are governmental agencies that investigate and police that. *Here, the purchased claims (which were not based on bonds or certificated equity interests) would not be securities so as to fall under the SEC's purview. Moreover, there was evidence that HMIT or Dondero-Related entities requested that the Texas State Securities Board investigate the claims trading and the board did not find a basis to pursue anyone for wrongdoing*.

**Hypothetical #8:** The United States Trustee can investigate wrongdoing by a debtor or unsecured creditors committee. While the United States Trustee would naturally have concerns about members of an unsecured creditors committee (or an officer of a debtor-in-possession) adhering to fiduciary duties and not putting their

own interests above those of the estate, here, there are a couple of points that seem noteworthy. One, the claims trading activity was post-confirmation so—while certain of the claim-sellers may have still been on the unsecured creditors committee, as the effective date of the plan had not yet occurred—the circumstances are very different than if this had all happened during the early, contentious stages of the case. It seems inconceivable that there was somehow a disparity of information that might be troubling—the Plan had been confirmed and it was available for the world to see. The whole notion of "insider information" (just after confirmation here) feels a bit off-point. Bankruptcy practitioners and judges sometimes call bankruptcy a fishbowl or use the "open kimono" metaphor for good reason. It is generally a very open process. And information-sharing on the part of a debtor-in-possession or unsecured creditors committee is intended to be robust. *See, e.g.,* Bankruptcy Code sections 521 and 1102(b)(3). In a way, HMIT here seems to be complaining about this very situation that the Code and Rules have designed.

In summary, claims trading is a highly ***unregulated*** activity in the bankruptcy world.

***HMIT is attempting to pursue causes of action here that, to this court's knowledge, have never been allowed in a context like this.***

B. *Back to Standing—Would HMIT Have Standing to Bring the Proposed Claims?*

The Proposed Defendants argue that HMIT lacks standing to bring the Proposed Claims, either: (a) derivatively on behalf of the Reorganized Debtor and Claimant Trust, or (b) directly on behalf of itself. Thus, they argue that this is one reason that the Motion for Leave should be denied.

In making their specific standing arguments, the parties analyze things slightly differently:

The Claims Purchasers focus primarily on HMIT's lack of ***constitutional*** standing but also argue that HMIT does not have ***prudential*** standing under Delaware trust law to bring the Proposed Claims either individually or derivatively. Why do they mention Delaware trust law? Because the Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29.[150]

The Highland Parties' standing arguments focus almost entirely on HMIT's lack of ***prudential*** standing under Delaware trust law to bring the Proposed Claims.

HMIT argues that the Proposed Defendants "play fast and loose with standing arguments" and that HMIT has ***constitutional*** standing as a "party aggrieved"[151] to bring the Proposed Claims on behalf of itself. HMIT also argues that it has standing under Delaware trust law to bring a

---

[150] *See* Proposed Complaint, ¶ 26.

[151] Proposed Complaint, ¶7.

derivative action on behalf of the Claimant Trust, and that it not only has standing to bring the Proposed Claims derivatively on behalf of the Reorganized Debtor under the Plan, but it is the best party to do so.

1.   The Different Types of Standing:  Constitutional Versus Prudential

The parties are addressing two concepts of standing that can sometimes be confused and misapplied by both attorneys and judges: ***constitutional Article III standing***, which implicates federal court subject matter jurisdiction,[152] and the narrower standing concept of ***prudential standing***, which does not implicate subject matter jurisdiction but nevertheless might prevent a party from having capacity to sue, pursuant to limitations set by courts, statutes or other law.

Article III constitutional standing works as follows:  a plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing three elements:  (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[153]   "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."[154] These elements ensure that a plaintiff has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."[155]

---

[152] Article III, Section 2 of the U.S. Constitution gives federal courts jurisdiction over enumerated cases and controversies.

[153] *See Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615, 1618 (2020)(citing the Supreme Court's seminal case on the tripartite test for Article III constitutional standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), where the Supreme Court stated that "the irreducible constitutional minimum of standing contains [the] three elements"); *see also Spokeo*, 578 U.S. at 338; *Abraugh v. Altimus*, 26 F.4th 298, 302 (5th Cir. 2022) (citing *id.*).

[154] *Transunion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021)(cleaned up).

[155] *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Apart from this minimal constitutional mandate, courts and statutes have set other limits on the class of persons who may seek judicial remedies—and this is the concept of prudential standing. In its recent opinion in *Abraugh v. Altimus*,[156] the Fifth Circuit set forth a detailed analysis of the two types of "standing," noting that the term "standing" is often "misused" in our legal system, which has led to confusion for both attorneys and judges.[157] The constitutional standing that is necessary for a court to exercise subject matter jurisdiction is broader than prudential standing and is only the first hurdle a party must clear before pursuing a claim in federal court.

The Fifth Circuit explained that ***in addition to*** Article III constitutional standing, "courts have occasionally articulated other 'standing' requirements that plaintiffs must satisfy under certain conditions, ***beyond those imposed by Article III***,"[158] such as the "standing" requirement that might be imposed by a statute or by jurisprudence. The *Abraugh* case was a perfect example of the latter.

*Abraugh* involved the civil rights statutes that provide, among other things, that "a party must have standing under the state wrongful death or survival statutes to bring [a § 1983 cause of action]" and noted that these statutes impose additional "standing" requirements that are a matter of prudential standing, not constitutional standing.[159] In *Abraugh*, the Fifth Circuit reversed and remanded a district court's dismissal of a § 1983 civil rights cause of action—noting that the district court had stated that it was dismissing based on a "lack of subject matter jurisdiction" because the plaintiff in that action lacked standing.[160] The plaintiff was the mother of a prisoner

---

[156] 26 F.4th 298.

[157] *Id.* at 303.

[158] *Id.* at 302 (emphasis added).

[159] *Id.* at 302-303.

[160] *Id.* at 301.

who died by suicide while in custody who brought a § 1983 action against Louisiana correctional officers and officials. After finding that the plaintiff/mother lacked standing under Louisiana's wrongful death and survival statutes (because there had been a surviving child and wife of the prisoner who were the proper parties with capacity to sue), the district court held that it was dismissing for lack of subject matter jurisdiction. The Fifth Circuit pointed out that the plaintiff/mother may have lacked standing under Louisiana's wrongful death and survival statutes to bring the claim under § 1983, but that type of standing was matter of ***prudential*** standing, and the plaintiff/mother actually ***did*** have ***Article III*** constitutional standing ("a constitutionally cognizable interest in the life of her son").[161]  Thus, the district court's error was ***not*** in finding that the plaintiff/mother lacked prudential standing but in improperly conflating the two standing concepts when it held that it had lacked ***subject matter jurisdiction*** to consider any of the plaintiff's/mother's amended complaints.[162]  The Fifth Circuit noted specifically that[163]

> prudential standing does not present a jurisdictional question, but "a merits question: who, according to the governing substantive law, is entitled to enforce the right?"  As the Federal Rules of Civil Procedure make clear, "an action must be prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1).  And a violation of this rule is a failure of "prudential" standing.  "Not one of our precedents holds that the inquiry is jurisdictional."  It goes only to the validity of the cause of action. And "the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction."

Somewhat relevant to this prudential standing discussion is the fact that, in this bankruptcy case, there have been dozens of appeals of bankruptcy court orders by Dondero and Dondero-related entities.  In connection therewith, both the district court and the Fifth Circuit, in evaluating the ***appellate standing*** of the appellants, have taken pains to distinguish between the concepts of:

---

[161] *Id.*

[162] *Id.* at 301, 303-304.  The Fifth Circuit opined that "the district court did not err in describing [the mother's] inability to sue under Louisiana law as a defect of 'standing[, b]ut it is a defect of prudential standing, not Article III standing" thus technically not implicating the federal court's subject matter jurisdiction. *Id.* at 303.

[163] *Id.* at 304 (cleaned up).

(a) traditional, constitutional standing, and (b) a type of prudential standing known as the "person aggrieved" test, which is applied in the Fifth Circuit in determining whether a party has **standing to appeal a bankruptcy court order**—which it describes as a narrower and "more exacting" standard than constitutional standing. As explained in a Fifth Circuit opinion addressing the standing of a Dondero-related entity called NexPoint to appeal bankruptcy court orders allowing professional fees, the "person aggrieved" standard that is typically applied to ascertain bankruptcy **appellate** standing originated in a statute in the Bankruptcy Act. The Fifth Circuit continued to apply it after Congress removed the provision when it enacted the Bankruptcy Code in 1978.[164] Because it is narrower and "more exacting" than the test for Article III constitutional standing, it involves application of prudential standing considerations.[165] The Fifth Circuit describes the "person aggrieved" test for bankruptcy appellant standing as requiring that an appellant show that it was "*directly and adversely affected pecuniarily* by the order of the bankruptcy court," requiring "a higher causal nexus between act and injury than traditional standing . . . that best deals with the unique posture of bankruptcy actions."[166] In affirming the district court's dismissal of NexPoint's appeal of the bankruptcy court's fee orders, due to NexPoint's lack of prudential standing under the "person aggrieved" test, the court rejected NexPoint's argument that it had standing to appeal

---

[164] *NexPoint Advisors, L.P. v. Pachulski Stang Ziehl & Jones, L.L.P. (In re Highland Capital Management, L.P.)*, No. 22-10575, 2023 WL 4621466, *2 (5th Cir. July 19, 2023)(citing *In re Coho Energy Inc.*, 395 F.3d 198, 202 (5th Cir. 2004)(cleaned up)).

[165] *Id.* at *1, **4-6 (where the Fifth Circuit repeatedly throughout its opinion refers to the "person aggrieved" test for standing in bankruptcy actions as a test for "prudential standing."); *see also Dondero v. Highland Capital Mgt., L.P.*, Civ. Act. No. 3:20-cv-3390-X, 2002 WL 837208 (N.D. Tex. Mar. 18, 2022)(where the district court, in addressing Dondero's standing to appeal a bankruptcy court order approving a Rule 9019 settlement (between Highland and Acis Capital Management GP LLC), notes that "[i]t is substantially more difficult to have standing to appeal a bankruptcy court's order than it is to pursue a typical complaint under Article III of the U.S. Constitution" and that "the Fifth Circuit has long recognized that bankruptcy cases' wide-reaching scope calls for a more stringent standing test.").

[166] *See id.* at *3 (cleaned up). The court quotes its 2018 opinion in *Matter of Technicool Sys., Inc. (In re Technicool)*, 896 F.3d 382, 385 (5th Cir. 2018), which explains why the "person aggrieved" prudential standing standard is applied in bankruptcy actions: "Bankruptcy cases often involve numerous parties with conflicting and overlapping interests. Allowing each and every party to appeal each and every order would clog up the system and bog down the courts. Given the specter of such sclerotic litigation, standing to appeal a bankruptcy court order is, of necessity, *quite limited.*" *Id.* (cleaned up).

because "it meets traditional Article III standing requirements [and that the more exacting] prudential standing considerations such as the 'person aggrieved' standard" did not survive the Supreme Court's 2014 *Lexmark*[167] opinion,[168] which addressed standing issues in the context of false advertising claims under the Lanham Act and reminded that courts may not "limit a cause of action that Congress has created merely because 'prudence' dictates."[169] The Fifth Circuit held that the Supreme Court's reminder in *Lexmark* did not nullify the "person aggrieved" test for prudential standing in bankruptcy appeals, citing its own decision in *Superior MRI Services Inc. v. Alliance Healthcare Services, Inc.*[170] (rendered a year after *Lexmark* was decided), in which it held that *Lexmark* applied only to the circumstances of that case, "rather than broadly modifying—or undermining—*all* prudential standing concerns, such as the one animating the 'person aggrieved' standard in bankruptcy appeals."[171]

Similarly, in yet another appeal in this bankruptcy case involving three Dondero-related entities as appellants (NexPoint, Dugaboy, and HCMFA)—this one an appeal of a bankruptcy court order authorizing the creation of an indemnity subtrust and entry into an indemnity trust agreement—the district court noted the parties' confusion about the standing issue, as exemplified in the parties' reference to constitutional standing when they were actually arguing that they had prudential standing under the "person aggrieved" test: "Although the parties frame this issue as one of constitutional standing . . . they cite case law and present arguments about the prudential

---

[167] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

[168] *Id.* at *2.

[169] *See id.* at *4 (cleaned up).

[170] 778 F.3d 502 (5th Cir. 2015).

[171] *NexPoint*, 2023 WL 4621466 at *4 (cleaned up).  The Fifth Circuit explicitly stated that "*Lexmark* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here." *Id.* at *5 (cleaned up).

standing requirement embodied in the 'person aggrieved' test."[172]   The district court noted that it

had an "independent obligation to consider constitutional standing before reaching its prudential

aspects."[173]   The district court dismissed the appeal as to Dugaboy and HCMFA for lack of

standing but, upon concluding that NexPoint did have standing, dismissed the appeal as to it on

the merits.   The Fifth Circuit affirmed.[174] Interestingly, the court noted that, while the parties did

not contest the district court's determination that NexPoint had standing to pursue the appeal, it

"may consider prudential standing issues *sua sponte*."[175]   In doing so, the Fifth Circuit recognized

the distinction between constitutional standing and the prudential "person aggrieved" test applied

to bankruptcy appeals, which "is, of necessity, quite limited" and "an even more exacting standard

than traditional constitutional standing," as it requires an appellant to show that it is "directly,

adversely, and financially impacted by a bankruptcy order."[176]

In summary, in analyzing whether HMIT would have standing to bring the Proposed

Claims, this court must ***first*** determine whether HMIT would have constitutional standing under

Article III (which is a subject matter jurisdiction hurdle) and, assuming it does, then ***additionally***

address whether HMIT would also have prudential standing (i.e., capacity to sue) pursuant to any

applicable statutes (e.g., Delaware statutes), jurisprudence, or other substantive law that might

***limit*** who may sue.   Notwithstanding HMIT's argument that it has standing under the "person

---

[172] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2002 WL 270862, *1 (N.D. Tex. Jan. 18, 2022)(cleaned up).   The district court dismissed the appeals of two of the appellants, Dugaboy and HCMFA, finding that they lacked both constitutional standing and prudential standing under the "person aggrieved" test and affirmed the bankruptcy court's order after finding the third appellant, NexPoint, to have prudential standing under the "person aggrieved" test. *Id.* at **1-3 and *4.

[173] *Id.* at *1 n.2.

[174] *Highland Capital Mgt. Fund, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, 57 F.4th 494 (5th Cir. 2023).

[175] *Id.* at 501 (cleaned up).

[176] *Id.*

aggrieved" test[177]—which, as discussed above, is a matter of prudential standing—this is applied

only in the context of bankruptcy *appellate* matters.[178] As noted in its most recent opinion

discussing standing in an appeal from the Highland bankruptcy case, the Fifth Circuit reiterated

that the "person aggrieved" test is a test for bankruptcy *appellate* standing, which is narrower than

a party in interest's right to be heard in bankruptcy cases in general.[179] The court rejected an

argument that Bankruptcy Code § 1109, which provides that "[a] party in interest . . . may raise

and may appear and be heard on any issue in a case under this chapter" confers *appellate* standing,

noting that "one's standing to appear and be heard before the bankruptcy court [is] a concept

distinct from standing to appeal the merits of a decision" and that the "person aggrieved" test for

bankruptcy appellate standing is narrower than the test for determining one's standing to appear

and be heard in a bankruptcy proceeding.[180]

Thus, the court will now analyze whether HMIT would, at a minimum, have constitutional

standing to bring the Proposed Claims.

2. HMIT Would Lack Article III Constitutional Standing to Bring the Proposed Claims.

As noted above, the Supreme Court and the Fifth Circuit have made clear that constitutional

standing is necessary for a court to exercise subject matter jurisdiction. It is only the first hurdle a

party must clear before pursuing a claim in federal court. HMIT, as plaintiff, would bear the

---

[177] HMIT insists that it has constitutional standing to bring claims on its individual behalf "as an aggrieved party." *See* Reply, ¶ 7.

[178] HMIT's argument in this matter that it has constitutional standing because it is a "party aggrieved" incorrectly conflates the prudential bankruptcy appellate "person aggrieved" test with the broader test that is applied to constitutional standing. The court is not being critical of this mistake. As noted at *supra* note 149, the Fifth Circuit in *Abraugh* pointed out that courts and attorneys alike have created confusion by misusing the term "standing" when they equate a lack of "standing," in all instances, with a lack of subject matter jurisdiction, even when the party is found to lack only prudential standing. Thus, HMIT is not alone in its confusion over the two different concepts of standing.

[179] *See NexPoint*, 2023 WL 4621466 at *6.

[180] *Id.* at *6 (cleaned up)("Because Section 1109(b) expands the right to be heard [in a bankruptcy proceeding] to a wider class than those who qualify under the 'person aggrieved' standard, courts considering the issue have concluded that merely being a party in interest is insufficient to confer *appellate* standing.")(emphasis added).

burden of establishing:   (1) that it suffered an injury in fact that is concrete, particularized, and actual or imminent—not conjectural or hypothetical, (2) that there is a causal connection between the injury and the conduct complained of, and (3) it must be likely, not speculative, that the injury will be redressed by a favorable decision.[181]

Concrete and Particularized; Actual or Imminent.  As the Supreme Court made clear in the *Lujan* case, the injury in fact element requires a showing that the injury was "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[182]  The Supreme Court in the *Spokeo* case expounded on the "concrete and particularized" requirements of the "injury in fact" element.  Particularization requires a showing that the injury "must affect the plaintiff in a personal and individual way," but while particularization is necessary, it alone is "not sufficient," because an injury in fact must also be "concrete."[183]  And, concreteness is "quite different from particularization."[184]  A "concrete" injury must be "real," and "not abstract," though it does not mean that the injury must be "tangible," as the injury can be intangible and nevertheless be concrete.[185]  In addition to the concreteness and particularization requirements, an injury in fact must be "actual or imminent" such that "allegations of injury that is merely conjectural or hypothetical do not suffice to confer standing."[186]  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly*

---

[181] *See supra* note 153.

[182] *Lujan*, 504 U.S. at 560 (cleaned up).

[183] *Spokeo*, 578 U.S. at 339.

[184] *Id.* at 340.

[185] *Id.*

[186] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

impending"; "allegations of *possible* future injury are not sufficient."[187]

Traceability - Causal Connection. As to the second element—that the injury was caused by the defendant—the Supreme Court in *Lujan* further described it as requiring a showing that "the injury has to be fairly traceable to the challenged action of the defendant."[188] The "fairly traceable" test requires an examination of "the causal connection between the assertedly unlawful conduct and the alleged injury."[189]

Redressability. The third element—redressability—requires the court to examine the connection "between the alleged injury and the judicial relief requested."[190] "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."[191] "[A] court must determine that there is an available remedy which will have a 'substantial probability' of redressing the plaintiff's injury."[192]

The Claims Purchasers argue that HMIT lacks constitutional standing to pursue the claims asserted in the Proposed Complaint because: (i) neither HMIT nor the Bankruptcy Estate was injured by the Claim Purchasers' acquisition of the claims; and (ii) the Proposed Complaint lacks a theory of cognizable damages to the Reorganized Debtor, the Claimant Trust, and/or the beneficiaries of the Claimant Trust.[193]

---

[187] *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013)(cleaned up); *see also Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023)("[Injury] cannot be speculative, conjectural, or hypothetical [and] [a]llegations of only a 'possible' future injury similarly will not suffice.")(cleaned up).

[188] *Lujan*, 504 U.S. at 560-61 (cleaned up).

[189] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

[190] *Id.* (noting "it is important to keep the ['fairly traceable' and 'redressability'] inquiries separate if the 'redressability' component is to focus on the requested relief.").

[191] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

[192] *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983)(Marshall, J., dissenting)(cleaned up); *see also Ondrusek v. U.S. Army Corps of Engineers*, Civ. Act. No. 3:22-cv-1874-N, 2023 WL 2169908, at *5 ("Plaintiffs have not demonstrated that any available remedy would be sufficiently likely to relieve their alleged economic losses. Without a showing of redressability, those harms also cannot support Plaintiff's Article III standing.").

[193] As noted earlier, certain of the Proposed Defendants—the Highland Parties—do not focus on HMIT's lack of constitutional standing to pursue the Proposed Claims against them, but on its lack of prudential standing under

69

The court agrees with the Claims Purchasers' argument here.  What is HMIT's concrete and particularized injury—that is "real" and is not abstract?  That is not conjectural or hypothetical?  That is actual or imminent?

Recall that, under the Plan, HMIT holds a Class 10 contingent interest in the Claimant Trust that only realizes value if all creditors are paid in full with interest. HMIT alleges the following injury:  it has suffered a devaluation of its unvested Contingent Claimant Trust Interest by virtue of the alleged over-compensation of Seery as the Claimant Trustee—Seery's alleged over-compensation depletes the assets in the Claimant Trust available for distribution to creditors under the Plan, such that there is less likely a chance that HMIT ultimately receives any distributions on account of its Class 10 Contingent Claimant Trust Interest.[194]  Yet, HMIT testified, through both witnesses Dondero and Patrick, that it had no personal knowledge of what Seery's actual compensation is under the CTA at the time HMIT filed its Motion for Leave.  It was clear that HMIT's allegations regarding Seery's "excessive" compensation were based entirely on Dondero's pure speculation.  In reality, Seery's base salary is exactly what the bankruptcy court approved during the bankruptcy case by a court order (after negotiations between Seery and the Committee).  The CTA now further governs his compensation.  The CTA, which was publicly filed *in advance of* the Plan confirmation hearing and approved by this court as part of the Plan

---

applicable law.  Because constitutional standing is a matter of subject matter jurisdiction, the court has an independent duty to determine whether HMIT would have constitutional standing to pursue the Proposed Claims in federal court. The issue cannot be forfeited or waived by a party. *See Abraugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.  Moreover, courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.")(cleaned up); *Abraugh*, 26 F.4th at 304 ("It is our constitutional duty, of course, to decline subject matter jurisdiction where it does not exist—and that is so whether the parties challenge Article III standing or not.")(cleaned up).

[194] At the June 8 Hearing, HMIT's counsel was unable to identify any other injury HMIT has alleged to have suffered. HMIT's counsel acknowledged that claims trades, in and of themselves, would not "involve injury to the Reorganized Debtor and to the Claimant Trust" and that claims trades are "normally outside the purview of the bankruptcy court" but that "[h]ere, we have alleged . . . . injury [that] takes the form of unearned excessive fees that Mr. Seery has garnered as a result of his relationship and arrangements, as we have alleged, with the Claims Purchasers." June 8 Hearing Transcript, 67:16-68:8. HMIT can only point to Seery's excess compensation as injury.

(which has been affirmed by the Fifth Circuit), specifically provides that Seery's post-Effective Date compensation would include a "Base Salary" (again, same as during the bankruptcy case), a "success fee," and "severance."[195]   The CTA discussed the role of the Committee and then the CTOB in setting the success fee and severance and the like.  A fully executed copy of the CTA was admitted into evidence at the June 8 Hearing.  HMIT is essentially arguing that its injury (i.e., diminished likelihood of realizing value on its Contingent Claimant Trust Interest) stems from a court-sanctioned and creditor-approved process for approving compensation to Seery.  Moreover, HMIT has failed to plead facts sufficient to show that, even if Seery received excessive compensation and that compensation is ordered to be returned, HMIT's Contingent Claimant Trust Interest will ever vest.  The district court and the Fifth Circuit in various appeals by Dugaboy, another Dondero-related entity that, similar to HMIT, was a holder of a limited partnership interest in Highland whose interests were terminated as of the Effective Date of the Plan in exchange for a Contingent Claimant Trust Interest, have repeatedly rejected Dugaboy's claims to have standing based on the ***speculative nature of its alleged injuries as a contingent beneficiary of the Claimant Trust under the Plan***.  For example, the Fifth Circuit affirmed the district court's dismissal of an appeal by Dugaboy of the bankruptcy court's order authorizing the creation of an indemnity subtrust, wherein Judge Fitzwater found that, in addition to lacking prudential standing under the

---

[195]   The Disclosure Statement that was approved by this court, after notice and a hearing, on November 24, 2020, provided that "The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement . . . ."  The CTA was part of a Plan Supplement (as amended) that was filed in advance of the confirmation hearing and provided:

> Compensation. As compensation for any services rendered by the Claimant Trustee in connection with this Agreement, the Claimant Trustee shall receive compensation of $150,000 per month (the "Base Salary"). Within the first forty-five days following the Confirmation Date, the Claimant Trustee, on the one hand, and the Committee, if prior to the Effective Date, or the Oversight Board, if on or after the Effective Date, on the other, will negotiate go-forward compensation for the Claimant Trustee which will include (a) the Base Salary, (b) a success fee, and (c) severance.

*See* Highland Ex. 38, at § 3.13(a)(i).

"person aggrieved" test to appeal the bankruptcy court's order, Dugaboy lacked constitutional standing "because they have not identified any injury fairly traceable to the Order: ***the injuries identified are speculative at best and nonexistent at worst***."[196]  HMIT's allegations of injury are, without a doubt, "merely conjectural or hypothetical" and are only speculative of possible future injury if its Contingent Claimant Trust Interest ever vests."[197]  The court finds that HMIT would not meet the "concrete and particularized" or the "actual or imminent" requirements for an "injury in fact," and, thus, would lack constitutional standing to pursue the Proposed Claims.

With regard to the second requirement of constitutional standing—whether HMIT could show "traceability" with respect to the Claims Purchasers and/or Seery (i.e., a "causal connection between the assertedly unlawful conduct and the alleged injury"[198]), as noted above, there is only a speculative injury.  Even if there is unlawful conduct asserted (i.e., sharing of MNPI to Claims Purchasers who then, as a *quid pro quo*, rubber stamped excessive compensation for Seery), there is nothing other than a hypothetical theory of an alleged injury (i.e., an allegedly less likelihood of a distribution on a Contingent Claimant Trust Interest).

With respect to the third requirement of constitutional standing—whether HMIT can show "redressability" (i.e., that it is likely, not speculative, that the injury can be redressed by a favorable

---

[196] *Highland Capital Mgt. Fund Advisors, L.P. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-1895-D, 2022 WL 270862, *1 n.2 (N.D. Tex. Jan. 28, 2022), *aff'd* 57 F.4th 494 (5th Cir. 2023)(emphasis added); *see also* Judge Scholer's opinion in *Dugaboy Inv. Tr. v. Highland Capital Mgt., L.P. (In re Highland Capital Mgt., L.P.)*, Civ. Act. No. 3:21-cv-2268-S, 2022 WL 3701720, *3 (N.D. Tex. Aug. 8, 2022)(cleaned up), *aff'd per curium*, No. 22-10831, 2023 WL 2263022 (5th Cir. Feb. 28, 2023) (where Dugaboy had argued that "***its pecuniary interest is . . . a potential recovery under the Plan as one of Debtor's former equity holders***" and that "it ha[d] standing as a 'contingent beneficiary' under the Plan, or a beneficiary who will be entitled to payment after all creditors are paid in full," and Judge Scholer stated, "This assertion is premised on the assumption that Dugaboy's 0.1866% pre-bankruptcy limited partnership interest in Debtor—which was extinguished under the Plan—makes it a contingent beneficiary of the creditor trust created under the Plan. . . . [S]uch a 'speculative prospect of harm is far from a direct, adverse, pecuniary hit' as required to confer standing."

[197] *Little v. KPMG LLP*, 575 F.3d 533, 540 (5th Cir. 2009).

[198] *Allen v. Wright*, 468 U.S. 737, 753 n. 19 (1984).

decision), there are multiple problems here.[199] The major remedy sought here is the equitable

disallowance of the allowed Purchased Claims (and disgorgement and/or constructive trust of amounts

paid or owed to the Claim Purchasers on account of their claims). There is no such remedy

available here.  As noted earlier, there is a similar concept of *equitable subordination* of a claim

to another claim, or of an interest to another interest, pursuant to Bankruptcy Code section 510(c).

But under the literal terms of section 510(c), *claims cannot be subordinated to interests*.

Moreover, the Fifth Circuit noted in the *Mobile Steel* case,[200] that *equitable disallowance* of a

claim (as opposed to equitable subordination of a claims) is not an available remedy.  Bankruptcy

Code section 502(b)(1) and the Fifth Circuit's *Lothian Oil* case might permit "recharacterization"

of a claim from debt to equity in certain circumstances—but not based on inequitable conduct but

rather on the nature of a financial transaction.  In any event, here, the claims have already been

adjudicated and allowed (some after mediation, and all after Rule 9019 settlement orders).  The

only way to reconsider a claim in a bankruptcy case that has already been allowed is through

Bankruptcy Code section 502(j) ("A claim that has been allowed or disallowed may be

reconsidered for cause. . .  according to the equities of the case.").  As noted earlier, the problem

here is that Bankruptcy Rule 9024 provides that a motion for "reconsideration of an order allowing

or disallowing a claim against the estate *entered without a contest* is not subject to the one year

limitation prescribed in Rule 60(c)" (emphasis added).  As further noted earlier, here there was

most definitely a "contest" with regard to all of these purchased claims.  ***Thus, it would appear***

---

[199] *See supra* notes 182-184 and accompanying text.  The court will note that, as discussed *supra* note 141 and pages 71-72, the remedy of equitable subordination (as to the Claims Purchasers) would not redress HMIT's alleged injury (because equitable subordination of claims to interests is not an available remedy in the Fifth Circuit and thus subordination of the Purchased Claims to other claims would not change HMIT's distributions from the Claimant Trust, if any), and because outright disallowance of all or part of the already allowed Purchased Claims is not an available remedy either, HMIT would not be able to meet the "redressability" requirement with respect to the Claims Purchasers.

[200] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).

*that any effort to have a court reconsider and potentially disallow these claims pursuant to*

*section 502(j) is untimely—as it has been well beyond a year since they were allowed.*

    3.   <u>HMIT Would Also Lack Prudential Standing to Bring the Proposed Claims</u>.

Even if HMIT would have constitutional standing to bring the Proposed Claims in an

adversary proceeding filed in the bankruptcy court, the Proposed Claims would still be barred if

HMIT would lack prudential standing to bring them under applicable state or federal law.  HMIT

argues that it does have prudential standing under both federal bankruptcy law and Delaware law

to pursue the Proposed Claims derivatively and also to bring the Proposed Claims in its individual

capacity.

With regard to "federal bankruptcy law," HMIT argues that it has standing pursuant to:  (a)

Rule 23.1 of the Federal Rules of Civil Procedure, pertaining to derivative actions, which "applies

to this proceeding pursuant to" Rule 7023.1 of the Federal Rules of Bankruptcy Procedure, and (b)

*Louisiana World Exposition v. Federal Insurance Co. ("LWE")*,[201] the Fifth Circuit's leading case

addressing when a creditors committee may be granted standing to bring causes of action on behalf

of a bankruptcy estate.  But, federal bankruptcy law does not confer standing *where the plaintiff*

*otherwise lacks standing under applicable state law*. In other words, whether HMIT would have

prudential standing to sue under Delaware law is dispositive of the issue, regardless of the forum.

Rule 23.1 "speaks only to the adequacy of the . . . pleadings," and "cannot be understood to

'abridge, enlarge, or modify any substantive right,'"[202] including a right (or lack thereof) to bring

a derivative action under the substantive law of Delaware.  Additionally, HMIT's reliance on *LWE*

is misplaced: *LWE* permits creditors, in certain circumstances *during* a bankruptcy case, to "file

---

[201] 858 F.2d 233 (5th Cir. 1988).

[202] *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991)(quoting 28 U.S.C. § 2072(b)).

suit on behalf of a debtor-in-possession or a trustee"[203] and does not apply to a party's right to sue, derivatively, on behalf of the Reorganized Debtor or any entity that is the assignee of the former bankruptcy estate's assets. Upon confirmation of the Plan, the bankruptcy estate of Highland ceased to exist;[204] Highland is no longer a debtor-in-possession but a reorganized debtor, and the Claimant Trust is a new entity created under the Plan and Claimant Trust Agreement. Even if *LWE* did apply in this ***post***-confirmation context, it supports the application of Delaware law to the issue of prudential standing and does not supersede state-law requirements for standing. In *LWE*, before addressing the requirements a creditors' committee must meet to sue derivatively on behalf of a bankruptcy estate as a matter of federal bankruptcy law, the Fifth Circuit conducted a lengthy analysis to determine "as a threshold issue" whether the creditors' committee in that case could assert its claims under Louisiana law.[205] The court specifically addressed whether the creditors' committee could pursue a derivative action under Louisiana law and concluded that "there is no bar in Louisiana law to actions brought by or in the name of a corporation against the directors and officers of the corporation which benefit only the creditors of the corporation; indeed, Louisiana law specifically recognizes such actions."[206] So, even under *LWE* (which the court does not think applies in this post-confirmation context), if HMIT would be barred from bringing a derivative action on behalf the Reorganized Debtor or Claimant Trust under state law, the analysis stops there.[207] Thus, the court looks to Delaware law to determine if HMIT would have prudential standing to pursue the derivative claims on behalf the Reorganized Debtor and the Claimant Trust.

---

[203] *LWE*, 858 F.2d at 247.

[204] *See In re Craig's Stores*, 266 F.3d 388, 390 (5th Cir. 2001).

[205] *LWE*, 858 F.2d at 236-45.

[206] *Id.* at 243.

[207] *See In re Dura Automotive Sys., LLC*, No. 19-123728 (Bankr. D. Del. June 10, 2020), Docket No. 1115 at 46 (where the Delaware bankruptcy court denied the creditors' committee standing to sue derivatively on behalf of a Delaware LLC because the committee lacked standing under the Delaware LLC Act, stating, "To determine that the third party

HMIT acknowledges that both the Reorganized Debtor and the Claimant Trust are organized under Delaware law, and thus the cause of action against Seery alleging breach of fiduciary duties to the Reorganized Debtor and the Claimant Trust are governed by Delaware law under the "Internal Affairs Doctrine."[208]  In addition, because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting theory of liability as to the Claims Purchasers is also governed by Delaware law.[209]  For the reasons set forth below, the court finds that HMIT would lack prudential standing under Delaware law to bring the claims set forth in the Proposed Complaint, derivatively, on behalf of either the Claimant Trust or the Reorganized Debtor.

    a)   First, HMIT Would Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Claimant Trust.

The Claimant Trust is a Delaware statutory trust governed by the Delaware Statutory Trust Act, 12 Del. C. §§ 3801–29,[210] and "to proceed derivatively against a Delaware statutory trust, a plaintiff has the burden of satisfying the continuous ownership requirement" such that "the plaintiff must be a beneficial owner" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[211]  This requirement is "mandatory and exclusive" and only "a beneficial owner" "has standing to bring a derivative claim on behalf of the

---

may bring the claim under the derivative basis and, thus, step into the shoes of the debtor to pursue them, the Court must look to the law of the debtors' state of incorporation or formation.").

[208] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[209] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

[210] *See* Proposed Complaint, ¶ 26.

[211] *Hartsel v. Vanguard Grp., Inc.*, 2011 WL 2421003, at *19 n.123 (Del. Ch. June 15, 2011), *aff'd* 38 A.3d 1254 (Del. 2012); 12 Del C. § 3816(b).

Trust."[212]  The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, would lack standing to bring derivative claims on behalf of the Claimant Trust. HMIT argues to the contrary:  that it *is* currently, and was at all relevant times, a "beneficial owner" of the Claimant Trust under Delaware trust law such that it would have standing to bring derivative claims on behalf of the Claimant Trust if it were allowed to proceed with the filing of the Proposed Complaint.  The disagreement turns on the nature of HMIT's interest under the Plan and the Claimant Trust Agreement and whether HMIT, as a holder of such interest, would be considered a "beneficial owner" of the Claimant Trust under Delaware trust law.

As noted, pursuant to the Plan, HMIT's former limited partnership interest in Highland was cancelled as of the Effective Date in exchange for its pro rata share of a "Contingent Claimant Trust Interest," as defined under the Plan.[213]  HMIT argues that its Contingent Claimant Trust Interest makes it a contingent beneficiary of the Claimant Trust, which makes it a present "beneficial owner" under Delaware trust law.

The Highland Parties argue that HMIT is not a "beneficial owner" of the Claimant Trust; rather, the "beneficial owners" of the Claimant Trust are the "Claimant Trust Beneficiaries,"[214] which are defined in the Plan and the CTA as "the Holders of Allowed General Unsecured Claims" (which are in Class 8 under the Plan) and "Holders of Allowed Subordinated Claims" (which are in Class 9 under the Plan); [215] HMIT, a holder of a Class 10 interest under the Plan, is neither.

---

[212]*In re Nat'l Coll. Student Loan Tr. Litig.*, 251 A.3d 116, 191 (Del. Ch. 2020) (citing *CML V, LLC v. Bax*, 28 A.3d 1037, 1042 (Del. 2011)).  HMIT acknowledges this requirement in its Reply:  "Delaware statutory trust law provides that a plaintiff in a derivative action on behalf of a trust must be a beneficial owner at the time of the action and at the time of the transaction." Reply, ¶ 19 (citing 12 Del C. § 3816).

[213] *See* Plan Art. III.H.10 and Art. I.B.44.

[214] Section 2.8 of the CTA provides, "The Claimant Trust Beneficiaries shall be the sole beneficiaries of the Claimant Trust . . . ." HMIT Ex. 26, § 2.8.

[215] *See* Plan Art. I.B.44 ("'*Claimant Trust Beneficiaries*' means the Holders of Allowed General Unsecured Claims, Holders of Allowed Subordinated Claims, including, upon Allowance, Disputed General Unsecured Claims and Disputed Subordinated Claims that become Allowed following the Effective Date, and, only upon certification by the

HMIT, as the holder of a "Contingent Claimant Trust Interest," has only an *unvested* contingent interest in the Claimant Trust and, as such, is not a "beneficial owner" of the Claimant Trust for standing purposes under Delaware trust law. HMIT argues that it "should be treated as a vested Claimant Trust Beneficiary due to [the Proposed Defendants'] wrongful conduct and considering the current value of the Claimant Trust Assets before and after the relief requested herein."[216] The court disagrees.

HMIT's status as a "beneficiary" of the Claimant Trust is defined by the CTA itself, pure and simple. The CTA specifically provides that "Contingent Trust Interests" "shall not have any rights under this Agreement" and will not "be deemed 'Beneficiaries' under this Agreement," "unless and until" they vest in accordance with the Plan and the CTA. It is undisputed that HMIT's Contingent Trust Interest has not vested under the terms of the Plan and the CTA, and the court does not have the power to equitably deem HMIT's Contingent Trust Interest to be vested based on HMIT's unsupported allegation of wrongdoing on the part of Seery, the Claimant Trustee. Thus, the court finds that HMIT is not a "beneficial owner" of the Claimant Trust and, therefore, lacks prudential standing under Delaware law to bring derivative claims on behalf of the Claimant Trust.[217]

---

Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent all Allowed unsecured Claims, excluding Subordinated Claims, have been paid in full, post-petition interest from the Petition Date at the Federal Judgment Rate in accordance with the terms and conditions set forth in the Claimant Trust Agreement and all Disputed Claims in Class 8 and Class 9 have been resolved, Holders of Allowed Class B/C Limited Partnership Interests, and Holders of Allowed Class A Limited Partnership Interests."); CTA § 1.1(h). *See also*, CTA, 1 at n.2 ("For the avoidance of doubt, and as set forth in the Plan, Holders of Class A Limited Partnership Interests and Class B/C Limited Partnership Interests will be Claimant Trust Beneficiaries only upon certification by the Claimant Trustee that the Holders of such Claims have been paid indefeasibly in full plus, to the extent applicable, post-petition interest in accordance with the terms and conditions set forth herein and in the Plan."). HMIT Ex. 26.

[216] Proposed Complaint ¶ 24.

[217] *See Nat'l Coll.*, 251 A.3d at 190–92 (dismissing creditors' derivative claims because they were not "beneficial owners of the Trusts"); *Hartsel*, 2011 WL 2421003, at *19 n.123 (dismissing derivative claims by investors that "no longer own shares" because "those investors no longer have standing to pursue a derivative claim").

b) HMIT Would Likewise Lack Prudential Standing Under Delaware Law to Bring Derivative Actions on behalf of the Reorganized Debtor.

HMIT acknowledges that the Reorganized Debtor, Highland Capital Management, L.P., is a Delaware limited liability partnership governed by the Delaware Limited Partnership Act, 6 Del. C. § 17-101, *et seq.*[218]   To bring "a derivative action" on behalf of a limited partnership, "the plaintiff must be a partner or an assignee of a partnership interest" continuously from "the time of the transaction of which the plaintiff complains" through "the time of bringing the action."[219]

HMIT is not a partner, general or limited, of the Reorganized Debtor limited partnership. HMIT **was** a limited partner in the original debtor (specifically, a holder of Class B/C Limited Partnership interests in Highland), but that limited partnership interest was extinguished on August 11, 2021 (the Effective Date of the Plan) per the terms of the Plan, and HMIT does not own any partnership interest in the newly created Reorganized Debtor limited partnership.[220]   Because HMIT would not hold a partnership interest in the Reorganized Debtor at "the time of bringing the action," it "lacks derivative standing" to bring claims "on the partnership's behalf."[221]   HMIT likewise cannot satisfy "the continuous ownership requirement"; when HMIT's limited partnership interest in the original Debtor was cancelled on the Plan's Effective Date, HMIT "los[t] standing to continue a derivative suit" on behalf of the Debtor.[222]   Finally, to the extent HMIT

---

[218] Proposed Complaint ¶ 25.

[219] 6 Del. C. § 17-1002; *see Tow v. Amegy Bank, N.A.*, 976 F. Supp. 2d 889, 904 (S.D. Tex. 2013) ("The [Delaware] partnership act facially bars any party other than a limited partner from suing derivatively. . . . Delaware courts historically have interpreted the provisions as giving the partners exclusive rights to sue for breach of another party's fiduciary duties to them.") (quoting *CML V, LLC v. Bax*, 6 A.3d 238, 245 (Del. Ch. 2010), *aff'd* 28 A.3d 1037 (Del. 2011)); *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1265 n.87 (Del. 2016) ("The statutory foundation for the continuous ownership requirement in the corporate realm is echoed in the limited partnership context.") (citing 6 Del. C. § 17-211(h)).

[220] *See* Plan Art. IV.A.

[221] *Tow*, 976 F. Supp. 2d at 904 (dismissing derivative claims by creditor on behalf of partnership for lack of standing).

[222] *El Paso*, 152 A.3d at 1265 (cleaned up) (dismissing derivative action for lack of standing where plaintiff's partnership interest was extinguished by a merger transaction); *see also Schmermerhorn v. CenturyTel, Inc. (In re*

seeks to bring a "double derivative" action on behalf of the Claimant Trust based on claims purportedly held by its wholly owned subsidiary, the Reorganized Debtor, HMIT lacks standing. A "double derivative" action is a suit "brought by a shareholder of a parent corporation to enforce a claim belonging to a subsidiary that is either wholly owned or majority controlled."[223] And, under Delaware law, "parent level standing is required to enforce a subsidiary's claim derivatively."[224] Because HMIT would lack derivative standing to bring claims on behalf of the parent Claimant Trust,[225] it also would lack standing to bring a double derivative action.

c) Finally, HMIT Would Also Lack Prudential Standing under Applicable Law to Bring the Proposed Claims As *Direct* Claims.

HMIT argues that it has "direct" standing to pursue the Proposed Claims on behalf of itself, individually.[226] But just because HMIT asserts that some or even all of the Proposed Claims are direct, not derivative claims, does not make it so: "a claim is not 'direct' simply because it is pleaded that way."[227] Rather, in determining whether claims are direct or derivative, a court must "look at the substance of the Petition, and the nature of the wrongs alleged therein, rather than the Plaintiffs' characterization."[228] And, under Delaware law, "whether a claim is solely derivative or

---

*SkyPort Global Commcn's, Inc.*), 2011 WL 111427, at *25–26 (Bankr. S.D. Tex. Jan. 13, 2011) (holding that pre-petition shareholders "lack standing to bring a derivative claim" under Delaware law because they "had their equity interests in the company extinguished pursuant to the merger under the Plan"); *In re WorldCom, Inc.*, 351 B.R. 130, 134 (Bankr. S.D.N.Y. 2006) ("[T]he cancellation of WorldCom shares under the Plan … prevents the required continuation of shareholder status through the litigation.") (cleaned up).

[223] *Lambrecht v. O'Neal*, 3 A.3d 277, 282 (Del. 2010).

[224] *Sagarra*, 34 A.3d at 1079–81 (capitalization omitted) (citing *Lambrecht*, 3 A.3d at 282).

[225] *See supra* pp. 80-82.

[226] *See e.g.*, Motion for Leave ¶ 10 ("HMIT has individual standing to bring this action because Seery owed fiduciary duties directly to HMIT at that time . . . ."); *id.* ¶ 67 (arguing that "HMIT has [d]irect [s]tanding"); Proposed Complaint ¶ 24 ("HMIT has constitutional standing and capacity to bring these claims both individually and derivatively.").

[227] *Schmermerhorn*, 2011 WL 111427, at *26 (quoting *Gatz v. Ponsoldt*, 2004 WL 3029868 at *7 (Del. Ch. Nov. 5, 2004)).

[228] *See id.* (citing *Armstrong v. Capshaw, Goss & Bowers LLP*, 404 F.3d 933, 936 (5th Cir. 2005)); *see also Moore v. Simon Enters., Inc.*, 919 F.Supp. 1007, 1009 (N.D. Tex. 1995)("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a [party's] characterization or stated intention.")(cleaned up).

may continue as a dual-natured claim 'must turn ***solely*** on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?'"[229]  "In addition, to prove that a claim is direct, a plaintiff 'must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.'"[230]  Similarly, in the bankruptcy context, whether a creditor can assert a claim directly or whether the claim belongs to the estate turns on the nature of the injury for which relief is sought:  "[i]f the harm to the creditor comes about only because of harm to the debtor, then its injury is derivative, and the claim is property of the estate," such that "only the bankruptcy trustee has standing to pursue the claim for the estate . . . ."[231]  "To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."[232]

As a reminder, HMIT argues that the injury it has suffered is a devaluation of its interests in the Claimant Trust by virtue of alleged over-compensation of Seery as the Claimant Trustee. HMIT was unable, when pressed during closing arguments, to identify any other injury.  It essentially admitted that the claims trades, in and of themselves, would not have harmed the Claimant Trust, the Reorganized Debtor, or individual stakeholders, including HMIT, ***since the Claims Purchasers acquired already allowed unsecured claims, such that the distributions on those claims pursuant to the Plan would be unchanged in the hands of new holders of the claims***.

---

[229] *El Paso*, 152 A.3d at 1260 (quoting *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)) (emphasis in original).

[230] *Id.* (quoting *Tooley*, 845 A.2d at 1033); *see also Schmermerhorn*, 2011 WL 111427, at *24 (same).

[231] *Meridian Cap. CIS Fund v. Burton (In re Buccaneer Res., L.L.C.)*, 912 F.3d 291, 293 (5th Cir. 2019) (citing 11 U.S.C. § 541(a)(1)).

[232] *Id.*; *see also Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)("If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate.")(citations omitted).

Thus, by its own concessions, any alleged harm to HMIT (through devaluation of assets in the Claimant Trust) "comes about only because of harm to the debtor," so the alleged "injury is derivative."[233]  The court concludes that all of the claims set forth in the Proposed Complaint allege derivative claims only, and that none would be direct claims against the Proposed Defendants. Thus, HMIT would lack prudential standing to bring any of the Proposed Claims in the Proposed Complaint, so its Motion for Leave should be denied.

  d) Some Final Points Regarding Standing.

In this standing discussion, one should not lose sight of the fact that there are both procedural safeguards in place, as well as certain independent individuals in place with fiduciary duties that might act in the event of any shenanigans regarding Claimant Trust activities.  Under section 4.1 of the CTA (approved as part of the Plan process), the CTOB, which includes an independent disinterested member in addition to representatives of the Claims Purchasers,[234] oversees the Claimant Trustee's performance of his duties, approves his compensation, and may remove him for cause.  Moreover, there is a separate "Litigation Trustee" in this case who was brought in, post-confirmation, as an independent fiduciary to pursue claims and causes of action. These independent persons are checks and balances in the post-confirmation wind down of Highland.  This is what creditors voted on in connection with the Plan.  Seery and the Claims Purchasers are not in sole control of anything.  The CTA, as well as Delaware law, very clearly set forth who can bring an action in the event of some colorable claim.  This is the reality of prudential

---

[233] *Meridian*, 912 F.3d at 293–94 ("The creditors' injury (reduced bankruptcy recovery) derived from injury to the debtor (the loss of estate assets), so only the estate could sue the third parties."); *see also El Paso,* 152 A.3d at 1260– 61 & n.60 (holding that claim "claims of corporate overpayment are normally treated as causing harm solely to the corporation and, thus, are regarded as derivative") (collecting cases); *Gerber v EPE Holdings, LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) (holding that claims were derivative because plaintiff had "not identified any independent harm suffered by the limited partners"; "the partnership suffered all the harm at issue—it paid too much").

[234] *See supra* note 23 and accompanying text.

standing.  Just as in the *Abraugh* case, where Louisiana law dictated that a mother could not bring a wrongful death case when the deceased prisoner had a surviving wife and child, Delaware law and the CTA dictate here that a contingent beneficiary cannot bring the Proposed Claims here. This is separate and apart from whether the claims are colorable.

*C. Are the Proposed Claims "Colorable"?*

1. <u>What is the Proper Standard of Review for a "Colorability" Determination?</u>

Although the court has determined that HMIT would ***not*** have standing (constitutional or prudential) to bring the Proposed Claims, this court will nevertheless evaluate whether the claims—assuming HMIT somehow has standing—might be "colorable."  This, in turn, requires the court to assess what the legal standard is to determine if a claim is "colorable." As a reminder, the Plan's Gatekeeper Provision and this court's prior Gatekeeper Orders entered in January and July 2020 each required that, before a party may commence or pursue claims relating to the bankruptcy case against certain protected parties, it must first obtain a finding from the bankruptcy court that its proposed claims are "colorable." The Gatekeeper Provision and Gatekeeper Orders did not specifically define "colorable" or what type of legal standard should apply.

HMIT argues that the standard for review to be applied by this court is the same as a simple "plausibility" standard used in connection with a Rule 12(b)(6) motions to dismiss.  In other words, the court should simply assess whether the allegations of the Proposed Complaint, taken as true and with all inferences drawn in favor of the movant, state a ***plausible*** claim for relief (i.e., colorable equals plausible), and that this standard does not allow for the weighing of evidence by the court.[235] The Proposed Defendants, however, argue that the test for colorability should be more

---

[235] Reply, ¶ 5 ("[T]he determination of 'colorability' does not allow the 'weighing' of evidence. At most, a Rule 12(b)(6) 'plausibility' standard applies.").

akin to the test applied under the *Barton* doctrine,[236] under which a plaintiff must make a *prima facie* case that a proposed claim against a bankruptcy trustee is "not without foundation." In this regard, they argue that the court can and should consider evidence outside of the four corners of the complaint—especially since HMIT attached to its Motion for Leave, as "evidence" to support it, two declarations of Dondero (as part of a 350-page attachment) and only attempted to withdraw those declarations after the Highland Parties urged that they be permitted to cross-examine Dondero on them.

This court ultimately determined that the "colorability" standard was somewhat of a mixed question of fact and law and, therefore, the parties could put on evidence at the June 8 Hearing if they so-chose. The court would not require it. It was up to the parties. But, in any event, the Proposed Defendants should have an opportunity to cross-examine Dondero on the statements made in his declarations since the declarations had been filed on the docket and the court had reviewed them at this point. HMIT attempted to withdraw the declarations and any reference to them in the Motion for Leave, by filing redacted versions of the Motion for Leave,[237] less than 72 hours before the June 8 Hearing; however, the redacted versions did not redact any allegations in the Motion for Leave that were purportedly supported by the Dondero declarations. Also, HMIT called Dondero as a direct witness, in addition to calling Seery as an adverse witness at the June 8 Hearing, albeit subject to its running objection to the evidentiary format of the hearing.[238] HMIT also filed a witness and exhibit list attaching 80 exhibits and over 2850 pages of evidence and

---

[236] *Barton v. Barbour,* 104 U.S. 126 (1881).

[237] Bankr. Dkt. Nos. 3815 and 3816.

[238] *See* June 8 Hearing Transcript, 7:20-24, 112:11-13.

moved for the admission of those exhibits at the June 8 Hearing (again, subject to its running objection to the evidentiary format of the hearing).[239]

In determining what appropriate legal standard applies here in the "colorability" analysis, the context in which the Gatekeeper Provision of the Plan was approved seems very relevant. In determining that the Gatekeeper Provision was legal, necessary, and in the best interest of all of the parties, this court set forth in the Confirmation Order a lengthy discussion of the factual support for it, and made specific findings relating to Dondero's post-petition litigation and the need for inclusion of the Gatekeeper Provision in the Plan.[240] This court observed that "prior to the commencement of the Debtor's bankruptcy case, and while under the direction of Dondero, the Debtor had been involved in a myriad of litigation, some of which had gone on for years and, in some cases, over a decade" and that "[d]uring the last several months, Dondero and the Dondero Related Entities have harassed the Debtor, which has resulted in further substantial, costly, and time-consuming litigation for the Debtor."[241] This court further found that: (1) Dondero's post-petition litigation "was a result of Dondero failing to obtain creditor support for his plan proposal and consistent with his comments, as set forth in Seery's credible testimony, that if Dondero's plan proposal was not accepted, he would 'burn down the place,'"[242] (2) without the Gatekeeper Provision in place, "Dondero and his related entities will likely commence litigation against the Protected Parties after the Effective Date" and that "the threat of continued litigation by Dondero and his related entities after the Effective Date will impede efforts by the Claimant Trust to monetize assets for the benefit of creditors and result in lower distributions to creditors because of

---

[239] *See Hunter Mountain Investment Trust's Witness and Exhibit List in Connection with Its Emergency Motion for Leave to File Verified Adversary Proceeding, and Supplement* ("HMIT W&E List")[Bankr. Dkt. No. 3818] and n.1 thereto; *see also* June 8 Hearing Transcript, 33:7-10.

[240] *See* Confirmation Order ¶¶ 76-79.

[241] *Id.* ¶ 77.

[242] *Id.* ¶ 78. *See supra* note 12.

costs and distraction such litigation or the threats of such litigation would cause,"[243] and, (3)

"unless the [court] approves the Gatekeeper Provision, the Claimant Trustee and the Claimant

Trust Oversight Board will not be able to obtain D&O insurance,[244] the absence of which will

present unacceptable risks to parties currently willing to serve in such roles." Thus, as set forth in

the Confirmation Order, the Gatekeeper Provision (and the Gatekeeper Orders as well, which were

approved based on the same concerns regarding the threat of continued litigation by Dondero and

his related entities) required Dondero and related entities to make a threshold showing of

colorability, noting that the:

> Gatekeeper Provision is also within the spirit of the Supreme Court's "Barton
> Doctrine." *Barton v. Barbour*, 104 U.S. 126 (1881).  The Gatekeeper Provision is
> also consistent with the notion of a prefiling injunction to deter vexatious litigants,
> that has been approved by the Fifth Circuit in such cases as *Baum v. Blue Moon
> Ventures, LLC,* 513 F.3d 181, 189 (5th Cir. 2008), and *In re Carroll,* 850 F.3d 811
> (5th Cir. 2017)."[245]

The Fifth Circuit, in approving the Gatekeeper Provision on appeal, noted that that the Plan

injunction and Gatekeeper Provision "screen and prevent bad-faith litigation against Highland

Capital, its successors, and other bankruptcy participants that could disrupt the Plan's

effectiveness."[246]

Again, the court believes it is appropriate to consider the context in which—and the

purpose for which—the Gatekeeper Orders and Gatekeeper Provision were entered in assessing

---

[243] *Id.*

[244] Asd noted at ⁋ 79 of the Confirmation Order, the bankruptcy court heard testimony from Mark Tauber, a Vice President with AON Financial Services, the Debtor's insurance broker ("AON"), regarding his efforts to obtain D&O insurance for the post-confirmation parties implementing the Plan. Mr. Tauber credibly testified that of all the insurance carriers that AON approached to provide D&O insurance coverage after the Effective Date, the only one willing to do so ***without an exclusion for claims asserted by Mr. Dondero and his affiliates*** required that the Confirmation Order approve the Gatekeeper Provision.

[245] *Id.* ¶ 80.

[246] *NexPoint Advisors, L.P. v. Highland Cap. Mgmt., L.P.* (*In re Highland Cap. Mgmt., L.P.*), 48 F.4th 419, 435 (5th Cir. 2022).

how "colorability" should work here.  It seems that applying HMIT's proposed Rule 12(b)(6)

"plausibility" standard would impose no hurdle at all to litigants and would render the threshold

for bringing claims under the Gatekeeper Provision and Gatekeeper Orders entirely duplicative of

the motion to dismiss standard that every litigant already faces.

The authorities cited by HMIT in support of its argument for applying a Rule 12(b)(6)

standard are inapposite.  HMIT has cited no authority that addresses the appropriate standard for

assessing the "colorability" of claims in the context of a plan gatekeeper provision—specifically,

one implemented in response to a demonstrated need to screen and prevent continued bad-faith,

harassing litigation against a chapter 11 debtor that would impede the debtor's implementation of

a plan, which is what we have here.  HMIT relies on a bevy of cases that include benefits coverage

disputes under ERISA, Medicare coverage disputes, and constitutional challenges[247]—none of

which implicate the *Barton* doctrine and vexatious-litigant concerns that were referenced by the

court in the Plan as justifications for the gatekeeping provisions at issue here.

In affirming the Plan's Gatekeeper Provision, the Fifth Circuit stated, "Courts have long

recognized bankruptcy courts can perform a gatekeeping function" and noted, by way of example,

that "[u]nder the '*Barton* doctrine,' the bankruptcy court may require a party to 'obtain leave of

---

[247] *See Gonzales v. Columbia Hosp. at Med. City Dallas Subsidiary, L.P.*, 207 F. Supp. 2d 570, 577 (N.D. Tex. 2002) (assessing whether an employee has "a colorable claim to vested benefits" such that the employee may be considered a "participant" under ERISA); *Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir. 1996) (same); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir. 1996) (same); *Lake Eugenie Land & Dev., Inc. v. BP Expl. & Prods. (In re Deepwater Horizon)*, 732 F.3d 326, 340 (5th Cir. 2013) (holding that claims administrator incorrectly interpreted class settlement agreement by permitting "claimants [with] no colorable legal claim" to receive awards); *Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984) (discussing whether criminal defendant's double jeopardy claim was "colorable" such that it could be appealed before final judgments); *Trippodo v. SP Plus Corp.*, 2021 WL 2446204, at *3 (S.D. Tex. June 15, 2021) (assessing whether plaintiff stated a "colorable claim" against proposed additional defendants in determining whether plaintiff could amend complaint); *Reyes v. Vanmatre*, 2021 WL 5905557, at *3 (S.D. Tex. Dec. 13, 2021) (same); *Family Rehab., Inc. v. Azar*, 886 F.3d 496, 504 n.15 (5th Cir. 2018) (assessing whether plaintiff raised a "colorable claim" to warrant the district court's exercise of jurisdiction over a Medicare coverage dispute); *Am. Med. Hospice Care, LLC v. Azar*, 2020 WL 9814144, at *5 (W.D. Tex. Dec. 9, 2020) (same); *Harry v. Colvin*, 2013 WL 12174300, at *5 (W.D. Tex. Nov. 6, 2013) (considering whether plaintiff asserted a "colorable constitutional claim" such that the court could exercise jurisdiction); *Sabhari v. Mukasey*, 522 F.3d 842, 844 (8th Cir. 2008) (same); *Stanley v. Gonzales*, 476 F.3d 653, 657 (9th Cir. 2007) (same).

the bankruptcy court before initiating an action in district court when the action is against the trustee or other bankruptcy-court-appointed officer, for acts done in the actor's official capacity."[248] As noted above, the Fifth Circuit found that the Gatekeeper Provision, which "requires that, before any lawsuit is filed, the plaintiff must seek the bankruptcy court's approval of the claim as 'colorable'"—*i.e.*, to "screen and prevent bad-faith litigation,"—is "sound."[249]

On balance, the court views jurisprudence applying the *Barton* doctrine and vexatious litigant injunctions—while not specifically addressing the "colorability" standard under gatekeeping provisions in a plan[250]—as more informative on how to approach "colorability" than any of the other authorities presented by the parties.  One example is *In re VistaCare Group, LLC*.[251]

In *VistaCare*, the Third Circuit noted that, under the *Barton* doctrine, "[a] party seeking leave of court to sue a trustee must make a prima facie case against the trustee, showing that its claim is not without foundation," and emphasized that the "not without foundation" standard, while similar to the standard courts apply in evaluating Rule 12(b)(6) motions to dismiss, "involves a greater degree of flexibility" than a Rule 12(b)(6) motion to dismiss because "the bankruptcy court, which given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit," and "is also uniquely situated to determine the potential effect of a judgment against the trustee on the debtor's estate."[252]  To satisfy the "*prima facie* case standard," "the movant must do more than meet the liberal notice-pleading

---

[248] *Id.* at 438 (cleaned up).

[249] *Id.* at 435.

[250] The court acknowledges that the *Barton* doctrine itself would not be directly applicable here because HMIT is proposing to bring the Proposed Complaint in the bankruptcy court – the "appointing" court of Seery.

[251] 678 F.3d 218 (3d Cir. 2012).

[252] *Id.* at 232-233 (cleaned up).

requirements of Rule 8."[253] "[I]f the [bankruptcy] court relied on mere notice-pleading standards rather than evaluating the merits of the allegations, the leave requirement would become meaningless."[254] This court agrees with the notion, that "[t]o apply a less stringent standard would eviscerate the protections" of the Gatekeeper Provision and Gatekeeper Orders.[255] The court notes, as well, that courts in the *Barton* doctrine context regularly hold evidentiary hearings on motions for leave to determine if the proposed complaint meets the necessary threshold for pursuing litigation. The Third Circuit in *VistaCare* noted that "[w]hether to hold a hearing [on a motion for leave to bring suit against a trustee] is within the sound discretion of the bankruptcy court,"[256] and that "the decision whether to grant leave may involve a 'balancing of the interests of all parties involved,'" which will ordinarily require an evidentiary hearing.[257] The Third Circuit applied "the deferential abuse of discretion standard" in considering whether the bankruptcy court's granting of leave should be affirmed on appeal.[258]

---

[253] *In re World Mktg. Chi., LLC*, 584 B.R. 737, 743 (Bankr. N.D. Ill. 2018) (cleaned up; collecting cases).

[254] *Leighton Holdings, Ltd. v. Belofsky (In re Kids Creek Partners, L.P.)*, 2000 WL 1761020, at *2 (N.D. Ill. Nov. 30, 2000).

[255] *World*, 584 B.R. at 743 (quoting *Leighton*, 2000 WL 1761020, at *2).

[256] *VistaCare*, 678 F.3d at 232 n.12.

[257] *Id.* at 233 (quoting *In re Kashani*, 190 B.R. 875, 886–87 (9th Cir. BAP 1995)). The Third Circuit noted that the bankruptcy court's holding of an evidentiary hearing on the motion for leave was appropriate (though not required in every case)). *Id.* at 232 n.12.

[258] *Id.* at 224 ("We review a bankruptcy court's decision to grant a motion for leave to sue a trustee under the deferential abuse of discretion standard.") (citing *In re Linton*, 136 F.3d 544, 546 (7th Cir. 1998); *In re Beck Indus., Inc.*, 725 F.2d 880, 889 (2d Cir. 1984)). Courts of appeal routinely apply the deferential abuse of discretion standard to a bankruptcy court's decision regarding whether leave should be granted to sue a trustee. Although the Fifth Circuit has not squarely addressed this issue, all nine Circuits that have considered this issue have also adopted an abuse-of-discretion standard. *See In re Bednar*, 2021 WL 1625399, at *3 (B.A.P. 10th Cir. Apr. 27, 2021) ("[T]he Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion . . . .") (citing *VistaCare*); *SEC v. N. Am. Clearing, Inc.*, 656 F. App'x 969, 973–74 (11th Cir. 2016) ("Although we have never determined the standard of review for a challenge to the denial of a *Barton* motion, other Circuits that have considered the issue review a lower court's ruling on a *Barton* motion for an abuse of discretion.") (citing *VistaCare*); *In re Lupo*, 2014 WL 4653064, at *3 (B.A.P. 1st Cir. Sept. 17, 2014) ("Appellate courts review a bankruptcy court's decision to deny a motion for leave to sue under the abuse of discretion standard.") (citing *VistaCare*); *Grant, Konvalinka & Harrison, PC v. Banks (In re McKenzie)*, 716 F.3d 404, 422 (6th Cir. 2013) (holding that abuse-of-discretion standard applies to *Barton* doctrine); *Alexander v. Hedback*, 718 F.3d 762 (8th Cir. 2013) (applying abuse-of-discretion standard to *Barton* doctrine).

The Fifth Circuit has affirmed a bankruptcy court's conducting of an evidentiary hearing, in the context of applying a *Barton* doctrine analysis as to a proposed lawsuit against a trustee, without any concern that the inquiry was somehow improper.[259]

Similarly, courts in the vexatious litigant context, where there was an injunction requiring a movant to seek leave to pursue claims, have required movants to "show that the claims sought to be asserted have sufficient merit," including that "the proposed filing is both procedural and legally sound," and "that the claims are not brought for any improper purpose, such as harassment."[260] "For a prefiling injunction to have the intended impact, it must not merely require a reviewing official to apply an already existing level of review," such as the "plausibility" standard for a Rule 12(b)(6) motion.[261] Rather, courts apply "an additional layer of review," and "may appropriately deny leave to file when even part of the pleading fails to satisfy the reviewer that it warrants a federal civil action" or that the "litigant's allegations are unlikely," especially "when prior cases have shown the litigant to be untrustworthy or not credible . . . ."[262]

In summary, the court rejects HMIT's positions: (a) that it need only show, at most, that the allegations in the Proposed Complaint are "plausible" under the Rule 12(b)(6) standard for motions to dismiss; and (b) that this court improperly conducted an evidentiary hearing on the Motion for Leave (i.e., that consideration of evidence in this context is impermissible). The court notes, again, that HMIT's argument that this court is not permitted to consider evidence in making its "colorability" determination is completely contradictory to HMIT's actions in filing the Motion

---

[259] *See Howell v. Adler (In re Grodsky)*, 2019 WL 2006020, at *4 (Bankr. E.D. La. Apr. 11, 2019) (dismissing an action under *Barton* after "a close examination" by the bankruptcy court of the evidence regarding the trustee's actions and finding that "the plaintiffs' allegations are not based in fact"), *aff'd* 799 F. App'x 271 (5th Cir. 2020).

[260] *Silver v. City of San Antonio*, 2020 WL 3803922, at *1 (W.D. Tex. July 7, 2020) (denying leave to file lawsuit); *see also Silver v. Perez*, 2020 WL 3790489, at *1 (W.D. Tex. July 7, 2020) (same).

[261] *Silver*, 2020 WL 3803922, at *6.

[262] *Id.*

for Leave, where it attached two Dondero declarations as part of 350 pages of "objective evidence" that "supported" its motion.

The court concludes that the appropriate standard to be applied in making its "colorability" determination in *this* bankruptcy case, in the exercise of its gatekeeping function pursuant to the two Gatekeeper Orders and the Gatekeeper Provision in *this* Plan, is a broader standard than the "plausibility" standard applied to Rule 12(b)(6) motions to dismiss. It is, rather, a standard that involves *an additional level of review*—one that places on the proposed plaintiff a burden of making a prima facie case that its proposed claims are *not without foundation*, are *not without merit*, and are *not being pursued for any improper purpose such as harassment*. Additionally, this court may, and should, take into consideration its *knowledge* of the *bankruptcy proceedings* and *the parties* and any additional evidence presented at the hearing on the Motion for Leave. For ease of reference, the court will refer to this standard of "colorability" as the "Gatekeeper Colorability Test." The court considers this test as a sort of hybrid of what the *Barton* doctrine contemplates and what courts have applied when considering motions to file suit when a vexatious litigant bar order is in place.

2. HMIT's Proposed Complaint Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test or Even Under a Rule 12(b)(6) "Plausibility" Standard.

The court finds, in the exercise of its gatekeeping function under the Gatekeeper Orders and the Gatekeeping Provision in the Plan, that the Motion for Leave should be denied as the claims set forth in the Proposed Complaint are not "colorable" claims. The court makes this determination after considering evidence admitted at the June 8 Hearing, including the testimony of Dondero, Patrick, and Seery, and the numerous exhibits offered by HMIT and the Highland Parties. HMIT's Proposed Claims lack foundation, are without merit, and appear to be motivated by the improper purposes of vexatiousness and harassment. But, even under the less stringent

91

"plausibility" standard under Rule 12(b)(6) motions to dismiss, where all allegations must be accepted as true, HMIT's "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," fail to "[]cross the line from conceivable to plausible."[263]

HMIT makes unsubstantiated and conclusory allegations in its Motion for Leave and Proposed Complaint that the Claims Purchasers purchased the large allowed unsecured claims only because Seery, while he was CEO of Highland prior to the Effective Date of the Plan, provided them with MNPI and assurances that the Purchased Claims were very valuable. This was allegedly in exchange for their agreement to approve, in their future capacities as members of the CTOB, excessive compensation for Seery in his capacity as the Claimant Trustee after the Effective Date of the Plan. This was an alleged *quid pro quo* that HMIT claims establishes Seery's breach of fiduciary duties and the Claims Purchasers' conspiracy to participate in that breach. As discussed below, these allegations are unsubstantiated and conclusory allegations, and they do not support the inferences that HMIT needs the court to make when it analyzes whether the Proposed Claims are "colorable"—or even merely plausible.

a) HMIT's Proposed Breach of Fiduciary Duties Claim Set Forth in Count I of the Proposed Complaint

Based on HMIT's Proposed Complaint and the evidence admitted at the June 8 Hearing, the court finds that HMIT has not pleaded facts that would support a "colorable" breach of fiduciary duties claim against Seery, under this court's Gatekeeper Colorability Test, nor a plausible claim pursuant to the Rule 12(b) standard. HMIT alleges that Seery breached his fiduciary duties (i) "[b]y disclosing material non-public information to Stonehill and Farallon"

---

[263] *Ashcroft v. Iqbal*, 556 U.S. 662, 679–80 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).

before their purchase of certain Highland claims, and (ii) by receiving "compensation paid to him under the terms of the [CTA] since the Effective Date of the Plan in August 2021."[264]

As earlier noted, both the Reorganized Debtor and the Claimant Trust are organized under Delaware law and, thus, its proposed Count I against Seery for breach of fiduciary duties to these entities is governed by Delaware law under the "Internal Affairs Doctrine."[265]  Under Delaware law, "[t]o bring a claim for breach of fiduciary duty, a plaintiff must allege '(1) that a fiduciary duty existed and (2) that the defendant breached that duty.'"[266] HMIT fails to plausibly or sufficiently allege either element such that its breach of fiduciary duty claims against Seery could survive.

Under Delaware law, officers and directors generally owe fiduciary duties only to the entity and its stakeholders as a whole, not to individual shareholders.[267] Because Seery did not owe any "duty" to HMIT directly and individually, the Proposed Complaint fails to state a claim for breach of fiduciary duties to HMIT.  HMIT's "legal conclusion[]" that Seery "owed fiduciary duties to HMIT, as equity, and to the Debtor's Estate"[268] "do[es] not suffice" to plausibly allege the existence of any actionable fiduciary relationship.[269]  And as discussed earlier in the standing section, HMIT does not have standing to assert a breach of fiduciary claim derivatively on behalf

---

[264] Proposed Complaint ¶¶ 64–67.

[265] Motion for Leave, ¶ 21 and n.24; *see also* Plan Art. XII.M ("corporate governance matters . . . shall be governed by the laws of the state of organization" of the respective entity); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 34 A.3d 1074, 1081–82 (Del. 2011) ("In American corporation law, the internal affairs doctrine is a dominant and overarching choice of law principle."). The Reorganized Debtor and the Claimant Trust are both organized under the laws of Delaware.

[266] *Brooks v. United Dev. Funding III, L.P.*, 2020 WL 6132230, at *30 (N.D. Tex. Apr. 15, 2020) (quoting *Joseph C. Bamford & Young Min Ban v. Penfold, L.P.*, 2020 WL 967942, at *8 (Del. Ch. Feb. 28, 2020)).

[267] *See Gilbert v El Paso Co.*, 1988 WL 124325, at *9 (Del. Ch. Nov. 21, 1988) ("[D]irectors' fiduciary duty runs to the corporation and to the entire body of shareholders generally, as opposed to specific shareholders or shareholder subgroups.") *aff'd,* 575 A.2d 1131 (Del. 1990); *Klaassen v Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del. Ch. Nov. 7, 2013) (same).

[268] Proposed Complaint ¶ 63.

[269] *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

of the Claimant Trust or Reorganized Debtor. But even if HMIT had sufficiently alleged the existence of a fiduciary duty by Seery to HMIT—or to the Reorganized Debtor or Claimant Trust that HMIT would have standing to assert—Seery's alleged communications with Farallon would not have breached those duties.

HMIT alleges that Seery ""disclose[d] material non-public information to Stonehill and Farallon," and they "acted on inside information and Seery's secret assurances of great profits."[270] But the Proposed Complaint does not make any factual allegations regarding HMIT's "conclusory allegations," and its "legal conclusions" are "purely speculative, devoid of factual support," and therefore "stop[] short of the line between possibility and plausibility of entitlement to relief"[271] (and certainly stop short of being "colorable"). HMIT never alleges when any of these purported communications occurred, what material non-public information Seery provided, and what "assurances of great profits" he made to Farallon or to Stonehill. At the June 8 Hearing, Dondero could only clarify that he believed the MGM Email to have been MNPI and that he **believed** that Seery **must have** communicated that MNPI to Farallon at some point between December 17, 2020 (the date the MGM Email was sent) and May 28, 2021 (the day that Dondero alleges to have had three telephone calls with representatives of Farallon, Messrs. Patel and Linn, regarding Farallon's purchase of the bankruptcy claims). Dondero alleges that, during these phone calls, Patel and Linn gave Dondero no reason for their purchase of the claims that "made [any] sense." Dondero and Patrick also both testified that neither of them had any personal knowledge: (a) of a *quid pro quo* arrangement between Seery and the Claims Purchasers, (b) of Seery having actually communicated any information from the MGM Email to Farallon, or (c) whether Seery's post-Effective Date compensation had or had not been negotiated in an arms' length transaction. Dondero only

---

[270] Proposed Complaint ¶¶ 3, 64; *see also id.* ¶¶ 13–14, 40, 47, 50.

[271] *Reed v. Linehan (In re Soporex, Inc.)*, 463 B.R. 344, 367, 386 (Bankr. N.D. Tex. 2011) (cleaned up).

speculates regarding these things, because it "made no sense" to him that the Claims Purchasers would have acquired the bankruptcy claims without having received the MNPI.  But HMIT admits in the Proposed Complaint that Farallon and Stonehill purchased the Highland claims at discounts of 43% to 65% to their allowed amounts.  Thus, they would receive at least an 18% return based on publicly available estimates in Highland's court-approved Disclosure Statement.[272]  The evidence established that, if the acquisition of the UBS claims is excluded—recall that the UBS claims were not purchased until August 2021, which was after the May 28, 2021 phones calls that Dondero made to Farallon personnel—the Claims Purchasers would have expected to net over $33 million in profits, or nearly a 30% return on their investment, had Highland met its projections (this is based on the aggregate purchase price of $113 million for the non-UBS claims purchased in the Spring 2021).

To be clear, the only purported MNPI identified in HMIT's Proposed Complaint was the MGM Email Dondero sent to Seery containing "information regarding Amazon and Apple's interest in acquiring MGM."  But, the evidence showed that this information was widely reported in the financial press at the time.  Thus, it could not have constituted MNPI as a matter of law.[273] Moreover, the evidence showed that Dondero **did not** communicate in the MGM Email the actual inside information that he claimed to have obtained as a board member of MGM–which was that Amazon had met MGM's "strike price" and that the MGM board was going into exclusive negotiations with Amazon to culminate the merger with them (and, thus, Apple was no longer considered a potential purchaser).  Dondero admitted that he included Apple in the MGM Email for the purpose of making it look like there was a competitive process still ongoing.  In other

---

[272] Proposed Complaint ¶¶ 3, 37, 42.

[273] *See, e.g.*, *SEC v. Cuban*, 2013 WL 791405, at *10–11 (N.D. Tex. Mar. 5, 2013) (holding that information is not "material, nonpublic information" and "'becomes public when disclosed to achieve a broad dissemination to the investing public'") (quoting *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997)).

words, the MGM Email, at the very least, did not include MNPI and, at worst, was deceptive regarding the status of the negotiations between MGM and potential purchasers.

As to HMIT's allegations that Seery's post-Effective Date compensation is "excessive" and that the negotiations between Seery and the CTOB "were not arm's-length,"[274] the evidence at the June 8 Hearing reflected that the allegations are completely speculative, without any foundation whatsoever, and lack merit. And they are also simply not plausible. HMIT fails to allege facts in the Proposed Complaint that would support a reasonable inference that Seery breached his fiduciary duty to HMIT or the estate as a result of bad faith, self-interest, or other intentional misconduct rising to the level of a breach of the duty of loyalty.[275]

      b) HMIT's Proposed Claims Set Forth in Counts II (Knowing Participation in Breach of Fiduciaries) and III (Conspiracy)

HMIT seeks to hold the Claims Purchasers secondarily liable for Seery's alleged breach of fiduciaries duties on an aiding and abetting theory in Count II of the Proposed Complaint[276] and, along with Seery, on a civil conspiracy theory of liability in Count III of the Proposed Complaint.[277] Because HMIT's breach of fiduciary duties claim is governed by Delaware law, its aiding and abetting breach of fiduciary duties claim against the Claims Purchasers (Count II) is also governed by Delaware law.[278] HMIT's conspiracy cause of action against the Claims

---

[274] Proposed Complaint ¶¶ 4, 13, 54, 74.

[275] *See Pfeffer v. Redstone*, 965 A.2d 676, 690 (Del. 2009) (dismissing claim for breach of duty of loyalty against a director where "conclusory allegations" failed to give rise to inference that director failed to perform fiduciary duties); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 (Del. Ch. 2000) (dismissing claim for breach of fiduciary duty where "[a]though the complaint makes the conclusory allegation that the defendants breached their duty of disclosure in a 'bad faith and knowing manner,' no facts pled in the complaint buttress that accusation.").

[276] Proposed Complaint ¶¶ 69-74.

[277] Proposed Complaint ¶¶ 75-81.

[278] *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas).

Purchasers and Seery (Count III), on the other hand, does not involve a matter of "internal affairs" or of corporate governance, so it is governed by Texas law under the Plan.[279]

As an initial matter, because HMIT does not present either a "colorable"—or even plausible claim—that Seery breached his fiduciary duties, it cannot show that it has alleged a "colorable" or plausible claim for secondary liability for the same alleged wrongdoing.[280]   In addition, HMIT's civil conspiracy claim against the Claims Purchasers and Seery is based entirely on Dondero's speculation and unsupported inferences and, thus, HMIT has not "colorably" alleged, or even plausibly alleged, its conspiracy claim.   Under Texas law, "civil conspiracy is a theory of vicarious liability and not an independent tort."[281] "[T]he elements of civil conspiracy [are] "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result."[282]   While HMIT alleges that "Defendants conspired with each other to unlawfully breach fiduciary duties,"[283] it is simply a "legal conclusion" and not the kind of allegation that the court must assume to be true even for purposes of determining plausibility under a motion to dismiss.[284]

---

[279] *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M)(which provides for the application of Texas law to "the rights and obligations arising under this Plan" except for "corporate governance matters.")

[280] *See English v. Narang*, 2019 WL 1300855, at *14 (Del. Ch. Mar. 20, 2019) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.") (cleaned up; collecting cases); *Hill v. Keliher*, 2022 WL 213978, at *10 (Tex. App. Jan. 25, 2022) ("[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable.") (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)).   Because HMIT's breach of fiduciary duty claim is governed by Delaware law, its aiding and abetting theory of liability is also governed by Delaware law. *See Xtreme Power Plan Tr. v. Schindler (In re Xtreme Power)*, 563 B.R. 614, 632, 645 (Bankr. W.D. Tex. 2016) (applying Delaware law to claim for aiding and abetting breach of fiduciary duty involving Delaware corporation headquartered in Texas). By contrast, "conspiracy is not an internal affair" or a matter of corporate governance, so it is governed by Texas law under the Plan. *Klinek v. LuxeYard, Inc.*, 596 S.W.3d 437, 450 n.9 (Tex. App. – Houston [14th Dist.] 2020) (applying Delaware law to fiduciary duty claim and Texas law to conspiracy theory); (Plan Art. XII.M).

[281] *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

[282] *Id.* at 141 (cleaned up).

[283] Proposed Complaint ¶ 76.

[284] *Iqbal*, 556 U.S. at 680 (citing *Twombly*, 555 U.S. at 565–66).

HMIT repeats four times that Seery provided MNPI to Farallon and Stonehill as a "as a *quid pro quo*" for "additional compensation,"[285] each time based upon conclusory allegations based "upon information and belief" and, frankly, pure speculation from Dondero that his imagined "scheme," "covert *quid pro quo,*" and secret "conspiracy" between Seery, on the one hand, and Farallon and Stonehill, on the other,[286] ***must have*** occurred because "[i]t made no sense for the [Claims] Purchasers to invest millions of dollars for assets that – per the publicly available information – did not offer a sufficient potential profit to justify the publicly disclosed risk" (i.e., "[t]he counter-intuitive nature of the purchases at issue compels the conclusion that the [Claims] Purchasers acted on inside information and Seery's assurance of great profits.")[287] Importantly, HMIT admits that the Claims Purchasers would have turned a profit based on the information available to them at the time of their acquisitions of the Purchased Claims.[288] HMIT's allegations about the level of potential profits were contradicted by their own allegations and other evidence admitted at the June 8 Hearing. But Dondero's speculation about what level of projected return would be sufficient to justify the acquisition of the claims by the Claims Purchasers, or any other third-party investor, does not give rise to a plausible inference that they acted improperly.[289] Thus, HMIT cannot meet

---

[285] Proposed Complaint ¶ 77; *see also id.* ¶¶ 4, 47, 74.

[286] *See id.* ¶ 3 ("Thus, acting within a cloak of secrecy, Seery provided close business acquaintances, the other Defendants with material non-public information concerning the value of assets which they then used to purchase the largest approved unsecured claims.").

[287] *Id.*

[288] *See, e.g., id.* ¶ 3 (alleging that acquiring the claims "did not offer a ***sufficient*** potential profit to justify the publicly disclosed risk")(emphasis added); ¶ 43 ("Furthermore, although the publicly available projections suggested only a small margin of error on any profit potential for its significant investment . . . ."); ¶ 49 ("Yet, in this case, it would have been *impossible* for Stonehill and Farallon (in the absence of inside information) to forecast *any **significant*** profit at the time of their multi-million-dollar investments given the publicly available, negative financial information.") (third emphasis added).

[289] In fact, the court did not allow Mr. Dondero to testify regarding what kind of information a hypothetical investor in bankruptcy claims would require or what level of potential profits would justify the purchase of bankruptcy claims by investors in the bankruptcy claims trading market because he was testifying as a fact witness, not an expert. Thus, the court only allowed Dondero to testify as to what data ***he*** (or entities he controls or controlled) would rely on, what ***his*** risk tolerance would have been, and what level of potential profits ***he*** would have required to purchase an allowed unsecured bankruptcy claim in a post-confirmation situation. June 8 Hearing Transcript, 129:6-130:4.

its burden, under the Gatekeeper Colorability Test, of making a prima facie showing that its allegations do not lack foundation or merit. Nor can it meet a plausibility standard.

In addition, contrary to the Proposed Complaint's statement that it would have been "***impossible*** for Stonehill and Farallon (in the absence of insider information) to forecast ***any*** significant profit at the time of their multi-million-dollar investments," the evidence showed there were already reports in the financial press that MGM was engaging with Amazon, Apple, and others in selling its media portfolio, and thus the prospect of an MGM transaction increasing the value of, and return on, the Purchased Claims, "at the time of their multi-million-dollar investments" was publicly available information.[290] HMIT's suggestion that the Claims Purchasers were in possession of inside information not publicly available when they acquired the Purchased Claims is simply not plausible. Nor is HMIT's allegation that "[u]pon information and belief" Farallon "conducted no due diligence but relied on Seery's profit guarantees" plausible. The allegations regarding Farallon not conducting any due diligence are based, again, entirely on Dondero's speculation and inferences he made from what Patel and Linn (of Farallon) allegedly told him on May 28, 2021; Dondero did not testify that either Patel or Linn ever told him specifically that they had conducted no due diligence. HMIT's allegations in the Proposed Complaint that ***Farallon*** "conducted no due diligence," are based on Dondero's speculation, unsubstantiated, and contradicted by the testimony of Seery, who testified that emails to him from Linn in June 2020 and later in January 2021 indicated to him that Farallon, at least, had been conducting some level of due diligence in that they had been following and paying attention to the

---

[290] The court notes, as well, that the Claim Purchasers acquired the UBS claims in August 2021—approximately two and a half months ***after*** the announcement of the MGM-Amazon transaction (which was on May 26, 2021)—a fact that HMIT makes no attempt to harmonize with its conspiracy theory that the Claims Purchasers profited from the misuse of MNPI allegedly given to them by Seery.

Highland case.[291]   In addition, there are no allegations in the Proposed Complaint regarding whether Stonehill conducted due diligence or not, and Patrick testified that neither he nor HMIT had any personal knowledge of how much due diligence Farallon or Stonehill did prior to acquiring the Purchased Claims.[292]   The court finds and concludes that HMIT's allegations of aiding and abetting and conspiracy in Counts II and III of the Proposed Complaint are based on unsubstantiated inferences and speculation, lack internal consistency, and lack consistency with verifiable public facts.   Accordingly, HMIT has failed to show that these claims have a foundation and merit and has also failed to show that they are plausible.

      c)  HMIT's Proposed Claims Set Forth in Counts IV (Equitable Disallowance), V (Unjust Enrichment and Constructive Trust), and VI (Declaratory Relief) of the Proposed Complaint

      i.  Count IV (Equitable Disallowance).

In Count IV of its Proposed Complaint, HMIT seeks "equitable disallowance" of the claims acquired by Farallon's and Stonehill's special purpose entities Muck and Jessup, "to the extent over and above their initial investment," and, in the alternative, equitable subordination of their claims to all claims and interests, including HMIT's unvested Class 10 Contingent Claimant Trust Interest, "given [their] willful, inequitable, bad faith conduct" of allegedly "purchasing the Claims based on material non-public information" and being "unfairly advantaged" in "earning significant profits on their purchases."[293]   As noted above, these remedies are not available to HMIT.[294]

First, HMIT's request to equitably subordinate the Purchased Claims to all claims and interests is not permitted because Bankruptcy Code § 510(c), by its terms, permits equitable

---

[291] *See* June 8 Hearing Transcript, 239:6-21.

[292] *See id.*, 310:19-312:2.

[293] Proposed Complaint ¶¶ 83-87.

[294] *See infra* pages 74-75.

subordination of a ***claim to other claims*** or an ***interest to other interests*** but does not permit equitable subordination of a ***claim to interests***.

Second, "equitable" disallowance of claims is not an available remedy in the Fifth Circuit pursuant to the *Mobile Steel* case.[295]

Third, reconsideration of an already-allowed claim in a bankruptcy case can only be accomplished through Bankruptcy Code § 502(j), which, pursuant to Federal Rule of Bankruptcy Procedure 9024, allows reconsideration of allowance of a claim that was allowed following ***a contest*** (which is certainly the case with respect to the Purchased Claims) based on the "equities of the case." But this is only if the request for reconsideration is made within the one-year limitation prescribed in Rule 60(c) of the Federal Rules of Civil Procedure. HMIT's request for disallowance of Muck and Jessup's Purchased Claims (if it could somehow be construed as a request for reconsideration of their claims), is clearly untimely, as it is being made well beyond a year since their allowance by this court following contests and approval of Rule 9019 settlements. Thus, the court finds that HMIT has not alleged a colorable or even plausible claim in Count IV of the Proposed Complaint and, therefore, the Motion for Leave should be denied.

    ii.    Count V (Unjust Enrichment and Constructive Trust)

In Count V of the Proposed Complaint, HMIT alleges that, "by acquiring the Claims using [MNPI], Stonehill and Farallon were unjustly enriched and gained an undue advantage over other creditors and former equity" and that "[a]llowing [the Claims Purchasers] to retain their ill-gotten benefits would be unconscionable;" thus, HMIT alleges, the Claims Purchasers "should be forced to disgorge all distributions over and above their original investment in the Claims as restitution for their unjust enrichment" and "a constructive trust should be imposed on such proceeds . . . ."[296]

---

[295] *In re Mobile Steel Co., Inc.*, 563 F.2d 692 (5th Cir. 1977).
[296] Proposed Complaint ¶¶ 89-93.

HMIT alleges further that "Seery was also unjustly enriched by his participation in this scheme and he should be required to disgorge or restitute all compensation he has received from the outset of his collusive activities" and "[a]lternatively he should be required to disgorge and restitute all compensation received since the Effective Date" over which a constructive trust should be imposed.[297]  HMIT has not alleged a colorable or even a plausible claim for unjust enrichment or constructive trust in Count V.

Under Texas law,[298] "[u]njust enrichment is not an independent cause of action but rather characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay."[299]  Thus, "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory."[300]  Here, as noted above, HMIT's only alleged injury is a diminution of the value of its unvested Contingent Claimant Trust Interest by virtue of Seery's allegedly having wrongfully obtained excessive compensation, with the help of the Claims Purchasers.  ***Yet Seery's compensation is governed by express agreements*** (i.e., the Plan and the CTA).  Thus, HMIT's claim based on unjust enrichment is not an available theory of recovery.

iii.   Count VI (Declaratory Relief)

HMIT seeks declaratory relief in Count VI of the Proposed Complaint, essentially, that Dondero's conspiracy theory is correct and that HMIT's would succeed on the merits with respect

---

[297] *Id.* ¶ 94.

[298] Under the Plan, Texas law governs HMIT's "claim" for unjust enrichment because it is not a "corporate governance matter." (Plan Art. XII.M.) It also governs HMIT's "claim" for constructive trust, which "is merely a remedy used to grant relief on the underlying cause of action." *Sherer v. Sherer*, 393 S.W.3d 480, 491 (Tex. App. 2013).

[299] *Taylor v. Trevino*, 569 F. Supp. 3d 414, 435 (N.D. Tex. 2021) (cleaned up); *see also Yowell v. Granite Operating Co.*, 630 S.W.3d 566, 578 (Tex. App. 2021) (same).

[300] *Taylor*, 569 F. Supp. 3d at 435 (quoting *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000)).

to the Proposed Claims if it were permitted leave to bring them in an adversary proceeding.[301]   But, a request for declaratory relief is not "an independent cause of action"[302] and "in the absence of any underlying viable claims such relief is unavailable."[303]   This court has already found and concluded that HMIT would not have constitutional or prudential standing to bring the underlying causes of action in the Proposed Complaint.   This court has also found and concluded that all of the Proposed Claims are without foundation or merit and are not even plausible and are all; being brought for the improper purpose of continuing Dondero's vexatious, harassing, bad-faith litigation.   Thus, HMIT would not be entitled to pursue declaratory judgement relief as requested in Count VI of the Proposed Complaint.

d)   HMIT Has No Basis to Seek Punitive Damages

HMIT separately alleges that the Claims Purchasers' and Seery's "misconduct was intentional, knowing, willful, in bad faith, fraudulent, and in total disregard of the rights of others," thus entitling HMIT to an award of punitive damages under applicable law.   But, HMIT abandoned its proposed fraud claim that was in its Original Proposed Complaint, so its sole claim for primary liability is Seery's alleged breach of his fiduciary duties.   And under Delaware law, the "court cannot award punitive damages in [a] fiduciary duty action."[304]

---

[301] Proposed Complaint ¶¶ 96-99.

[302] *See Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 932 (5th Cir. 2023).

[303] *Green v. Wells Fargo Home Mtg.*, 2016 WL 3746276, at *2 (S.D. Tex. June 7, 2016) (citing *Collin Cty. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170–71 (5th Cir. 1990)); *see also Hopkins v. Cornerstone Am.*

[304] *Buchwald v. Renco Grp. (In re Magnesium Corp. of Am.)*, 539 B.R. 31, 52 (S.D.N.Y. 2015) (citing *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006)), *aff'd* 682 F. App'x 24 (2d Cir. 2017).

3.   HMIT Does Not Present "Colorable" Claims Under this Court's Gatekeeper Colorability Test Because It Seeks to Bring the Proposed Complaint for Improper Purposes of Harassment and Bad-Faith, Vexatiousness.

Under this court's Gatekeeper Colorability Test, in addition to showing that its allegations and claims are not without foundation or merit, HMIT must also show that the Proposed Claims are not being brought for any improper purpose.  Taking into consideration the court's knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, the court finds that HMIT is acting at the behest of, and under the control or influence of, Dondero in continuing to pursue harassing, bad faith, vexatious litigation to achieve his desired result in these bankruptcy proceedings.  So, in addition to failing to show that its Proposed Claims have foundation and merit, HMIT cannot show that it is pursuing the Proposed Claims for a proper purpose and, thus, cannot meet the requirements under the Gatekeeper Colorability Test; HMIT's Motion for Leave should be denied.

## IV.    CONCLUSION

The court concludes, having taken into consideration both its knowledge of the bankruptcy proceedings and the parties and the evidence presented at the hearing on the Motion for Leave, that HMIT's Motion for Leave should be denied for three independent reasons:  (1) HMIT would lack constitutional standing to bring the Proposed Claims (and, thus, the federal courts would lack subject matter jurisdiction over the Proposed Claims); (2) even if HMIT would have constitutional standing to pursue the Proposed Claims, it would lack prudential standing to bring the Proposed Claims; and (3) even if HMIT would have both constitutional standing and prudential standing to bring the Proposed Claims, it has not met its burden under the Gatekeeper Colorability Test of showing that its Proposed Claims are "colorable" claims—that the Proposed Claims are not without foundation, not without merit, and not being pursued for an improper purpose.  Moreover,

even if this court's Gatekeeper Colorability Test should be replaced with a Rule 12(b)(6)

"plausibility" standard, the Proposed Claims are not plausible.

Accordingly,

**IT IS ORDERED** that HMIT's Motion for Leave be, and hereby is **DENIED**.

**###End of Memorandum Opinion and Order###**